

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 12CV80438 DMM
Judge Middlebrooks

EAGAN AVENATTI, LLP; a California
Limited Liability Partnership; and
MICHAEL J. AVENATTI, an individual,

        Plaintiffs,

v.

DAVID B. GREENBERG, an individual,

        Defendant.

_____/

### DEFENDANT DAVID B. GREENBERG'S
### DECLARATION IN SUPPORT OF MOTION TO SET ASIDE DEFAULT

    I, David B. Greenberg, hereby state and declare the following facts are personally known to me. If called upon, I could and would competently testify to these facts.

    1.    I am named as a defendant in this action and am appearing *pro se*.

    2.    I first learned of this action and the entry of default slightly more than a week *after* the default was entered by the Court's Clerk.

    3.    This is the third action Plaintiff Avenatti now has pending against me in three different courts.

    4.    The first action, *Blum v. KPMG LLP, et al.*, is presently pending in the U.S.D.C., C.D. Cal., case number SACV11-01885 CJC (RNBx). A copy of the complaint is attached as Exhibit A.

Case No.:  12CV80438 DMM
Page 2

5.      I was a former KPMG tax partner in its Los Angeles office and left my employment there effective August 2003.  I had nothing to do with Blum's transaction or the type of tax transaction Blum entered into.

6.      I understand and believe that Avenatti named me in the Blum case because Avenatti is angry with me over an earlier case in which Avenatti was involved (the "*Stein*" case).

7.      I was a defendant (and ultimately acquitted) in the widely reported criminal tax shelter case before Judge Kaplan, *U.S. v. Stein* (SDNY 2005) 05 CRIM 888.

8.      During the *Stein* trial, Avenatti represented a witness, Fred Sands, another purported tax shelter "victim" like Blum.  On the witness stand, my lawyers demonstrated that Sands was an inveterate liar who couldn't keep his obviously pre-rehearsed story straight.

9.      Avenatti was livid because he had a significant pending civil case representing Sands against KPMG over a tax shelter entered into by Sands.  Avenatti angrily told me and my lawyers afterward that Avenatti was going to get even with me for embarrassing him and Sands.

10.     Less than two months after filing this action, Avenatti then filed a California state court action against me for civil harassment on June 15, 2012 entitled *Michael J. Avenatti v. David B. Greenberg*, Orange County Superior Court case number:  30-2012-00577159-CU-HR-CJC.  A copy of the complaint is attached as Exhibit B.

11.     For approximately the past ten years, I have been domiciled and resident in the State of Florida.

12.     I do not reside, nor have I ever resided at, 4621 Gorham, Corona Del Mar, California.  I do not own the Gorham property, do not rent the Gorham property, do not maintain a room there, and keep no personal belongings there.

13.     My mother previously resided in the Gorham residence until her death.

Case No.:  12CV80438 DMM
Page 3

14.     My six-year-old daughter resides in the Gorham residence part time with a friend of mine who is one of her caretakers, Kelly Fennell.

15.     The Gorham residence is not my dwelling house; not my usual place of abode; not my usual place of business; and not my usual mailing address.

16.     I have resided in Florida for over 10 years and never in that 10 year period have I resided in California.

17.     I do not have a California drivers license.  My drivers license was issued by the State of Florida.

18.     I have no automobiles registered in the State of California.

19.     I do not maintain an office in the State of California.

20.     In the past approximate ten years, I have neither personally owned any businesses nor had any personal employees located in California.

21.     I have not designated for myself personally a local agent for service of process in California.

22.     I have not authorized anyone in California or elsewhere to accept service on my behalf.

23.     I do not personally own any physical assets located in California.

24.     I do not have any loans or liabilities secured by real or personal property in California.

25.     In the past ten years, I have not had any bank or brokerage accounts located in California for myself personally.

26.     In the past ten years, I have not established mail service in California for myself personally.

Case No.:  12CV80438 DMM
Page 4

27.     In the past ten years, I have not maintained a phone or fax listing in California for myself personally.

28.     In the past ten years, I have not been registered to vote in California.

29.     I was not in the State of California at the time process server Harrigan claims to have seen me.

30.     Harrigan has never personally served me in any case.

31.     Attached as Exhibit F is a proof of substituted service in the *Blum* case prepared by Harrigan.

32.     I have been a single man for over a decade.

33.     I did not receive notice of this case until after the default was entered.

34.     I first learned of the entry of default on or about June 12, 2012 and immediately began determining how to properly proceed in light of the allegations in the lawsuit and the entry of default.

35.     I had my California lawyer prepare a letter to Plaintiffs' lawyer on June 14, 2012 concerning the defects in service.  A copy of that letter is attached as Exhibit G.

36.     The response from Plaintiff's lawyer dated June 18, 2012 is attached as Exhibit H.

37.     My understanding is that my neither my California lawyer nor any of the lawyers in his office are admitted to practice in Florida.

38.     I attempted to locate a Florida lawyer to represent me in this action, but I was unsuccessful due to my financial constraints.  I am therefore appearing *pro se* in this action.

39.     I acted promptly to protect my interests less than one week after I learned that a default had been entered against me.

Case No.:  12CV80438 DMM
Page 5

40.     I acted promptly to protect my interests less than one week after I learned that a default had been entered against me.

41.     There was no willful conduct or gross negligence by me that resulted in the entry of default and I am acting promptly to set it aside.

Executed on July 11, 2012, in the State of New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
David B. Greenberg

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by First Class

U.S. Mail on July 12, 2012 on all counsel or parties of record on the Service List below.

_____
Gary Strait

## SERVICE LIST

William C. Hearon, Esq.
WILLIAM C. HEARON, P.A.
Attorney for Plaintiffs
1 S.E. Third Avenue, Suite 3000
Miami, Florida  33131
Ph: (305) 579-9813
Fax: (305) 358-4707
E-mail: bill@williamhearon.com



**CH-100** | **Request for Civil Harassment Restraining Orders**



*Read* Can a Civil Harassment Restraining Order Help Me? *(Form CH-100-INFO) before completing this form. Also fill out Confidential CLETS Information (Form CLETS-001), with as much information as you know.*

*Clerk stamps date here when form is filed.*

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**JUN 15 2012**

ALAN CARLSON, Clerk of the Court

**(1) Person Seeking Protection**

a.  Your Full Name: Michael J. Avenatti            Age: 41
    Your Lawyer *(if you have one for this case):*
    Name: Michael J. Avenatti         State Bar No.: 206929
    Firm Name: Eagan Avenatti, LLP

*Fill in court name and street address:*
Superior Court of California, County of
Orange, Central Justice Center
700 Civic Center Drive West
P. O. Box 22014
Santa Ana, CA 92702-2014

b.  Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or e-mail.):*

    Address: 450 Newport Center Drive, Second Floor
    City: Newport Beach        State: CA   Zip: 92660
    Telephone: 949-706-7000    Fax: 949-706-7050
    E-Mail Address: mavenatti@eaganavenatti.com

*Court fills in case number when form is filed.*
Case Number: **30-2012**
**00577159**

**(2) Person From Whom Protection Is Sought**

Full Name: David B. Greenberg            Age: 50
Address *(if known):* 4621 Gorham Drive (California Residence)
City: Corona del Mar        State: CA   Zip: 92625

**(3) Additional Protected Persons**

a.  Are you asking for protection for any other family or household members? ☑ Yes ☐ No  *If yes, list them:*

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| Scott Blum (age approx.) | M | 45 | ☐ Yes ☑ No | Current Client/Witness |
| Mark Calvert (age approx.) | M | 45 | ☐ Yes ☑ No | Current Client |
| Fred Sands (age approx.) | M | 70 | ☐ Yes ☑ No | Former Client/Witness |
|  |  |  | ☐ Yes ☐ No |  |

☑ *Check here if there are more persons. Attach a sheet of paper and write "Attachment 3a—Additional Protected Persons" for a title. You may use Form MC-025, Attachment.*

b.  Why do these people need protection? *(Explain below.)*
☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 3b—Why Others Need Protection" for a title.*

See No. 11, below.

---

**This is not a Court Order.**

---

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2012, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9

**Request for Civil Harassment Restraining Orders**
(Civil Harassment Prevention)

CH-100, Page 1 of 6
→

Page 098

Case Number:

### (4) Relationship of Parties

How do you know the person in ②? *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 4—Relationship of Parties" for a title.*

Greenberg is a defendant in a tax fraud case filed by Avenatti in Federal Court (see below)

### (5) Venue

Why are you filing in this county? *(Check all that apply):*

a. ☐ The person in ② lives in this county.
b. ☑ I was harassed by the person in ② in this county.
c. ☑ Other *(specify):* Greenberg maintains a residence in Corona del Mar while claiming to
be a permanent Florida resident.

### (6) Other Court Cases

a. Have you or any of the persons named in ③ been involved in another court case with the person in ②?

☐ No ☑ Yes   *If yes, check each kind of case and indicate where and when each was filed:*

| | Kind of Case | Filed in *(County/State)* | Year Filed | Case Number *(if known)* |
|---|---|---|---|---|
| (1) ☐ | Civil Harassment | | | |
| (2) ☐ | Domestic Violence | | | |
| (3) ☐ | Divorce, Nullity, Legal Separation | | | |
| (4) ☐ | Paternity, Parentage, Child Custody | | | |
| (5) ☐ | Elder or Dependent Adult Abuse | | | |
| (6) ☐ | Eviction | | | |
| (7) ☐ | Guardianship | | | |
| (8) ☐ | Workplace Violence | | | |
| (9) ☐ | Small Claims | | | |
| (10) ☐ | Criminal | | | |
| (11) ☑ | Other *(specify):* Blum v. KPMG | Fed Ct, Santa Ana | 2011 | SACV11-01885 |

b. Are there now any protective or restraining orders in effect relating to you or any of the persons in ③ and the person in ②? ☑ No ☐ Yes   *If yes, attach a copy if you have one.*

### (7) Description of Harassment

Harassment means violence or threats of violence against you, or a course of conduct that seriously alarmed, annoyed, or harassed you and caused you substantial emotional distress. A course of conduct is more than one act.

a. Tell the court about the last time the person in ② harassed you.

(1) When did it happen? *(provide date or estimated date):* June 15, 2012

(2) Who else was there?
See attachment 7.

**This is not a Court Order.**

| Case Number: |
| --- |
|  |

(3) How did the person in ② harass you? *(Explain below):*
    ☑ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet*
    *of paper or Form MC-025 and write "Attachment 7a(3)—Describe Harassment" for a title.*

See Attachment 7.

_____
_____
_____
_____
_____
_____

(4) Did the person in ② use or threaten to use a gun or any other weapon?
    ☐ Yes ☑ No   *(If yes, explain below):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet*
    *of paper or Form MC-025 and write "Attachment 7a(4)—Use of Weapons" for a title.*

_____
_____

(5) Were you harmed or injured because of the harassment?
    ☑ Yes ☐ No   *(If yes, explain below):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet*
    *of paper or Form MC-025 and write "Attachment 7a(5)—Harm or Injury" for a title.*

Continuing damage to my reputation, loss of business, emotional distress, and anxiety.

_____
_____

(6) Did the police come? ☐ Yes ☑ No
    If yes, did they give you or the person in ② an Emergency Protective Order? ☐ Yes ☐ No
    If yes, the order protects *(check all that apply):*
    a. ☐ Me  b. ☐ The person in ②  c. ☐ The persons in ③
    *Attach a copy of the order if you have one.*

b.  Has the person in ② harassed you at other times?
    ☑ Yes ☐ No  *(If yes, describe prior incidents and provide dates of harassment below):*
    ☑ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet*
    *of paper or Form MC-025 and write "Attachment 7b—Previous Harassment" for a title.*

See Attachment 7.

_____
_____
_____

**This is not a Court Order.**

Case Number:

**Check the orders you want.** ☑

**(8)** ☑ **Personal Conduct Orders**

I ask the court to order the person in **②** **not** to do any of the following things to me or to any person to be protected listed in **③**:

a. ☑ Harass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of the person.

b. ☐ Contact the person, either directly or indirectly, in any way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.

c. ☑ Other *(specify):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 8c—Other Personal Conduct Orders," for a title.*

See Section 15, below.

_____

*The person in* **②** *will be ordered not to take any action to get the addresses or locations of any protected person unless the court finds good cause not to make the order.*

**(9)** ☑ **Stay-Away Orders**

a. I ask the court to order the person in **②** to stay at least  250  yards away from *(check all that apply):*

(1) ☑ Me
(2) ☑ The other persons listed in **③**
(3) ☑ My home
(4) ☑ My job or workplace
(5) ☐ My school
(6) ☐ My children's school
(7) ☐ My children's place of child care

(8) ☑ My vehicle
(9) ☑ Other *(specify):* _____
My childrens' place of residence.
_____
_____
_____
_____
_____

b. If the court orders the person in **②** to stay away from all the places listed above, will he or she still be able to get to his or her home, school, or job?  ☑ Yes  ☐ No  *(If no, explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 9b—Stay-Away Orders," for a title.*

_____
_____

**(10)** **Guns or Other Firearms and Ammunition**

Does the person in **②** own or possess any guns or other firearms?  ☐ Yes  ☐ No  ☑ I don't know

*If the judge grants a protective order, the person in* **②** *will be prohibited from owning, possessing, purchasing, receiving, or attempting to purchase or receive a gun, other firearm, and ammunition while the protective order is in effect. The person in* **②** *will also be ordered to turn in to law enforcement or sell to a gun dealer any guns or firearms within his or her immediate possession or control.*

**This is not a Court Order.**

**Request for Civil Harassment Restraining Orders**
(Civil Harassment Prevention)

Case Number: _____

**(11) Immediate Orders**

Do you want the court to make any of these orders now that will last until the hearing without notice to the person in ② ? ☑ Yes ☐ No    *(If you answered yes, explain why below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 11—Immediate Orders" for a title.*

<u>Mr. Greenberg's threats and harassment are escalating daily if not hourly as evidenced by his</u> <u>emails. Mr. Greenberg has repeatedly stated that he does not care if he lives or dies and that</u> <u>he is a "walking dead man." There is every reason to believe that unless the orders requested</u> <u>are immediately entered Mr. Greenberg will engage in violent acts against one or more of the</u> <u>individuals in No. 3.</u>

**(12) ☑ Request to Give Less Than Five Days' Notice**

*You must have your papers personally served on the person in ② at least five days before the hearing, unless the court orders a shorter time for service. (Form CH-200-INFO explains What Is "Proof of Personal Service"? Form CH-200, Proof of Personal Service, may be used to show the court that the papers have been served.)*

If you want there to be fewer than five days between service and the hearing, explain why below:

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 12—Request to Give Less Than Five-Days Notice" for a title.*

<u>See No. 11, above.</u>

**(13) ☐ No Fee for Filing or Service**

a. ☐ There should be no filing fee because the person in ② has used or threatened to use violence against me, has stalked me, or has acted or spoken in some other way that makes me reasonably fear violence.

b. ☐ The sheriff or marshal should serve (notify) the person in ② about the orders for free because my request for orders is based on unlawful violence, a credible threat of violence, or stalking.

c. ☐ There should be no filing fee and the sheriff or marshal should serve the person in ② for free because I am entitled to a fee waiver. *(You must complete and file Form FW-001, Application for Waiver of Court Fees and Costs.)*

**(14) ☐ Lawyer's Fees and Costs**

I ask the court to order payment of my: a. ☐ Lawyer's fees  b. ☐ Court costs
The amounts requested are:

| Item | Amount | Item | Amount |
|------|--------|------|--------|
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |

☐ *Check here if there are more items. Put the items and amounts on the attached sheet of paper or Form MC-025 and write "Attachment 14—Lawyer's Fees and Costs" for a title.*

**This is not a Court Order.**

Revised January 1, 2012        **Request for Civil Harassment Restraining Orders**        CH-100, Page 5 of 6
                                        *(Civil Harassment Prevention)*                              →

Page 102

Case Number:

**(15)** ☑ **Additional Orders Requested**

I ask the court to make the following additional orders *(specify)*:

☑ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or Form MC-025 and write "Attachment 15—Additional Orders Requested," for a title.*

1. Mr. Greenberg is not to post on the internet any threatening, derogtaory or harassing statements about any of the persons listed in No. 3;

2. Mr. Greenberg is not to email any other person any threatening, derogatory or harassing statements about any of the persons listed in No. 3;

3. Mr. Greenberg is not to attempt to utilize any other alias, person, entity or agent to accomplish or carry out conduct prohibited by this Order.

**(16)** Number of pages attached to this form, if any: **44**

Date: June 15, 2012

Michael J. Avenatti
*Lawyer's name (if any)*

*Lawyer's signature*

I declare under penalty of perjury under the laws of the State of California that the information above and on all attachments is true and correct.

Date: June 15, 2012

Michael J. AVenatti
*Type or print your name*

*Sign your name*

**This is not a Court Order.**

**Request for Civil Harassment Restraining Orders**
**(Civil Harassment Prevention)**
CH-100, Page 6 of 6

# EXHIBIT

3A

## ATTACHMENT 3a – ADDITIONAL PROTECTED PERSONS

| | | |
|---|---|---|
| John Arden | Male/37 | Attorney – Eagan Avenatti, LLP |
| Mariam Bicknell | Female/39 | Employee - Eagan Avenatti, LLP |
| Alexander L. Conti | Male/47 | Attorney – Eagan Avenatti, LLP |
| Hillary Converse | Female/26 | Employee - Eagan Avenatti, LLP |
| Michael Q. Eagan | Male/65 | Attorney - Eagan Avenatti, LLP |
| Jason Frank | Male/40 | Attorney – Eagan Avenatti, LLP |
| Ahmed Ibrahim | Male/30 | Attorney – Eagan Avenatti, LLP |
| Marshall Mancillas | Male/30 | Attorney – Eagan Avenatti, LLP |
| Anthony McNeil | Male/42 | Employee - Eagan Avenatti, LLP |
| Gina Melo | Female/27 | Employee - Eagan Avenatti, LLP |
| Katherine Mosby | Female/50 | Employee - Eagan Avenatti, LLP |
| Shea Murphy | Male/30 | Attorney – Eagan Avenatti, LLP |
| Maritza Nowowiejski | Female/40 | Employee - Eagan Avenatti, LLP |
| Judy Regnier | Female/47 | Employee - Eagan Avenatti, LLP |
| Scott Sims | Male/30 | Attorney – Eagan Avenatti, LLP |
| Lisa Wegner | Female/35 | Attorney – Eagan Avenatti, LLP |
| Amy Williams | Female/35 | Employee - Eagan Avenatti, LLP |
| Morgan Witos | Female/26 | Employee - Eagan Avenatti, LLP |

**3A**

# EXHIBIT



## ATTACHMENT 7 TO REQUEST FOR CIVIL HARASSMENT

## RESTRAINING ORDERS

Michael J. Avenatti is a founding partner of the law firm Eagan Avenatti, LLP of Newport Beach, CA ("the Firm"). On December 7, 2011, Mr. Avenatti, on behalf of the Firm's client Scott A. Blum, filed the action Scott A. Blum v. KPMG, LLP, Jeffrey Stein, Jeffrey Eischeid, Carl Hasting, Robin Paule, and David Greenberg, Case No. SACV11-01885 (CJC), in United States District Court for the Central District of California (the "lawsuit" or "action"). David Greenberg was named as a defendant in the action. On or about December 16, 2012, David Greenberg was served in the action.

In January of 2012, Mr. Avenatti became aware of the existence of written statements published in January 2012 to the internet on the web sites of *Forbes* and the *Wall Street Journal* posted by Mr. Greenberg. These statements were harassing, abusive and threatening towards Mr. Avenatti, Mr. Scott Blum (a client of the firm and a witness) and Mr. Fred Sands (also a client of the firm and a witness), including the following:

   a. "MICHAEL J. AVENATTI IS A LYING SCUMBAG DOING ANYTHING TO MAKE A BUCK INCLUDING RAT F......ING THE DEFENSLESS"

   b. "WHAT A JOKE, AVENATTI IS ALREADY A WELL KNOWN FRAUDSTER AND THIEF, ENGAGING IN BLACKMAILING FOR A LIVING, THE LYING SCUMBAG."

   c. "IT TAKES ONE TO KNOW ONE AND OBVIOUSLY AVENATTI KNOWS LYING THIEVES SINCE HE IS ONE OF THE BIGGER LIARS AND THIEVES IN NEWPORT BEACH, HOME TO MANY LIARS AND THIEVES."

   d. "I AM JUST GETTING STARTED BOYS (MAGGOTS), MY INVESTIGATORS WILL TRACK DOWN EVERY LIE YOU EVER TOLD UNDER THE GUISE OF LITIGATION PRIVILEGE AND EVERY GIRL (OR BOY) YOU SCUMBAGS EVER BANGED, NEWPORT BEACH IS A SMALL UNIVERSE YOU LYING THIEVES."

[See Exhibits A-D]

Unfortunately, however, Mr. Greenberg's abusive and threatening conduct did not end with these posts. Instead, it escalated. [See Exhibits E-K] As the attached documents indicate, Mr. Greenberg began contacting Mr. Avenatti directly, via email, and sending similarly threatening and abusive emails. Moreover, Mr. Greenberg began referring to himself as a "walking dead man" and stating "I care about nothing and pray to god for death every day." [Exhibit K]

1

7

**Indeed, just this morning, Mr. Greenberg wrote in an email:**

> **U need to get it through ur thick head, I died 7 years ago and crave the release of death as opposed to having to remember being gang ass raped by jew hating niggers every 5 mother fukin seconds ... u should have left me alone fuk hed**

[Exhibit Q]

Mr. Greenberg's abuse and threats have not been, unfortunately, limited to Mr. Avenatti. He has further escalated his conduct by making threatening and inappropriate comments to employees of the Firm. For example, on April 16, 2012 after Katherine Mosby, a non-attorney employee of the Firm, transmitted to Mr. Greenberg, via email, a letter from Mr. Avenatti regarding the Blum action, Mr. Greenberg responded stating (among other things):

> Avenazzi, I was wondering if you would mind if I asked your legal assistant Katherine out for a drink, friends of mine in Newport tell me she is kind of hot...

[Exhibit L]

In the same email, Mr. Greenberg also referenced an associate at the Firm, Shea Murphy, writing, "is it the same for your associate Murphy, is he or she (we will do the background search eventually) a lying scumbag who appears to hate Jews like you, Avenazzi?" [Exhibit L]

Similarly, on June 12, 2012, Judy Regnier, a non-attorney employee at the Firm, transmitted to Mr. Greenberg, via email, a letter regarding the Blum lawsuit to Mr. Greenberg. Mr. Greenberg responded to Ms. Regnier's email as follows:

> Judy, nice, doing the dirty work for that little piss ant, keep in mind according to bonhoeffer "to not speak in the face of evil is evil in of itself". Of course the jew hater hitler like your jew hating piss ant boss killed bonehoeffer for supporting all those jews
>
> Just wait until I free up some time to make sure your friends at change.org or church group in yorba linda know you support a guy who believes it erotic for me a scumbag jew to have been gang ass raped by jew hating niggers while the prison guards jerked off in my face

[Exhibit M]

As the latter paragraph indicates, Mr. Greenberg had clearly researched personal information about Ms. Regnier, and sought to threaten, harass and intimidate her by indicating that he would contact people she knew. The email also indicates that he had researched what town she lives in. Similarly, Mr. Greenberg indicated that he would be doing background research on other employees of the Firm and threatened to ask another employee out. Obviously, the thought that Mr. Greenberg might do such a thing was disconcerting to say the least and

2

prompted Ms. Regnier, and others at the Firm, to be extremely concerned for their own safety and well-being.

In addition to sending abusive and threatening correspondence to Mr. Avenatti and employees of the Firm, Mr. Greenberg further escalated his conduct and recently began contacting other third parties, including clients of Michael Avenatti and his firm. For example, Mr. Greenberg sent emails to individuals at George Washington University Law School – where Mr. Avenatti serves on the Board of Advisors and attended law school. [Exhibits G, N] Mr. Greenberg also contacted other clients of the Firm in matters entirely unrelated to the Blum lawsuit. [Exhibit O]

Mr. Greenberg also contacted Scott Blum, the plaintiff in the Blum lawsuit and a witness, sending threatening and abusive emails to him. [Exhibit P] In doing so, Mr. Greenberg not only attempted to intimidate a witness and a client of the Firm, but the plaintiff in the action pending against Mr. Greenberg and a witness in a judicial proceeding.

It should not be overlooked that in contacting these various individuals, Mr. Greenberg is clearly researching and stalking both Mr. Avenatti and other Firm employees, as well as the individuals he has contacted. Mr. Greenberg has no reason to contact or associate with any of the individuals he has contacted other than for the purpose of harassing both them and Mr. Avenatti and the Firm's employees.

Nevertheless, Mr. Greenberg has made it apparent that he is engaged in numerous efforts to find out information about Mr. Avenatti and the Firm's employees and clients in an effort to harass and intimidate them. This coupled with Mr. Greenberg's statements about desiring death and having nothing left to live for causes Michael Avenatti, the firm's employees and its clients to fear for their safety.

3

# EXHIBIT



Courthouse News Service

Page 1 of 1

EAGAN AVENATTI, LLP EAGAN AVENATTI, LLP IS A FIRM OF LYING WORM BAGSMICHAEL J. AVENATTI IS A LYING SCUMBAG DOING ANYTHING TO MAKE A BUCK INCLUDING RAT F......ING THE DEFENSLESSMICHAEL AVENETTI REPRESENTS THE SCUM OF THE SCUM LIKE FRED SANDS AND SCOTTBLUM TWO CRADLE ROBBING FAMILY DESTROYING LYING PIECES OF SCUMWHAT A JOKE, AVENATTI IS ALREADY A WELL KNOWN FRAUDSTER AND THIEF, ENGAGINGIN BLACKMAILING FOR A LIVING, THE LYING SCUMBAG.AVENATTI PROBABLY SEEKS OUT THE SCUM OF THE SCUM LIKE FRED SANDS THEPURPORTED REAL ESTATE MOGUL WHO NOT ONLY HAS COMMITTED PERJURY ANDACCOUNTING FRAUD, BUT LIED AND DESTROYED SEVERAL FAMILIES WHILE BANGINEVERYTHING IN WEST LA, NOT BAD FOR A SHORT WORMY LOOKIN JEW.SCOTT BLUM ON THE OTHER HAND IS A DECEITFUL DISGRACEFUL LYING PIECE OFGARBAGE, HE HAS DEFRAUDED JUST ABOUT EVERYONE HE EVER MET AND HE HAS THELAWSUITS TO PROVE IT.IT TAKES ONE TO KNOW ONE AND OBVIOUSLY AVENATTI KNOWS LYING THIEVES SINCEHE IS ONE OF THE BIGGER LIARS AND THIEVES IN NEWPORT BEACH, HOME TO MANYLIARS AND THIEVES.I AM JUST GETTING STARTED BOYS (MAGGOTS), MY INVESTIGATORS WILL TRACK DOWNEVERY LIE YOU EVER TOLD UNDER THE GUISE OF LITIGATION PRIVILEGE AND EVERY GIRL(OR BOY) YOU SCUMBAGS EVER BANGED, NEWPORT BEACH IS A SMALL UNIVERSE YOULYING THIEVES.FOR STARTERS WE GOT OVER ONE HUNDRED LIES TOLD BY AVENATTI, BLUM AND SANDS,AND THAT IS WITHOUT EVEN TRYING, YOU GUYS THREATENED THE WRONG FUK THISTIME, WHEN YOU GOT NOTHING LEFT TO LOSE, YOU GOT NOTHING LEFT TO LOSE, THETRUTH WILL SHOW AVENATTI, BLUM AND SANDS TO BE LYING PIECES OF GARBAGEDESERVED OF SCORN AND PUBLIC HUMILIATION (IF IT IS EVEN POSSIBLE TO HUMILIATETHESE DEVIATES).LITAIGATION PRIVILEGE PROTECTS YOU FROM EVERYTHING BUT THE TRUTH, AND THETRUTH IS MOTHER F.....ING UGLY IN THIS CASE.

HOME PAGE ABOUT US BACK ISSUES

COLUMNS

DARKROOM

ALMANAC
ENTERTAINMENT LAW
REPORTS
APPELLATE OPINIONS
MASTHEAD
Wednesday, September 03, 2008

Last Update:
11:25:24 AM
KPMG Cost Them $50 Million InFake Tax Shelters, Investors Say

EXHIBIT A

# EXHIBIT

Finding Free Tax Help - The Tax Blog - SmartMoney                                   Page 3 of 3

Comments (6 of 12)                              VIEW ALL COMMENTS »

1:06 pm March 29, 2012
Alliance Financial and Insurance Tax wrote:

It seems like taking the time to find a tax specialist would be well worth the effort in the scenarios that were listed.

1:47 pm March 27, 2012
Wendy Carspool wrote:

There are quite a few free tax advice websites available to consumers. Taxbuzz offers a tax advice blog for consumers offering tax planning tips, personal finance tips and breaking tax law news.

5:00 pm February 20, 2012
Jim wrote:

Pablo, if you made under $50,000 last year, go to http://www.irs.gov and put VITA in the search block. It will tell you where to have your taxes done free by IRS-owned volunteers. No hidden charges, fees, etc. Totally free. Only drawbacks are the income limit and not all returns qualify. But their scope includes about 98% of individual returns. Even includes Sch C (business income/loss) and sch D (gain/loss from stocks, bonds, etc.)

1:50 pm February 15, 2012
Pablo wrote:

This would be the first time to have my taxes filed with free help.Im currently unemployed and I would like to know who I talk to at H&R Block to let them know im having my taxes filed for free, ?

12:57 pm February 6, 2012
Anonymous wrote:

Eagan Avenatti LLP Eagan Avenatti LLP Eagan Avenatti LLP Eagan Avenatti LLP

A firm of liars, thieves and cheats. A firm of liars, thieves and cheats.

Litigation Privilege Litigation Privilege Litigation Privilege

Michael Avenatti is a lying thieving scumbag who hides behind litigation privilege to spin his evil malevolent web of lies causing death and destruction of many families.

Michael Avenatti does not care what lies he tells as long as he can make a buck, he is a despicable lying thief. Michael Avenatti preys on the defenseless like the lying weivelling coward he is, he makes Sandusky's abuses of disadvantaged youth look like charitable acts compared to the lives he destroys with his lies and thievery.

Michael Avenatti you are pure scum, so far we have accumulated 25% of public filings you have made, and without even trying, identified 1,000 outright lies contained in your briefs, I know litigation privilege you l.....ing scumbag. We are just beginning and may have to hire 20 Filipinos to work around the clock so as we can apprise the public of all your malevolent lies and skulduggery. The lies and perjury already committed by your scumbag clients Fred Sands and Scott Blum total well over 200, you lying luiser, I know litigation privilege.

You very crossed the line (even for a scumbag lawyer) when you threatened someone in federal custody (who had been repeatedly see raped and tortured by angry blacks) with massive future abuse in prison, tell me Michael Avenatti you l.leg douche bag, what could be worse then being repeatedly see raped and sodomized by angry blacks while the guards laughingly watch you ph f....k, tell me since you are one that made a threat of future massive abuse, I know litigation privilege, you scumbag f.....k.

Your client Fred Sands is a lying maggot, I can't wait to depo him, prove he committed perjury like the lying f.king scumbag he is and then have him say, I was only spinning the web of lies my scumbag lawyer Michael Avenatti told me to say, litigation privilege.

You threatened the wrong mother f...ker A hole. I will make it a mission to publicly expose every l.....ars lie you deserted, and it looks like there are many. I know, litigation privilege but hey, just like it is not a crime to lie like a mother f....ker behind the cloak of litigation privilege (an Avenatti specialty), at least as of this day in this country, it is still not a crime to make public the truth. Of course, I would not expect a scumbag like you to understand anything about the truth, F U Avenatti.

Previously Abused and Threatened by Avenatti

http://blogs.smartmoney.com/tax/2012/01/23/finding-free-tax-help/                    4/17/2012

EXHIBIT B



**EXHIBIT**



# Money for Nothing

EAGAN AVENATTI, LLP EAGAN AVENATTI, LLP IS A FIRM OF LYING WORM BAGS

MICHAEL J. AVENATTI IS A LYING SCUMBAG DOING ANYTHING TO MAKE A BUCK INCLUDING RAT F......ING THE DEFENSLE?S

MICHAEL AVENETTI REPRESENTS THE SCUM OF THE SCUM LIKE FRED SANDS AND SCOTT BLUM TWO CRADLE ROBBING FAMILY DESTROYING LYING PIECES OF SCUM

WHAT A JOKE, AVENATTI IS ALREADY A WELL KNOWN FRAUDSTER AND THIEF, ENGAGING IN BLACKMAILING FOR A LIVING, THE LYING SCUMBAG.

AVENATTI PROBABLY SEEKS OUT THE SCUM OF THE SCUM LIKE FRED SANDS THE PURPORTED REAL ESTATE MOGUL WHO NOT ONLY HAS COMMITTED PERJURY AND ACCOUNTING FRAUD, BUT LIED AND DESTROYED SEVERAL FAMILIES WHILE BANGIN EVERYTHING IN WEST LA, NOT BAD FOR A SHORT WORMY LOOKIN JEW.

SCOTT BLUM ON THE OTHER HAND IS A DECEITFUL, DISGRACEFUL LYING PIECE OF GARBAGE, HE HAS DEFRAUDED JUST ABOUT EVERYONE HE EVER MET AND HE HAS THE LAWSUITS TO PROVE IT.

IT TAKES ONE TO KNOW ONE AND OBVIOUSLY AVENATTI KNOWS LYING THIEVES SINCE HE IS ONE OF THE BIGGER LIARS AND THIEVES IN NEWPORT BEACH, HOME TO MANY LIARS AND THIEVES.

I AM JUST GETTING STARTED BOYS (MAGGOTS), MY INVESTIGATORS WILL TRACK DOWN EVERY LIE YOU EVER TOLD UNDER THE GUISE OF LITIGATION PRIVILEGE AND EVERY GIRL (OR BOY) YOU SCUMBAGS EVER BANGED, NEWPORT BEACH IS A SMALL UNIVERSE YOU LYING THIEVES.

EXHIBIT C

Money for Nothing - Overheard - WSJ                                    Page 2 of 5

FOR STARTERS WE GOT OVER ONE HUNDRED LIES TOLD BY AVENATTI, BLUM AND
SANDS, AND THAT IS WITHOUT EVEN TRYING. YOU GUYS THREATENED THE WRONG
FUK THIS TIME, WHEN YOU GOT NOTHING LEFT TO LOSE, YOU GOT NOTHING LEFT TO
LOSE, THE TRUTH WILL SHOW AVENATTI, BLUM AND SANDS TO BE LYING PIECES OF
GARBAGE DESERVED OF SCORN AND PUBLIC HUMILIATION (IF IT IS EVEN POSSIBLE
TO HUMILIATE THESE DEVIATES).

LITIGATION PRIVILEGE PROTECTS YOU FROM EVERYTHING BUT THE TRUTH, AND
THE TRUTH IS MOTHER F......ING UGLY IN THIS CASE.

HOME PAGE ABOUT US BACK ISSUES COLUMNS DARKROOM ALMANAC
ENTERTAINMENT LAW REPORTS APPELLATE OPINIONS MASTHEAD

Wednesday, September 03, 2008 Last Update: 11:28:24 AM
KPMG Cost Them $50 Million in
Fake Tax Shelters, Investors Say
By KARINA BROWN
LOS ANGELES (CN) — Equity groups say they lost $50 million by relying on
the duplicitous advice of accounting firm KPMG, which sold them fraudulent tax
shelters, though it knew the IRS probably would deny the deductions. KPMG
pushed the shelters in order to rake in millions in fees, say plaintiffs, leaving
them owing millions in taxes and interest.
KPMG also allegedly tricked the plaintiffs into selling FSR Brokerage, a business
the plaintiffs ran for 30 years, "in order to benefit from a tax strategy KPMG and
other defendants knew was a sham," according to the Superior Court complaint.
The plaintiffs are Camden Equity Holdings, Alpine Equity Holdings, Bedford
Equity Holdings, Vintage Capital Group, and Fred C. Sands and two Sands Trusts.
KPMG claimed that the plaintiffs would be better off selling the business in
2000, so the plaintiffs say they sold FSR on Nov. 30, 2000 at a lower than optimal
price. But the plaintiffs say KPMG stood to benefit from a rushed sale, since it
could charge an extra fee to include the plaintiffs in its fraudulent "Redemption
Note Transaction" tax shelter for 2000.
The plaintiffs say KPMG knew they would have been better off waiting until
2001 to sell FSR at its market value, since they could have taken advantage of
2001's lower capital gains tax rate.
The plaintiffs say KPMG repeatedly assured them that the tax shelters were
"more likely than not" to be upheld by a tax court, and were a "not to be missed"
investment opportunity, despite growing internal concern from KPMG's tax
specialists.
The plaintiffs say they filed this lawsuit on the heels of 2005 criminal
proceedings in which KPMG admitted it created fraudulent tax shelters; KPMG
negotiated a deferred prosecution agreement with federal investigators.
KPMG allegedly admitted hiding the real effects of its tax shelters from clients,
and using fake attorney-client privilege claims to conceal its knowledge from
investigators. The criminal indictment against KPMG also accuses the firm of
lying to a 2003 Senate investigative panel.
The plaintiffs claim that KPMG started a "Tax Innovation Center" in 1997,
where it encouraged specialists to push the fraudulent shelters in order to increase
its flat fee revenues. Before, KPMG had largely made its money through hourly
fees.
KPMG is the third-largest accounting firm in the United States, with estimated
annual revenue of more than $4 billion, according to the complaint.
The plaintiffs demand more than $50 million, and punitive damages. They are
represented by Michael Avenatti with Eagan O'Malley & Avenatti of Newport
Beach.

Home Back to Top
> Courthouse News Service Search RSS Contact Us

http://www.courthousenews.com/2008/09/03/KPMG_Cost_Them_$50_Million_in_Fake_T...
1/9/2012

6:48 am January 9, 2012
Anonymous wrote :
KPMG holds training on Shariah finance in Oman | Shariah Finance Watch Page 1 of 6

KPMG KPMG KPMG KPMG

TAX SHELTER TAX SHELTER TAX SHELTER TAX SHELTER

FRAUD FRAUD FRAUD FRAUD

Michael Hamersley, Managing Partner of Hamersley Partners, how detailed, deceptive and
insane are you? The email below shows you to be a complete and utter liar.

We already know your massive lies and perjury to the U.S. Senate and Kevin Downing of the
USDOJ caused the death and destruction of many families. Geez you even lied and ratted out
your very own clients and criminally disclosed their confidential information while at the same
time spinning your web of lies about what actually transpired, you duplicitous wretch.

Hamersley , Dude, my private investigators tell me you have not passed the Bar in California,
Virginia, DC, New York......nor do you have a CPA license in California yet your website says
your office is in California and offers legal and accounting services. You are unlicensed in

# EXHIBIT



**Add a Comment**

Name

We welcome the spirited comments from readers. Please comply with our guidelines. Our blogs do not require the use of your real name.

Comment

CLEAR   POST

Medical Billing Software
Request a Demo, Price Quote of Easy & Affordable SaaS based Solution
www.ifecimm.com/medicalbilling

Dukes of Hazzard Video
Exclusive Coverage at Inside Line Free Video, Photos, Much More.
www.insideLine.com

My Social Network People
Social Networking
marpeople.com

---

**Comments (2 of 2)**          View all Comments »

9:56 am February 14, 2012

**writing service** wrote :

Interesting post, this was really useful. Thanks!

11:21 am February 8, 2012

**Anonymous** wrote :

Eagan Avenatti LLP Eagan Avenatti LLP Eagan Avenatti LLP Eagan Avenatti LLP

A firm of liars, thieves and cheats. A firm of liars, thieves and cheats.

Litigation Privilege Litigation Privilege Litigation Privilege

Michael Avenatti is a lying thieving scumbag who hides behind litigation privilege to spin his evil malevolent web of lies causing death and destruction of many families.

Michael Avenatti does not care what lies he tells as long as he can make a buck, he is a despicable lying thief, Michael Avenatti preys on the defenseless like the lying sniveling coward he is, he makes Sandusky's abuse of disadvantaged youth look like charitable acts compared to the lives he destroys with his lies and thievery.

Michael Avenatti you are pure scum, so far we have accumulated 25% of public filings you have made, and without even trying, identified 1,000 outright lies contained in your briefs, I know litigation privilege you f....ing scumbag. We are just beginning and may have to hire 30 Filipinos to work around the clock so as we can apprise the public of all your malevolent lies and skulduggery. The lies and perjury already committed by your scumbag clients Fred Sands and Scott Blum total well over 200, you lying f.....r, I know litigation privilege.

You way crossed the line (even for a scumbag lawyer) when you threatened someone in federal custody (who had been repeatedly ass raped and tortured by angry blacks) with massive future abuse in prison, tell me Michael Avenatti you f..ing douche bag, what could be worse than being repeatedly ass raped and sodomized by angry blacks while the guards laughingly watch you sick f....k, tell me since you are one that made a threat of future massive abuse, I know litigation privilege, you scumbag f.....k.

Your client Fred Sands is a lying maggot, I can't wait to depo him, prove he committed perjury like the lying f.king scumbag he is and then have him say, I was only spinning the web of lies my scumbag lawyer Michael Avenatti told me to say, litigation privilege.

You threatened the wrong mother f....ker A hole, I will make it a mission to publicly expose every f.... bln lie you ever told, and it looks like there are many. I know, litigation privilege but hey, just like it is not a crime to lie like a mother f...ker behind the cloak of litigation privilege (as Avenatti speciality), at least as of this day in this country, it is still not a crime to make public the truth. Of course, I would not expect a scumbag like you to understand anything about the truth, F U Avenatti.

Previously Abused and Threatened by Avenatti

BACK TO TOP

---

| Customer Center | About | WSJ.com: | Tools & Formats | |
|---|---|---|---|---|
| My Account | Content Partnerships | Site Map | Today's Paper | Digital Network |
| My Subscriptions | Reprints | Home | Video Center | WSJ.com |
| | Advertising | World | Graphics | Marketwatch.com |
| Create an Account: | Classifieds | U.S. | Columns | Barrons.com |
| Register for Limited Access | Advertise Locally | New York | Blogs | SmartMoney.com |
| Subscribe to WSJ.com | Conferences | Business | Topics | AllThingsD.com |
| Sign up for WSJ Professional | About Dow Jones | Markets | Guides | FINS: Finance, IT Jobs, Sales Jobs |
| Subscribe to WSJ Weekend - Print Edition | Privacy Policy - UPDATED 10/18/2011 | Market Data | Alerts | BigCharts.com |
| | | Tech | Newsletters | Virtual Stock Exchange |

# EXHIBIT
## 2

**Michael J. Avenatti**

| | |
|---|---|
| **From:** | David Greenberg <ernk1234@gmail.com> |
| **Sent:** | Friday, June 01, 2012 7:05 AM |
| **To:** | 'dvoreacos@bloomberg.net.' |
| **Cc:** | Peter.Morrison@skadden.com; rmarmaro@skadden.com; jdicanio@skadden.com; rweinste@skadden.com; mharris@scheperkim.com; horst@khlawfirm.com; cporterfield@hunton.com; MEgan - MQE; DWest@crowell.com; Katherine L. Mosby; Michael J. Avenatti; bkeoun@blocmberg.net; Pkuntz1@bloomberg.net |
| **Subject:** | A trial resulted in the acquittal of a former KPMG tax partner, David Greenberg. |
| **Attachments:** | Greenberg (avenattisuksdik)  Answer to Blum Complaint.09 April 2012.pdf |

Hey dude ever think about telling the truth or is it more preferable to pretend everything is hunky dory?????

http://www.businessweek.com/news/2012-05-31/tax-division-s-downing-said-to-resign-from-justice-department

You guys never print the truth, Kevin Downing destroyed my life so badly my fiancé committed suicide (as a result of death threats from KPMG personnel at the behest of Downing) in a violent disgusting manner after repeated threats by Downing; his henchmen from the IRS like Guy Ficco; and of course KPMG (who never stopped threatening Jane) , leaving her bloated bloody rotting body for me and her 5 year old daughter to find.

Kevin Downing had me anally gang raped by 23 blacks who hate Jews; laughed about it to my lawyer when he complained and told my lawyer KPMG would say whatever necessary to ensure Greenberg would never see the light of day again; and said the gang raping of me by black's who hate Jews would stop if I pled guilty and helped indict others (Downing said all that was required for the "niggars to stop shoving their cocks in Greenberg's ass was Greenberg to remember things correctly").

In fact currently one of Kevin Downing's good lawyer friends, Michael Avenatti (aka, "Avenazzi"), who actually (based on court filings) suborned perjury from Fred Sands at my trial on behalf of Kevin Downing, is suing me for $75 million dollars (see my answer to the Avenazzi lawsuit above) on behalf of a client I never met and for transactions I had nothing to do with.

One can only assume that Downing is a Jew hater like his good friend Michael Avenatti (at least based on court filings by Skadden Arps and KPMG wherein Avenazzi is described as being a Jew Hater) and based on Avenatti's statements in open court that he finds it erotic that Greenberg was anally gang raped by blacks who hate Jews while the prison guards masturbated into Greenberg's face (and that he and his good friend Kevin Downing had a good laugh about it).  This is all absolutely 100% true and verifiable unlike most of your article on Downing (no mention is made of how Downing screwed over the UBS rat).

I know nobody cares but for once in your life you may want to consider showing a shred of decency and writing an article that has a modicum of truth, the fact is Downing is a disgusting reprehensible being who lies about most things and destroyed hundreds of lives with his malicious "despicable" lies.

One of Downing's favorite quotes is "the truth has no bearing on this case all that matters is what I can prove". Well in the land of negative inferences and litigation privilege that allows lawyers to lie in court proceedings without impunity, people's lives are destroyed and some die, lies do have consequences even if covered by litigation privilege. At the end of my trial, Judge Kaplan stated Downing had lied to him about me (of course, my life was already completely over at that point as every 5 seconds I thought and still think of a bunch of Jew hating backs anally gang raping me), why not print that, it is right in the transcript on the last day of trial?

1

EXHIBIT E

I know who cares.

2

# EXHIBIT

## Michael J. Avenatti

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Wednesday, May 02, 2012 9:00 AM |
| **To:** | Michael J. Avenatti |
| **Cc:** | Peter.Morrison@skadden.com; rmarmaro@skadden.com; JDICANIO@SKADDEN.COM; rweinste@skadden.com; mharris@scheperkim.com; horst@khlawfirm.com; cporterfield@hunton.com; mqe@lomqe.com; DWest@crowell.com |
| **Subject:** | Re: FW: Greenberg Complaint |

avenazzi, do u think i give a fuk about anything????? stop harassing me with your threats,

avenazzi, tho you find it erotic that i was gang raped by niggars who hate jews while the guards jerked off in my face when i was put in prison based on the very same types of lies contained in scumbag blum's complaint authored by you (u sik twisted pervert) (and which kpmg in their internal emails has stated the kpmg statement of facts is almost completely untrue, i.e., kpmg's statement of facts was a complete fabircation crafted solely for the purpose of avoiding indictment, i got all the emails avenazzi u fuk hed);

anyways avenazzi, i really do not give a fuk about much, every 5 seconds i think of my fiances rotting stinking bloated corpse, jane killed hersef in part because of the very cok sukin types of lies contained in the blum complaint u piece of shit (lies do have consequences even if covered by litigation privilege) and 23 disgusting jew hating niggars shoving their cok in my ass (again resulting from the very types of lies contained in scumbg blum's complaint),

so go ahead, avenazzi threaten away, you cowardly douche, i just don't give a fuk, u brot me here, fuker

On Wed, May 2, 2012 at 8:25 AM, Michael J. Avenatti <mavenatti@eaganavenatti.com> wrote:
Mr. Greenberg:

Please be advised that unless you immediately curtail your outrageous comments and insults, including purposely misspelling my name, I will seek severe sanctions against you before Judge Carney. Seeing as you spend a lot of time on the internet, I would have thought you would have researched Judge Carney enough to know that it is highly unlikely that he will tolerate your conduct.

You are hereby on notice.

Michael Avenatti


Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

*The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended*

1

**EXHIBIT F**

# EXHIBIT



**Michael J. Avenatti**

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Thursday, June 14, 2012 6:09 PM |
| **To:** | Michael J. Avenatti; rcollins@law.gwu.edu; dfenstermaker@law.gwu.edu; jblumberg@law.gwu.edu; subrown@law.gwu.edu; scoggin@law.gwu.edu; nfratianne@law.gwu.edu; mccollins@law.gwu.edu; jcole@law.gwu.edu; agrant@law.gwu.edu; cmcnamee@law.gwu.edu; jtercha@law.gwu.edu; dzelenka@law.gwu.edu |
| **Cc:** | cporterfield@hunton.com; horst@khlawfirm.com; jromano@crowell.com; jrutherford@crowell.com; mharris@scheperkim.com; schneiderj@hunton.com; sirna@khlawfirm.com; Ryan.Weinstein@skadden.com; Peter.Morrison@skadden.com; Jack.DiCanio@skadden.com; John Arden; Judy K. Regnier; bkeoun@bloomberg.net; Pkuntz1@bloomberg.net; dscheer@bloomberg.net; rmarmaro@skadden.com; JDICANIO@SKADDEN.COM; rweinste@skadden.com; MEgan - MQE; DWest@crowell.com |
| **Subject:** | Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least) |
| **Attachments:** | avenatti is a coksukin fraudster.pdf |

Hey avenazzi, I doubt the veracity of what u say. How should I contact u to discuss your cok sukin lies as your email requested?

U invited me in douche bag, I don't even want to be here.

Attached is a letter we just sent your lawyer describing how you lied and perpetrated a fraud on the courts in Florida.

Your agent and you, will be hearing from my lawyers very shortly, I do not take threats on your behalf by your agents against my daughter lightly douche bag and your man way crossed the line when he trespassed and threatened my girlfriend and daughter, fuk u cok suker.

I know u know some guineas in Corona, big fukin deal.

Fukin with me is one thing asshole, but you better stay the fuk away from my family, I will not tolerate such behavior or anymore threats by you against my family (sound familiar, I know I sound like a faggot).

Also, please explain why you claim to not hate Jews yet have accepted monies from Dresdner Bank (the bank that funded Hitler's concentration camps and still hides Nazi monies), worked for the extreme anti Israelite Rahm Emanuel and paid Ralph Nader (the well known Jew hater) to speak at your alma matter?????

Avenazzi, the evidence certainly suggests you are a Jew hater and I have not even started on your alma matter yet and its affiliation with the piece of shit former clans man Byrd or its extreme anti Israel stances.

You know what is really quite amusing, it looks like u and Christine both made political donations to the tax cheater Gephart and your client Cast Arts looks to have been cheating on its taxes for years, tsk, tsk , tsk (too bad KPMG beat your ass in that one).

How would u like to proceed you Jew hating asshole?

1

**EXHIBIT G**

Hot Coffee Draws Capacity Crowd

Filmmaker Susan Vogel Saladoff, JD '83, returned to GW in September to screen and discuss her acclaimed documentary Hot Coffee, which critiques the current state of the U.S. civil justice system and examines the complex concepts behind the phrase "tort reform."  GW's Jack Morton Auditorium drew a capacity crowd for the event, which featured a lively discussion and Q & A about the film and related topics with Ms. Saladoff and expert guests, including Public Citizen co-founders Ralph Nader and Alan Morrison, Lerner Family Associate Dean for Public Interest and Public Service Law. The event was sponsored by accomplished litigator Michael Avenatti, JD '00.

Read more about Ms. Saladoff and the award-winning film in the Summer 2011 issue of GW Law School Magazine, available at www.gwmagazine.com/2011_law_summer/dept_alumni_profile2.html.

GW Magazine Page 17

September 17, 2005

Ralph Nader is an anti-Semite

editorial

*Ralph Nader started out as a righteous man, a crusader for auto safety.* Fattened by a large settlement after General Motors was discovered to have attempted to have him seduced and blackmailed, he moved on to inspire a half—generation of college students who joined him a low—paid researchers, called 'Nader's Raiders.' I was one of them for a year.

As the years went on, Nader increasingly degenerated into a crank: reflexively anti—corporate, and in thrall to trial lawyers. Although he demands transparency and perfection of corporations, he has never acceded to requests that he divulge who his donors are. Critics suspect that prominent tort attorneys have been supporting him with major donations.

Once politics got into his blood, Ralph got much, much worse. Proximity to power often does that to good men. Lyndon Johnson, as portrayed in Robert Caro's monumental biographies, started out as an idealist, too.

Now, Nader has crossed the line, and has become a vicious bigot. The New York Sun carries the following quotation from Nader, when addressing a Muslim group:

'The Israeli puppeteer travels to Washington and meets with the puppet in White House. He then goes down Pennsylvania Avenue and meets with the puppets in Congress,' said Mr. Nader. The Israeli leader then 'brings back millions of dollars' in aid to Israel, he said.

Ralph Nader is old enough, and has been around politics long enough to know exactly what he is doing: pandering to Jew—haters, by invoking one of the oldest anti—Semitic slurs, that Jews secretly run the world. This sort of language is derivative of The Protocols of the Elders of Zion.

Perhaps Ralph needs to be reminded that the popularizer of the Protocols in the United States was none other than Henry Ford, who almost single—handedly enabled tens of millions of Americans to buy their first car, thereby causing hundreds of thousand of casualties in automobile accidents. Ant——Semites may be okay in Ralph's view, but auto manufacturers are something else.

Update: Charles at Little Green Footballs provides another quotation from Nader, on C—SPAN, to the same effect:

2

# EXHIBIT



**Michael J. Avenatti**

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Monday, April 30, 2012 12:37 PM |
| **To:** | Michael J. Avenatti |
| **Cc:** | bkeoun@bloomberg.net; Pkuntz1@bloomberg.net; dscheer@bloomberg.net; Peter.Morrison@skadden.com; rmarmaro@skadden.com; jdicanio@skadden.com; rweinste@skadden.com; mharris@scheperkim.com; horst@khlawfirm.com; cporterfield@hunton.com; mqe@!omqe.com; DWest@crowell.com |
| **Subject:** | Re: FW: Greenberg Complaint |

dude u just defamed me to the press, thank you, interestingly i was just reading through the stein transcripts related to fred sands' testimony, it is almost as if you were suborning perjury, how many lies did fred sands tell at your behest????

keep in mind your credibility is destroyed (as if sukin up to rahm emanuel is not bad enough), you have made a judical admission in a court filing that you find "erotic" my description of being anally gang raped by blaks who hate jews while the guards masturbated in my face during my stay in prison, you can not take it bak, law 101, you sik twisted jew hating pervert

i can not wait to depo you and everyone in your firm and those lying scum fred sands and scott blum, thanks dude

dude, i have no life and am a walking dead man who despises everyone and every thing while praying to god for my own death every second of every day, thanks for the stimulus (here i thot life was no longer worth living)

(i know, you are going to send the judge a copy of this email)

ps, oh yeah, and remember, the truth is an absolute defense, black's law defines lie as any statement that is factually incorrect, and your bull shit blustering only scares pansies like rahm emanuel

On Mon, Apr 30, 2012 at 12:17 PM, Michael J. Avenatti <mavenatti@eaganavenatti.com> wrote:
Attached is a copy of a complaint for defamation filed in federal court last week against Mr. Greenberg. His comments this morning are patently false and constitute yet additional defamation, which will likely serve as another basis for claims against Mr. Greenberg. Indeed, with each additional email or web posting, Mr. Greenberg (1) makes our case stronger by providing additional evidence and (2) further ensures that he is going to prolong his legal problems for months and years on end.

If you have any questions, please do not hesitate to contact me.

Michael Avenatti

1

**EXHIBIT H**

# EXHIBIT

I

## Michael J. Avenatti

| | |
|---|---|
| **From:** | david greenberg <emk1234@gmail.com> |
| **Sent:** | Friday, April 13, 2012 4:58 PM |
| **To:** | Michael J. Avenatti; Katherine L. Mosby |
| **Cc:** | B.A. Patterson; Peter.Morrison@skadden.com |
| **Subject:** | Fwd: FW: Greenberg Response to Avenatti threats contained in his 4-11-12 letter (attached) |

Avenetti,

Still spewing more of your Jew-hating garbage? Apparently you think it is fine for you to make false, outrageous, and defamatory statements in your filings, but you expect that others won't. The difference is that my statements are true and yours are pure bullshit, and you know it. You named me in this case so now you can deal with me. You're going to learn why you shouldn't name people in lawsuits that haven't done anything wrong.

You must be used to others just bending over and letting you f*&k them. You'll have to kill me before you can f&*k me. And you aren't man enough to do it.

From what I can tell, the only thing you are any good at doing is issuing press releases like Gloria Allred. You are nothing but a pathetic little publicity whore. You messed with the wrong dude this time, idiot. You'll be paying the price. I am going to make sure that everyone learns what a lying greedy asshole you are.

So go ahead and cry to Judge Carney that you don't like someone telling the truth about you and your piece of shit thieving client. I was required to state the facts that establish my defense and that's what I did.

You just don't like hearing the truth, do you? No, arrogant blowholes like you never do. You probably believe all of your bullshit.

We'll see how well you do in court with someone standing up to you and showing the world what you really are.

In your response below, you ignored that I said in my earlier letter to you, "I would be pleased to meet and confer with you on this matter. Please advise me of your availability."

Since you are too afraid to meet with me to comply with Local Rule 7-3, send me a letter fully setting forth the relief you intend to seek and the grounds for obtaining that relief. If you don't, I'll be sure to point out your failure to Judge Carney after you are done throwing your little temper-tantrum in front of him. After all, that's what crybabies do.

1

**EXHIBIT I**

David Greenberg

---

**From:** Michael J. Avenatti [mailto:mavenatti@eaganavenatti.com]
**Sent:** Thursday, April 12, 2012 10:02
**To:** David Greenberg
**Cc:** mge@lomge.com; Katherine L. Mosby; B.A. Patterson; Shea S. Murphy
**Subject:** RE: Greenberg Response to Avenatti threats contained in his 4-11-12 letter (attached)
**Importance:** High

Mr. Greenberg:

We will bring your response to the attention of the Court; I am confident that Judge Carney will not be pleased with your actions in this matter. In that regard, I suggest you should become familiar with Rule 11 of the Federal Rules of Civil Procedure.

Further, I demand that you immediately cease with your outrageous and defamatory comments regarding me, this law firm and our clients. I can assure you (meaning promise) that your conduct, including your internet postings, will have severe consequences for you and others assisting you (Mr. Patterson included). Others may have tolerated your nonsense in the past, but I will not.

Lastly, your claim that you had nothing to do with selling and marketing fraudulent tax shelters on behalf of KPMG is laughable.

Very truly yours,

Michael

---

**From:** David Greenberg [ernk1234@gmail.com]
**Sent:** Thursday, April 12, 2012 6:08 AM
**To:** Michael J. Avenatti; Michael J. Avenatti

2

# EXHIBIT

J

**Michael J. Avenatti**

| From: | david greenberg <ernk1234@gmail.com> |
|---|---|
| Sent: | Thursday, April 12, 2012 8:21 AM |
| To: | Michael J. Avenatti |
| Cc: | mqe@lomqe.com; Katherine L. Mosby; B.A. Patterson; Shea S. Murphy; Peter.Morrison@skadden.com |
| Subject: | Re: Greenberg Response to Avenatti threats contained in his 4-11-12 letter (attached) |

avenatti:

u r truly a piece of ........ just like ur old boss emanuel, tho i must admit i have been laughing my ass off for 30 minutes at ur last email but your threats and intimidation tactics r becoming somewhat tiresome (i only got 30 minutes a day right now to deal with this shit).

go tell the judge on me u cowardly pansy unlike yourself every word included in my complaint is true and correct, i have people lined up to testify about you and your jew hating antics

of cousre, everything included in your complaint about me is absolutely false and i am chomping at the bit to publicly prove you to b an abject lying bully and of course, then file a malicous prosecution suit and presently, a real lawyer is reviewing filing an abuse of pocess suit against u, u lying piece of ........ (oh yeah, i got copies of all kinds of emals and memoranda verifying everything I claimed, how about u liar not to mention I have an expert report from the IRS that provides over 75% of the trades i made were profitable (a 2 billion to 1 phenomenon))

the only thing that is laughable about this mess is your belief that you can bully me with your obvious abject and pathetic lies "selling fraudulent tax shelters", libel and slander on ur part, oh yeah, the sleaze bag lawyer's favorite, litigation privilege (tho i am unsure an unsolicited email qualifies, i got a real lawyer looking at that right now, idiot)

can't u tell, i am begging for u to bring on the "severe consequences", i am petrified (of course after 20 jew hating niggars have shoved thier coks in my ass, not much matters to me, Jew hater)

i can't wait to depo that piece of shit Fred Sands to show him to be the abject pathetic liar he is (just like u) so please bring it on under Rule 5, i think not 1 1 u dumb shit jew hater

of course, Blum is going to be so easy to show he is a lying piece of shit, dude stole over $200 million, i guess u like that number tho

i know litigation privilege, funny shit tho

1

EXHIBIT J

On Thu, Apr 12, 2012 at 7:02 AM, Michael J. Avenatti <mavenatti@eaganavenatti.com> wrote:
Mr. Greenberg:

We will bring your response to the attention of the Court; I am confident that Judge Carney will not be pleased with your actions in this matter.  In that regard, I suggest you should become familiar with Rule 11 of the Federal Rules of Civil Procedure.

Further, I demand that you immediately cease with your outrageous and defamatory comments regarding me, this law firm and our clients.  I can assure you (meaning promise) that your conduct, including your internet postings, will have severe consequences for you and others assisting you (Mr. Patterson included).  Others may have tolerated your nonsense in the past, but I will not.

Lastly, your claim that you had nothing to do with selling and marketing fraudulent tax shelters on behalf of KPMG is laughable.

Very truly yours,

Michael

---

**From:** David Greenberg [ernk1234@gmail.com]
**Sent:** Thursday, April 12, 2012 6:08 AM
**To:** Michael J. Avenatti; Michael J. Avenatti
**Cc:** mqe@lomqe.com; Katherine L. Mosby; B.A. Patterson; Peter.Morrison@skadden.com
**Subject:** Greenberg Response to Avenatti threats contained in his 4-11-12 letter (attached)

April 12, 2012


(Sent via email)


Mr. Avenatti:


With reference to your letter of intimidation dated 4-11-12 wherein you gave me 24 hours to respond to the following inflammatory, slanderous, salacious, perverted and outright deceitful allegations:


Mr. Avenatti why do you continue to threaten me so?

2



**Michael J. Avenatti**

| | |
|---|---|
| **From:** | David Greenberg <ernk1234@gmail.com> |
| **Sent:** | Thursday, April 12, 2012 6:09 AM |
| **To:** | Michael J. Avenatti; Michael J. Avenatti |
| **Cc:** | mqe@lomqe.com; Katherine L. Mosby; B.A. Patterson; Peter.Morrison@skadden.com |
| **Subject:** | Greenberg Response to Avenatti threats contained in his 4-11-12 letter (attached) |
| **Attachments:** | Corr to Greenberg (4-11-12) (1).pdf |

April 12, 2012

(Sent via email)

Mr. Avenatti:

With reference to your letter of intimidation dated 4-11-12 wherein you gave me 24 hours to respond to the following inflammatory, slanderous, salacious, perverted and outright deceitful allegations:

> Due to the entirely inappropriate, immaterial, and i
> the scandalous language employed therein, we intend to
> attention of the court and move to have it stricken from the
>
> Please advise me by the close of business on Apri
> withdraw your Answer, or would like to set up a time to me
> contents. Otherwise, we will proceed with filing the motion

*Mr. Avenatti why do you continue to threaten me so?*

What, you think giving me 24 hours to respond to an email sent by one of your henchmen containing multiple lies and *slanderous allegations is reasonable?*

You think you can intimidate me like your former boss Rahm Emanuel who used to walk around the locker room naked shoving his penis in the face of congress men to cajole them into supporting the socialistic ways of the Jew hater Obama?

Think again dude, you cannot intimidate me, I care about nothing and pray to my god for death every day just so I do not have to remember the horrors that have been inflicted on me by Jew haters like you.

(You and your maggot client Fred Sands should not have lied in court at my trial and threatened me with gang rape by blacks who hate Jews (or worse, your words dude) for exposing Sands and Kevin Downing of the USDOJ to be the disgusting reprehensible liars they are which even Judge Kaplan confirmed at the end of my trial).

1

EXHIBIT K

(I literally cannot wait to take the deposition of the scumbag Sands, we are going to legally eviscerate him and prove to the world what a lying scumbag both he and you are).  (I know it is not relevant, we will see you smug sniveling lying coward, half of Sands testimony was about Blips).

First of all, threatening to go to the Judge and forcing him to read my response to Your Complaint against me, sounds appealing to me, you dolt.  I know you think I am just another dumb Jew like the idiot Jews who hired you to represent in your $200,000,000 funeral case.  What a joke, those Jews are a disgrace to my race.

Second of all, withdraw my Answer, how stupid do you think I am (I know pretty fukin stupid), but remember I am not the type of disgraceful Jew who would retain you.  You are perpetrating fraud on the court, I know it, you know it and even those scumbags at KPMG know it, so yeah, file your motion forcing the Judge to actually read my complaint, I am absolutely petrified.

Presumably you believe me to be so stupid (though I can't argue with you I am pretty stupid) that I will withdraw my answer so you can file a default judgment against me or so you could drop your meritless deceitful lying complaint against me so I would be unable to file a malicious prosecution suit against you and your lying thieving fraudster client Blum (though I do respect how many chicks he has banged without too much grief from his dopey wife).  Keep in my mind while I may be pretty stupid, I am not a weasel type of Jew who would hire a Jew hater like you to represent me in a class action lawsuit.

Third of all, "scandalous language employed therein", you are a typical panty waist government bureaucrat feigning disgust when someone recites actual facts reflective of your direct actions.  If the following activities which you have engaged, been party to or implicitly supported based on your past actions are not scandalous certainly my language is not scandalous:

1.     Shredding to death and burning alive thousands of innocent women and children.
2.     Murdering American citizens (without trial).
3.     Sex with prostitutes.
4.     Over 3000 outright lies in court filings (my Filipinos are still working on this one).
5.     Threatening people with Rahm Emanuel's penis.
6.     Threatening me with massive abuse in prison knowing that your buddy Kevin Downing of the USDOJ had already had me anally gang raped by blacks who hate Jews.

(For the record, I will not recount all of your disgusting scandalous behaviors but suffice it to say I am just getting started and can only allocate about 30 minutes a day to you and KPMG but don't worry in another month I will have nothing but time and will be able to devote 21 hours a day to you guys (what else do I have to do since you guys took my life from me with all of your lies deceit and chicanery)).

…………………………………………………………………………………………………………………………………………

In summary, I would be pleased to meet and confer with you on this matter.  Please advise me of your availability.

David Greenberg
(a.k.a., walking dead man)

2

# EXHIBIT



**From:**   david greenberg <ernk1234@gmail.com>
**Sent:**   Monday, April 16, 2012 10:19 AM
**To:**   Katherine L. Mosby; Peter.Morrison@skadden.com; mqe@lomqe.com; Shea S. Murphy; Michael J. Avenatti
**Subject:**   Re: Blum v. KPMG - Filing

Avenazzi, (a.k.a., Jew Hater)

Thanks for your latest filing, dude you crack me up.

(I know you are going to make sure the Judge sees this email).

Keep in mind, Avenazzi you brought me to this party while I was off minding my own business and had put aside the fact you told "my counsel" at the Stein trial as I stated in my salacious brief that when I was in prison "you were going to have worse done to me" than being gang ass raped by Niggars who hate Jews.

Avenazzi, thanks for binging me back into this mess, you are truly an amusing creature, it is rare to find someone who lies so much and is so arrogant about it, is it the same for your associate Murphy, is he or she (we will do the backgraound search eventually) a lying scumbag who appears to hate Jews like you, Avenazzi?

Avenazzi, I was wondering if you would mind if I asked your legal assistant Katherine out for a drink, friends of mine in Newport tell me she is kind of hot; and since my fiancé Jane killed herself in a painful disgusting bloody manner in part as a direct result of the types of lies you and your firm are spewing about me (not to mention direct threats by KPMG and the U.S. Government), I am available (hopefully the part about Jane's bloody disgusting suicide is not what you were referring to, when you said my Answer was salacious (you do know the meaning of that word don't you))?

Avenazzi, I presume you would not mind since you find it "arousing or appealing to sexual desire or imagination : lascivious" (the definition of salacious in Webster's (yeah, I can read dude)) when I described my experience of being gang raped by Niggars in prison who hate Jews while the guards masturbated in my face at the request of your good friend Kevin Downing of the USDOJ.

Avenazzi, I must say your statement that you found my description of being gang raped by Niggars who hate Jews while the guards masturbated in my face as salacious to be unsurprising because of your past threats against me, dude, I guess you get off on this kind of stuff, unfortunately for me I do not find it salacious, it absolutely and utterly disgusts me and I pray to god for death day just so I do not have to remember the rapings you refer to as salacious.

Avenazzi, I guess, maybe you and/or Rahm like that kind of stuff or maybe that sick fuk Blum likes it (as ever since high school when Blum drove the principal's golf cart into the high school pool he seems to be a pervert according to some bar whores I know from Newport).

Avenazzi, you crack me up dude, freedom is just another word for nothing left to lose.

1

EXHIBIT L

On Fri, Apr 13, 2012 at 4:42 PM, Katherine L. Mosby <kmosby@eaganavenatti.com> wrote:

Please see attached.


Katherine L. Mosby

Legal Assistant to Michael J. Avenatti

EAGAN AVENATTI, LLP

450 Newport Center Drive, Second Floor

Newport Beach, CA 92660

(949) 706-7000

(949) 706-7050 (Fax)

(949) 500-3881 (Cell)

kmosby@eaganavenatti.com


The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

2

# EXHIBIT

**Judy K. Regnier**

| | |
|---|---|
| **From:** | DavidG <ernk1234@gmail.com> |
| **Sent:** | Tuesday, June 12, 2012 4:20 AM |
| **To:** | Judy K. Regnier |
| **Cc:** | cporterfield@hunton.com; horst@khlawfirm.com; JRomano@crowell.com; JRutherford@crowell.com; mharris@scheperkim.com; schneiderj@hunton.com; sirna@khlawfirm.com; ryan.weinstein@skadden.com; peter.morrison@skadden.com; jack.dicanio@skadden.com; jdicanio@skadden.com; Michael J. Avenatti; John Arden; Katherine L. Mosby |
| **Subject:** | Re: Blum v. KPMG |

Judy, nice, doing the dirty work for that little piss ant, keep in mind according to bonhoeffer "to not speak in the face of evil is evil in of itself". Of course the jew hater hitler like your jew hating piss ant boss killed bonehoeffer for supporting all those jews

Just wait until I free up some time to make sure your friends at change.org or church group in yorba linda know you support a guy who believes it erotic for me a scumbag jew to have been gang ass raped by jew hating niggers while the prison guards jerked off in my face

And had the temerity to threaten with worse or more erotic (to your fukin pervert boss) treatment while I was in federal custody because of scumbag liars like your little piss ant sword swallowing boss
Sent via BlackBerry by AT&T

---

**From:** "Judy K. Regnier" <jregnier@eaganavenatti.com>
**Date:** Sat, 9 Jun 2012 00:10:23 +0000
**To:** ernk1234@gmail.com<ernk1234@gmail.com>
**Cc:** cporterfield@hunton.com<cporterfield@hunton.com>; horst@khlawfirm.com<horst@khlawfirm.com>; JRomano@crowell.com<JRomano@crowell.com>; JRutherford@crowell.com<JRutherford@crowell.com>; mharris@scheperkim.com<mharris@scheperkim.com>; schneiderj@hunton.com<schneiderj@hunton.com>; sirna@khlawfirm.com<sirna@khlawfirm.com>; ryan.weinstein@skadden.com<ryan.weinstein@skadden.com>; peter.morrison@skadden.com<peter.morrison@skadden.com>; jack.dicanio@skadden.com<jack.dicanio@skadden.com>; jdicanio@skadden.com<jdicanio@skadden.com>; Michael J. Avenatti<mavenatti@eaganavenatti.com>; John Arden<jarden@eaganavenatti.com>; Katherine L. Mosby<kmosby@eaganavenatti.com>
**Subject:** RE: Blum v. KPMG

Please see attached documents filed this date.


Judy K. Regnier, CLA
Eagan Avenatti, LLP
450 Newport Center Drive, 2nd Floor
Newport Beach, CA 92660
(949) 706-7000
(877) 651-6134
(949) 706-7050 fax
(949) 300-6003 cell
jregnier@eaganavenatti.com

1

**EXHIBIT M**

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** DavidG [mailto:ernk1234@gmail.com]
**Sent:** Friday, June 08, 2012 11:08 AM
**To:** Judy K. Regnier
**Subject:** Re: Blum v. KPMG

Hey judy how is it u work for a guy that thinks it erotic I was gang raped by niggers in prison while the guards jerked off in my face, u must b a real fukin bitch to even associate with someone like that not to mention ur douche bag boss avenazzi threatened me while I was in federal cuystody. Fuk u and fuk him
Sent via BlackBerry by AT&T

**From:** "Judy K. Regnier" <jregnier@eaganavenatti.com>
**Date:** Fri, 8 Jun 2012 17:51:52 +0000
**To:** ernk1234@gmail.com<ernk1234@gmail.com>
**Cc:** cporterfield@hunton.com<cporterfield@hunton.com>; horst@khlawfirm.com<horst@khlawfirm.com>; JRomano@crowell.com<JRomano@crowell.com>; JRutherford@crowell.com<JRutherford@crowell.com>; mharris@scheperkim.com<mharris@scheperkim.com>; schneiderj@hunton.com<schneiderj@hunton.com>; sirna@khlawfirm.com<sirna@khlawfirm.com>; ryan.weinstein@skadden.com<ryan.weinstein@skadden.com>; peter.morrison@skadden.com<peter.morrison@skadden.com>; jack.dicanio@skadden.com<jack.dicanio@skadden.com>; jdicanio@skadden.com<jdicanio@skadden.com>; Michael J. Avenatti<mavenatti@eaganavenatti.com>; John Arden<jarden@eaganavenatti.com>; Katherine L. Mosby<kmosby@eaganavenatti.com>
**Subject:** Blum v. KPMG

Please see attached.

Judy K. Regnier, CLA
Eagan Avenatti, LLP
450 Newport Center Drive, 2nd Floor
Newport Beach, CA 92660
(949) 706-7000
(877) 651-6134
(949) 706-7050 fax
(949) 300-6003 cell
jregnier@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

2

# EXHIBIT



**Katherine L. Mosby**

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Thursday, June 14, 2012 6:53 AM |
| **To:** | Katherine L. Mosby |
| **Subject:** | Fwd: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least) |

---------- Forwarded message ----------
From: **David Greenberg** <ernk1234@gmail.com>
Date: Thu, Jun 14, 2012 at 6:51 AM
Subject: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least)
To: rcollins@law.gwu.edu, dfenstermaker@law.gwu.edu, jblumberg@law.gwu.edu, subrown@law.gwu.edu, scoggin@law.gwu.edu, nfratianne@law.gwu.edu, mccollins@law.gwu.edu, jcole@law.gwu.edu, agrant@law.gwu.edu, cmcnamee@law.gwu.edu, jtercha@law.gwu.edu, dzelenka@law.gwu.edu
Cc: cporterfield@hunton.com, horst@khlawfirm.com, jromano@crowell.com, jrutherford@crowell.com, mharris@scheperkim.com, schneiderj@hunton.com, sirna@khlawfirm.com, Ryan.Weinstein@skadden.com, Peter.Morrison@skadden.com, Jack.DiCanio@skadden.com, "Michael J. Avenatti" <mavenatti@eaganavenatti.com>, John Arden <jarden@eaganavenatti.com>, "Judy K. Regnier" <jregnier@eaganavenatti.com>, bkeoun@bloomberg.net, Pkuntz1@bloomberg.net, dscheer@bloomberg.net, rmarmaro@skadden.com, jdicanio@skadden.com, rweinste@skadden.com, mqe@lomqe.com, DWest@crowell.com


Michael J. Avenatti is one of your apparent distinguished law school alumnus.


A friend of mine has asked me to contribute and consider help in raising money for your university.


I informed my friend that based on the despicable reprehensible behavior of Michael J. Avenatti I would not, nor would I recommend any of my associates donating one penny to your University.


Perhaps, if you could explain why Michael J. Avenatti behaves so despicably and has even publicly stated that [he] finds it erotic I was anally gang raped by blacks who hate Jews while the prison guards masturbated into my face (for months on end):


(at the request of Michael J. Avenatti's good friend Kevin Downing of the United States Department of Justice),

1

EXHIBIT N

I would be able to consider recommending my friends donate money to your university or at a minimum not attempt to dissuade others from making donations.

Does your university teach that anal gang rape by blacks who hate Jews is erotic or even concur with Michael J. Avenatti's assertions?

Michael J. Avenatti has included me in a lawsuit because I believe he hates "real" Jews (not self loathing Jews like Rahm Emanuel who have betrayed Israel), is your university anti sematic?

Did Michael J. Avenatti learn at your law school to tell literally hundreds if not thousands of lies per meritless lawsuit he files, suborn perjury and intimidate witnesses all under the guise of litigation privilege?

What kind of law school are you people even running?

Below are just a few excerpts of statements Michael J. Avenatti included in one brief (what is wrong with you people??).

The Judy referred to directly below is Judy Regnier of Michael J. Avenatti's law firm.

//////////////////////////////////////////////

2

Judy, nice, doing the dirty work for that little piss ant, keep in mind according to bonhoeffer "to not speak in the face of evil is evil in of itself". Of course the jew hater hitler like your jew hating piss ant boss killed bonehoeffer for supporting all those jews

Just wait until I free up some time to make sure your friends at change.org or church group in yorba linda know you support a guy who believes it erotic for me a scumbag jew to have been gang ass raped by jew hating niggers while the prison guards jerked off in my face

And had the temerity to threaten with worse or more erotic (to your fukin pervert boss) treatment while I was in federal custody because of scumbag liars like your little piss ant sword swallowing boss

//////////////////////////////////////////////

Am laghin my ass off u fukin piece of shit. I died 7 years ago becuz of cok sukin liars like u. Bring it on baby I am a walking corpse and will prove u to be a jew hating lying nigger loving piece of shit

//////////////////////////////////////////////

    I declare under penalty of perjury under the laws of the United States and the laws of the State of California that the foregoing is true and correct. Executed this 12th day of June, 2012 at Newport Beach, California.


                                        /s/ Michael J. Avenatti
                                        Michael J. Avenatti

3



EXHIBIT

**Judy K. Regnier**

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Friday, June 15, 2012 9:42 AM |
| **To:** | mark@cascadecapitalgroup.com; kcorr@corrcronin.com; Michael J. Avenatti |
| **Cc:** | rcollins@law.gwu.edu; dfenstermaker@law.gwu.edu; jblumberg@law.gwu.edu; subrown@law.gwu.edu; scoggin@law.gwu.edu; nfratianne@law.gwu.edu; mccollins@law.gwu.edu; jcole@law.gwu.edu; agrant@law.gwu.edu; cmcnamee@law.gwu.edu; jtercha@law.gwu.edu; dzelenka@law.gwu.edu; cporterfield@hunton.com; horst@khlawfirm.com; jromano@crowell.com; jrutherford@crowell.com; mharris@scheperkim.com; schneiderj@hunton.com; sirna@khlawfirm.com; Ryan.Weinstein@skadden.com; Peter.Morrison@skadden.com; Jack.DiCanlo@skadden.com; John Arden; Judy K. Regnier; bkeoun@bloomberg.net; Pkuntz1@bloomberg.net; dscheer@bloomberg.net; rmarmaro@skadden.com; JDICANIO@SKADDEN.COM; rweinste@skadden.com; MEgan - MQE; DWest@crowell.com; Katherine L. Mosby |
| **Subject:** | Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least) |

mark@cascadecapitalgroup.com, kcorr@corrcronin.com

Mr. Calvert, I do hereby report to you that your attorney, Michael J. Avenatti, in the "Meridian" matter is not only dishonest and disreputable but has proven so already in Meridian (See article below recently published in Going Concern wherein Avenatti admits to being a liar).

As a trustee and fiduciary you are duty bound to investigate my allegations plus I do hereby put you on notice, you and your firm may be subject to a class action lawsuit as a result of your current breach of fiduciary duty and negligence.

From my personal experience, I am certain Avenatti is a liar and suborns perjury from his clients. In fact, in one suit alone that includes me, Avenatti has told over 500 outright easily provable lies which my legal advisors are chomping at the bit to prove at trial and then move for sanctions and damages for malicious prosecution against Avenatti and his client Scott Blum of Buy.com.

I am also in the process of compiling a listing of all the lies told by Avenatti in his various lawsuits which by our count total over 5000 (and still counting) for filing with the USDOJ OIG and California and Florida state bars as part of an overall complaint being drafted noting Avenatti's apparent civil rights violations, malicious prosecutions, witness and defendant intimidations, abuse of process, etc....... .

Though having a liar for your attorney may seem clever, it is not, the lies always come out, in fact, Avenatti's recent claimed $38 million victory in "Cast Arts" against KPMG was overturned, in that case Avenatti made the same types of arguments he makes here.

As you are likely aware winning lawsuits against accounting firms for this type of fraud is extremely difficult and requires actual legal work instead of lying and blustering from an insatiable publicity hound like Avenatti.

Further, if Moss Adams actually offered you $25,000,000 which I doubt but if they did and Avenatti advised you to forgo such offer, he likely committed malpractice as such payment would bring Moss Adams close to bankruptcy (they have no insurance to cover such a large payment).

1

EXHIBIT O

In the case Avenatti is pursuing against me, he has committed malpractice and defrauded the courts.

While this litigation style may work when an insurance company is available to foot the bills, that is not the case here and by using Avenatti's mafia like litigation tactics you are doing the estate you manage a disservice and perhaps, breaching your fiduciary duties as a trustee.

Make no mistake, I will follow this case very closely and apprise the investors of their legal recourse as a result of the malpractice already committed by Avenatti and most likely to be committed by Avenatti.

If you would like any information on this matter or just to speak to a lawyer that actually practices the art of law instead of extortion like Avenatti feel free to contact Bradley Patterson (949 253-0500) at LGI LLP, BAPATTERSON@LGILAW.NET if you decide to pursue Avenatti for malpractice or if you like I can recommend other class action lawyers who do not get overturned like Avenatti does.

Regards

David Greenberg

Duties of the Trustee

The overarching duty of the trustee is to collect and liquidate the property of the estate and to distribute the proceeds to creditors. The trustee's specific statutory duties, as set forth in Section 704 of the United States Bankruptcy Code, include the following:

1.    To collect and reduce to money the property of the estate and close the estate as expeditiously as compatible with the best interests of the parties in interest;

2.    To be accountable for all property received;

3.    To ensure that the debtor performs his or her intention as to retaining or surrendering property of the estate that secures consumer debt;

4.    To investigate the financial affairs of the debtor;

5.    If a purpose would be served, to examine proofs of claims and object to any that are improper;

6.    If advisable, to oppose the discharge of the debtor;

7.    Unless the court orders otherwise, to furnish information concerning the estate and the estate's administration as requested by a party in interest;

8.    If the debtor's business is authorized to continue operating, to file with the court appropriate reports and summaries, including a statement of receipts and disbursements; and

9.    To file a final account of the administration of the estate with the United States Trustee and the court.

Powers of the Trustee

The trustee in a Chapter 7 liquidation case is authorized to employ accountants, attorneys, appraisers, auctioneers and other professionals to assist in carrying out his or her duties. Additionally, the trustee may use, sell or lease property of the bankruptcy estate, subject to a notice requirement. However, there is no notice required for a trustee to enter into transactions in the ordinary course of business if he or she is authorized to operate the debtor's business. The trustee is also authorized to obtain unsecured or secured

2

credit in connection with the operation of a business and assume or reject executory contracts or unexpired leases of the debtor.

A trustee is vested with significant powers to aid in carrying out his or her fiduciary obligations to the bankruptcy estate. Among them is the ability to move to dismiss a bankruptcy case for cause, including unreasonable delay by the debtor that is prejudicial to creditors; non-payment of any fees or charges required under certain provisions of the Bankruptcy Code; and failure of the debtor to file certain information required under the Bankruptcy Code. The trustee may prosecute an objection to a discharge granted to an individual debtor. He or she may also object to proofs of claim filed by creditors in a bankruptcy case. The disallowance of a proof of claim or a reduction in its allowed amount has a significant impact on what creditors ultimately receive when the trustee distributes the funds on hand in a bankruptcy estate.

The most significant of the trustee's powers are generally referred to as avoidance powers, and they are often the subject of litigation in the Bankruptcy Court. Known as the "strong arm clause," Section 544(a) of the Bankruptcy Code gives the trustee the rights and powers of a judicial lien creditor or a purchaser of real estate, whether or not there is an actual judicial lien creditor or purchaser who may be able to exercise the same rights. Section 544(b) allows the trustee to bring actions that an unsecured creditor could bring (including state law fraudulent conveyance actions), while Section 545 permits the trustee to avoid the fixing of certain statutory liens. Section 547-Preferences authorizes a trustee to avoid certain transfers of property, including payments made by the debtor to creditors, within 90 days prior to the commencement of a bankruptcy case (subject to certain conditions). Section 548 authorizes a trustee to avoid fraudulent transfers or obligations made with actual intent to hinder, delay or defraud a past or future creditor. Transfers of property made by a debtor for less than a reasonably equivalent consideration are also vulnerable if the debtor was or thereby became insolvent, was engaged in business with an unreasonably small amount of capital or intentionally incurred debts that would be beyond the debtor's ability to repay. Finally, Section 549 authorizes the trustee to avoid transfers of property of the bankruptcy estate that occur after a bankruptcy case has commenced.

////////////////////////////////////////////////////////////////////

*Lawyer Suing Moss Adams Seems to Have Hurt Feelings After Opposing Counsel Called His Lawsuit "Flimsy"*

12 Jun 2012 / By Caleb Newquist

Anyone remember Frederick Darren Berg? He's a guy who had a thing - nay, a passion - for charter buses. It just so happens that he also was running Washington's largest ever Ponzi scheme to finance his passion. Moss Adams (who Berg says is not at fault) was the auditor for FDB's Meridian funds - the vehicles for the scheme - and they're currently tied up in court with the Meridian investors' court-appointed trustee. Last month, MA's lawyers made it known that they didn't think too much of the plaintiff's case, calling it "flimsy." The attorney for the trustee, Michael Avenatti, found that curious because he claimed that MA was ready to settle for $25 million. MA called bullshit, saying no offer was ever made and now they'd prefer that this Avenatti character take a hike for making this up:

Moss Adams' lawyers — Kelly Corr and Steven Fogg of the Seattle firm Corr Cronin Michelson Baumgardner & Preece LLP — say Avenatti made false statements and violated a confidentiality agreement by referring to the mediation negotiations.

3

Well, Avenatti wasn't about to let this go any further without explaining that A) he really didn't do anything wrong and B) he didn't have any choice but to spill the $25 million settlement story because opposing counsel was so mean:

"I kept all aspects of the mediation confidential and only disclosed Defendant's $25 million settlement offer in direct response to Defendant's false allegation that his lawsuit has no merit, is 'frivolous,' and "flimsy," Avenatti said in a court filing.

I'm all for lawyers getting bent out of shape but it's really frightening to imagine what would happen if they all reacted this way every time someone called their lawsuits flimsy.

Moss Adams fires back at attorney behind Berg audit suit [PSBJ]

On Fri, Jun 15, 2012 at 9:07 AM, Michael J. Avenatti <mavenatti@eaganavenatti.com> wrote:
Mr. Greenberg:

With each passing day, the damages associated with our successful defamation action against you grow ex. I very much look forward to presenting your continued tirade and associated conduct to federal Judge Middlebrooks, who I am confident will have no time for your shenanigans.


Michael


Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

---

**From:** david greenberg [mailto:ernk1234@gmail.com]
**Sent:** Friday, June 15, 2012 08:27 AM

**To:** rcollins@law.gwu.edu <rcollins@law.gwu.edu>; dfenstermaker@law.gwu.edu <dfenstermaker@law.gwu.edu>; jblumberg@law.gwu.edu <jblumberg@law.gwu.edu>; subrown@law.gwu.edu <subrown@law.gwu.edu>; scoggin@law.gwu.edu <scoggin@law.gwu.edu>; nfratianne@law.gwu.edu <nfratianne@law.gwu.edu>; mccollins@law.gwu.edu <mccollins@law.gwu.edu>; jcole@law.gwu.edu <jcole@law.gwu.edu>; agrant@law.gwu.edu

<agrant@law.gwu.edu>; cmcnamee@law.gwu.edu <cmcnamee@law.gwu.edu>; jtercha@law.gwu.edu <jtercha@law.gwu.edu>; dzelenka@law.gwu.edu <dzelenka@law.gwu.edu>
**Cc:** cporterfield@hunton.com <cporterfield@hunton.com>; horst@khlawfirm.com <horst@khlawfirm.com>; jromano@crowell.com <jromano@crowell.com>; jrutherford@crowell.com <jrutherford@crowell.com>; mharris@scheperkim.com <mharris@scheperkim.com>; schneiderj@hunton.com <schneiderj@hunton.com>; sirna@khlawfirm.com <sirna@khlawfirm.com>; Ryan.Weinstein@skadden.com <Ryan.Weinstein@skadden.com>; Peter.Morrison@skadden.com <Peter.Morrison@skadden.com>; Jack.DiCanio@skadden.com <Jack.DiCanio@skadden.com>; Michael J. Avenatti; John Arden; Judy K. Regnier; bkeoun@bloomberg.net <bkeoun@bloomberg.net>; Pkuntz1@bloomberg.net <Pkuntz1@bloomberg.net>; dscheer@bloomberg.net <dscheer@bloomberg.net>; rmarmaro@skadden.com <rmarmaro@skadden.com>; jdicanio@skadden.com <jdicanio@skadden.com>; rweinste@skadden.com <rweinste@skadden.com>; MEgan - MQE; DWest@crowell.com <DWest@crowell.com>
**Subject:** Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least)

# Lawyer Suing Moss Adams Seems to Have Hurt Feelings After Opposing Counsel Called His Lawsuit "Flimsy"

2 Comments
957 reads
12 Jun 2012 / By Caleb Newquist
More social linksTwitterFacebookLinkedinGoogle+

Anyone remember Frederick Darren Berg? He's a guy who had a thing - nay, a *passion* - for charter buses. It just so happens that he also was running Washington's largest ever Ponzi scheme to finance his passion. Moss Adams (who Berg says is not at fault) was the auditor for FDB's Meridian funds - the vehicles for the scheme - and they're currently tied up in court with the Meridian investors' court-appointed trustee. Last month, MA's lawyers made it known that they didn't think too much of the plaintiff's case, calling it "flimsy." The attorney for the trustee, Michael Avenatti, found that curious because he claimed that MA was ready to settle for $25 million. MA called bullshit, saying no offer was ever made and now they'd prefer that this Avenatti character take a hike for making this up:

> Moss Adams' lawyers — Kelly Corr and Steven Fogg of the Seattle firm Corr Cronin Michelson Baumgardner & Preece LLP — say Avenatti made false statements and violated a confidentiality agreement by referring to the mediation negotiations.

Well, Avenatti wasn't about to let this go any further without explaining that A) he really didn't do anything wrong and B) he didn't have any choice but to spill the $25 million settlement story because opposing counsel was so mean:

> "I kept all aspects of the mediation confidential and only disclosed Defendant's $25 million settlement offer **in direct response to Defendant's false allegation that his lawsuit has no merit, is 'frivolous,' and "flimsy,"** Avenatti said in a court filing.

I'm all for lawyers getting bent out of shape but it's really frightening to imagine what would happen if they all reacted this way every time someone called their lawsuits flimsy.

Moss Adams fires back at attorney behind Berg audit suit [PSBJ]

5

Tags:
Moss Adams
Frederick Darren Berg
Ponzi Schemes
Lawsuits
Fraud
Lawyers
charter buses
hurt feelings

On Thu, Jun 14, 2012 at 6:51 AM, David Greenberg <ernk1234@gmail.com> wrote:

Michael J. Avenatti is one of your apparent distinguished law school alumnus.

A friend of mine has asked me to contribute and consider help in raising money for your university.

I informed my friend that based on the despicable reprehensible behavior of Michael J. Avenatti I would not, nor would I recommend any of my associates donating one penny to your University.

Perhaps, if you could explain why Michael J. Avenatti behaves so despicably and has even publicly stated that [he] finds it erotic I was anally gang raped by blacks who hate Jews while the prison guards masturbated into my face (for months on end):

(at the request of Michael J. Avenatti's good friend Kevin Downing of the United States Department of Justice),

I would be able to consider recommending my friends donate money to your university or at a minimum not attempt to dissuade others from making donations.

Does your university teach that anal gang rape by blacks who hate Jews is erotic or even concur with Michael J. Avenatti's assertions?

Michael J. Avenatti has included me in a lawsuit because I believe he hates "real" Jews (not self loathing Jews like Rahm Emanuel who have betrayed Israel), is your university anti sematic?

6

Did Michael J. Avenatti learn at your law school to tell literally hundreds if not thousands of lies per meritless lawsuit he files, suborn perjury and intimidate witnesses all under the guise of litigation privilege?

What kind of law school are you people even running?

Below are just a few excerpts of statements Michael J. Avenatti included in one brief (what is wrong with you people??).

The Judy referred to directly below is Judy Regnier of Michael J. Avenatti's law firm.

//////////////////////////////////////////////////////////



**Judy, nice, doing the dirty work for that little piss ant, ke**
**according to bonhoeffer "to not speak in the face of evil i**
**itself". Of course the jew hater hitler like your jew hating**
**killed bonehoeffer for supporting all those jews**

**Just wait until I free up some time to make sure your frie**
**change.org or church group in yorba linda know you sup**
**believes it erotic for me a scumbag jew to have been gang**
**jew hating niggers while the prison guards jerked off in r**

**And had the temerity to threaten with worse or more ero**
**fukin pervert boss) treatment while I was in federal custo**
**scumbag liars like your little piss ant sword swallowing b**

//////////////////////////////////////////////////////////

7

Am laghin my ass off u fukin piece of shit. I died 7 years ago
sukin liars like u. Bring it on baby I am a walking corpse an
be a jew hating lying nigger loving piece of shit

///////////////////////////////////////////

I declare under penalty of perjury under the laws of the Uni
aws of the State of California that the foregoing is true and correct.
day of June, 2012 at Newport Beach, California.

_____/s/ Michael J. Ave
Michael J. Avenatti

8

# EXHIBIT



**John Arden**

| | |
|---|---|
| **From:** | david greenberg <ernk1234@gmail.com> |
| **Sent:** | Thursday, June 14, 2012 10:21 PM |
| **To:** | scott.blum@buy.com |
| **Cc:** | cporterfield@hunton.com; horst@khlawfirm.com; jromano@crowell.com; jrutherford@crowell.com; mharris@scheperkim.com; schneiderj@hunton.com; sirna@khlawfirm.com; Ryan.Weinstein@skadden.com; Peter.Morrison@skadden.com; Jack.DiCanio@skadden.com; Michael J. Avenatti; John Arden; Judy K. Regnier; bkeoun@bloomberg.net; Pkuntz1@bloomberg.net; dscheer@bloomberg.net; rmarmaro@skadden.com; jdicanio@skadden.com; nweinste@skadden.com; MEgan - MQE; DWest@crowell.com; Katherine L. Mosby |
| **Subject:** | Avenatti likely committed malpractice |
| **Attachments:** | blum tax court brief.pdf |

Mr. Blum, my name is david greenberg.

Though we have never met and though I had nothing to do with BLIPs or OPIS, you and your counsel Avenatti, have decided to sue me (which to date has provided me with an endless source of amusement) as part of KPMG's fraudulent tax shelter activities.

I have nothing but disdain for KPMG (and its counsel Skadden Arps) plus KPMG is directly responsible for the suicide of my fiance, Jane.

In preparing for your case against me, I was just reading today your tax court petition form 2006, your counsel, Avenatti fuked up here.

Based on your representations in the filing, I am going to be able to definitively prove in your case, at a minimum BLIPs and OPIS are not fraud and possibly work in your case on a more likely than not basis (even though I knew nothing about how the transactions worked until my criminal trial in 2008 where it was proven I had nothing to do with BLIPs and OPIS).

I noted in your tax case you provided no financial experts as if you were trying to lose, if you were trying to lose, you should have never made the representations about how you independently analyzed the potential profitability.

I have traded billions of dollars in securities and currencies over the last several years and during the time frame of your transactions had returns in excess of 500% while the S & P was negative. In fact, I am friends with traders in the Soros Group and have lined up at least two of them to testify about how they made over $1 Billion in one day when the pound broke in the mid 90s when we go to trial.

My point here is, if you and Avenatti had not included me in this case, no one would even attempt to prove that BLIPs and OPIS are not fraud as I am going to do.

Nothing would please me more than to see KPMG lose $75,000,000 to you but now, I will not allow that to happen.

There was no reason to include me in this case and I would submit to you that Avenatti committed malpractice by including me (and potentially has suborned perjury from you). It sickens me to be put in the position of:

1

EXHIBIT P

possibly helping KPMG who has completely and utterly destroyed my life with lies and deceit much of which has been purveyed by their counsel Skadden Arps.

Since I will not allow myself to be dropped from your lawsuit even if that comical little troll Avenatti were to suggest it (and I fully intend to sue you and Avenatti for malicious prosecution), you should consider suing Avenatti for malpractice.

There is absolutely no strategic reason for Avenatti to have talked you into including me in this case and even those scumbags at KPMG (who have taken everything from me already) have made court filings stating I had absolutely nothing to do with BLIPs and OPIS.

In fact, did Avenatti disclose to you that in December of 2008 he had Fred Sands commit perjury at my criminal trial (where I was acquitted of all charges) and Sands' lies were so evident the Judge made a comment, yelled at Avenatti and Avenatti threatened me with severe retribution and my lawyer for showing Sands to be an abject pathetic liar.

I would recommend you speak with Bradley Patterson (949 253-0500) at LGI LLP, BAPATTERSON@LGILAW.NET if you decide to pursue Avenatti for malpractice or if you like I can recommend other class action lawyers who do not get overturned like Avenatti does.

It looks like you previously used Paul Hastings in your tax court matters and you may want to consider consulting with Doug Schaff in their Orange County Office on the tax matters I reference since Avenatti has absolutely no tax expertise.

Regards

david greenberg

2

# EXHIBIT



**Judy K. Regnier**

| | |
|---|---|
| **From:** | DavidG <ernk1234@gmail.com> |
| **Sent:** | Friday, June 15, 2012 9:17 AM |
| **To:** | Michael J. Avenatti; 'rcollins@law.gwu.edu'; 'dfenstermaker@law.gwu.edu'; 'jblumberg@law.gwu.edu'; 'subrown@law.gwu.edu'; 'scoggin@law.gwu.edu'; 'nfratianne@law.gwu.edu'; 'mccollins@law.gwu.edu'; 'jcole@law.gwu.edu'; 'agrant@law.gwu.edu'; 'cmcnamee@law.gwu.edu'; 'jtercha@law.gwu.edu'; 'dzelenka@law.gwu.edu' |
| **Cc:** | 'cporterfield@hunton.com'; 'horst@khlawfirm.com'; 'jromano@crowell.com'; 'jrutherford@crowell.com'; 'mharris@scheperkim.com'; 'schneiderj@hunton.com'; 'sirna@khlawfirm.com'; 'Ryan.Weinstein@skadden.com'; 'Peter.Morrison@skadden.com'; 'Jack.DiCanio@skadden.com'; John Arden; Judy K. Regnier; 'bkeoun@bloomberg.net'; 'Pkuntz1@bloomberg.net'; 'dscheer@bloomberg.net'; 'rmarmaro@skadden.com'; 'JDICANIO@SKADDEN.COM'; 'rweinste@skadden.com'; MEgan - MQE; 'DWest@crowell.com' |
| **Subject:** | Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least) |

Dude, fuk u asshole, u really think I care about anything but exposing u for the lying jew hating piece of shit u are?????? U need to get it through ur thick head, I died 7 years ago and crave the release of death as opposed to having to remember being gang ass raped by jew hating niggers every 5 mother fukin seconds (I know u think it is erotic and ur gonna go tell the judge). Seriously dude I was super fukin pissed when u threatened me and my lawyers in 08 but couldn't do anything cuz ur faggot buddy, downing had his cok up my ass, u should have left me alone fuk hed
Sent via BlackBerry by AT&T

**From:** "Michael J. Avenatti" <mavenatti@eaganavenatti.com>
**Date:** Fri, 15 Jun 2012 16:07:10 +0000
**To:** 'ernk1234@gmail.com'<ernk1234@gmail.com>; 'rcollins@law.gwu.edu'<rcollins@law.gwu.edu>; 'dfenstermaker@law.gwu.edu'<dfenstermaker@law.gwu.edu>; 'jblumberg@law.gwu.edu'<jblumberg@law.gwu.edu>; 'subrown@law.gwu.edu'<subrown@law.gwu.edu>; 'scoggin@law.gwu.edu'<scoggin@law.gwu.edu>; 'nfratianne@law.gwu.edu'<nfratianne@law.gwu.edu>; 'mccollins@law.gwu.edu'<mccollins@law.gwu.edu>; 'jcole@law.gwu.edu'<jcole@law.gwu.edu>; 'agrant@law.gwu.edu'<agrant@law.gwu.edu>; 'cmcnamee@law.gwu.edu'<cmcnamee@law.gwu.edu>; 'jtercha@law.gwu.edu'<jtercha@law.gwu.edu>; 'dzelenka@law.gwu.edu'<dzelenka@law.gwu.edu>
**Cc:** 'cporterfield@hunton.com'<cporterfield@hunton.com>; 'horst@khlawfirm.com'<horst@khlawfirm.com>; 'jromano@crowell.com'<jromano@crowell.com>; 'jrutherford@crowell.com'<jrutherford@crowell.com>; 'mharris@scheperkim.com'<mharris@scheperkim.com>; 'schneiderj@hunton.com'<schneiderj@hunton.com>; 'sirna@khlawfirm.com'<sirna@khlawfirm.com>; 'Ryan.Weinstein@skadden.com'<Ryan.Weinstein@skadden.com>; 'Peter.Morrison@skadden.com'<Peter.Morrison@skadden.com>; 'Jack.DiCanio@skadden.com'<Jack.DiCanio@skadden.com>; John Arden<jarden@eaganavenatti.com>; Judy K. Regnier<jregnier@eaganavenatti.com>; 'bkeoun@bloomberg.net'<bkeoun@bloomberg.net>; 'Pkuntz1@bloomberg.net'<Pkuntz1@bloomberg.net>; 'dscheer@bloomberg.net'<dscheer@bloomberg.net>; 'rmarmaro@skadden.com'<rmarmaro@skadden.com>; 'JDICANIO@SKADDEN.COM'<JDICANIO@SKADDEN.COM>; 'rweinste@skadden.com'<rweinste@skadden.com>; MEgan - MQE<mqe@lomqe.com>; 'DWest@crowell.com'<DWest@crowell.com>

1

EXHIBIT Q

**Subject:** Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least)

Mr. Greenberg:

With each passing day, the damages associated with our successful defamation action against you grow ex. I very much look forward to presenting your continued tirade and associated conduct to federal Judge Middlebrooks, who I am confident will have no time for your shenanigans.

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
450 Newport Center Drive, Second Floor
Newport Beach, CA 92660
Tel: (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information. It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system. Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

**From:** david greenberg [mailto:ernk1234@gmail.com]
**Sent:** Friday, June 15, 2012 08:27 AM
**To:** rcollins@law.gwu.edu <rcollins@law.gwu.edu>; dfenstermaker@law.gwu.edu <dfenstermaker@law.gwu.edu>; jblumberg@law.gwu.edu <jblumberg@law.gwu.edu>; subrown@law.gwu.edu <subrown@law.gwu.edu>; scoggin@law.gwu.edu <scoggin@law.gwu.edu>; nfratianne@law.gwu.edu <nfratianne@law.gwu.edu>; mccollins@law.gwu.edu <mccollins@law.gwu.edu>; jcole@law.gwu.edu <jcole@law.gwu.edu>; agrant@law.gwu.edu <agrant@law.gwu.edu>; cmcnamee@law.gwu.edu <cmcnamee@law.gwu.edu>; jtercha@law.gwu.edu <jtercha@law.gwu.edu>; dzelenka@law.gwu.edu <dzelenka@law.gwu.edu>
**Cc:** cporterfield@hunton.com <cporterfield@hunton.com>; horst@khlawfirm.com <horst@khlawfirm.com>; jromano@crowell.com <jromano@crowell.com>; jrutherford@crowell.com <jrutherford@crowell.com>; mharris@scheperkim.com <mharris@scheperkim.com>; schneiderj@hunton.com <schneiderj@hunton.com>; sirna@khlawfirm.com <sirna@khlawfirm.com>; Ryan.Weinstein@skadden.com <Ryan.Weinstein@skadden.com>; Peter.Morrison@skadden.com <Peter.Morrison@skadden.com>; Jack.DiCanio@skadden.com <Jack.DiCanio@skadden.com>; Michael J. Avenatti; John Arden; Judy K. Regnier; bkeoun@bloomberg.net <bkeoun@bloomberg.net>; Pkuntz1@bloomberg.net <Pkuntz1@bloomberg.net>; dscheer@bloomberg.net <dscheer@bloomberg.net>; rmarmaro@skadden.com <rmarmaro@skadden.com>; jdicanio@skadden.com <jdicanio@skadden.com>; rweinste@skadden.com <rweinste@skadden.com>; MEgan - MQE; DWest@crowell.com <DWest@crowell.com>
**Subject:** Re: Michel J. Avenatti is a despicable liar that knows no bounds (and based on his own statements to the court, a filthy disgusting Jew hater in my view at least)

2

# Lawyer Suing Moss Adams Seems to Have Hurt Feelings After Opposing Counsel Called His Lawsuit "Flimsy"

2 Comments
957 reads
12 Jun 2012 / By Caleb Newquist
More social linksTwitterFacebookLinkedinGoogle+

Anyone remember Frederick Darren Berg? He's a guy who had a thing - nay, a *passion* - for charter buses. It just so happens that he also was running Washington's largest ever Ponzi scheme to finance his passion. Moss Adams (who Berg says is not at fault) was the auditor for FDB's Meridian funds - the vehicles for the scheme - and they're currently tied up in court with the Meridian investors' court-appointed trustee. Last month, MA's lawyers made it known that they didn't think too much of the plaintiff's case, calling it "flimsy." The attorney for the trustee, Michael Avenatti, found that curious because he claimed that MA was ready to settle for $25 million. MA called bullshit, saying no offer was ever made and now they'd prefer that this Avenatti character take a hike for making this up:

> Moss Adams' lawyers — Kelly Corr and Steven Fogg of the Seattle firm Corr Cronin Michelson Baumgardner & Preece LLP — say Avenatti made false statements and violated a confidentiality agreement by referring to the mediation negotiations.

Well, Avenatti wasn't about to let this go any further without explaining that A) he really didn't do anything wrong and B) he didn't have any choice but to spill the $25 million settlement story because opposing counsel was so mean:

> "I kept all aspects of the mediation confidential and only disclosed Defendant's $25 million settlement offer **in direct response to Defendant's false allegation that his lawsuit has no merit, is 'frivolous,' and "flimsy,"** Avenatti said in a court filing.

I'm all for lawyers getting bent out of shape but it's really frightening to imagine what would happen if they all reacted this way every time someone called their lawsuits flimsy.

Moss Adams fires back at attorney behind Berg audit suit [PSBJ]

Tags:
Moss Adams
Frederick Darren Berg
Ponzi Schemes
Lawsuits
Fraud
Lawyers
charter buses
hurt feelings

On Thu, Jun 14, 2012 at 6:51 AM, David Greenberg <ernk1234@gmail.com> wrote:

Michael J. Avenatti is one of your apparent distinguished law school alumnus.

3

A friend of mine has asked me to contribute and consider help in raising money for your university.

I informed my friend that based on the despicable reprehensible behavior of Michael J. Avenatti I would not, nor would I recommend any of my associates donating one penny to your University.

Perhaps, if you could explain why Michael J. Avenatti behaves so despicably and has even publicly stated that [he] finds it erotic I was anally gang raped by blacks who hate Jews while the prison guards masturbated into my face (for months on end):

(at the request of Michael J. Avenatti's good friend Kevin Downing of the United States Department of Justice),

I would be able to consider recommending my friends donate money to your university or at a minimum not attempt to dissuade others from making donations.

Does your university teach that anal gang rape by blacks who hate Jews is erotic or even concur with Michael J. Avenatti's assertions?

Michael J. Avenatti has included me in a lawsuit because I believe he hates "real" Jews (not self loathing Jews like Rahm Emanuel who have betrayed Israel), is your university anti sematic?

Did Michael J. Avenatti learn at your law school to tell literally hundreds if not thousands of lies per meritless lawsuit he files, suborn perjury and intimidate witnesses all under the guise of litigation privilege?

What kind of law school are you people even running?

Below are just a few excerpts of statements Michael J. Avenatti included in one brief (what is wrong with you people??).

The Judy referred to directly below is Judy Regnier of Michael J. Avenatti's law firm.

4

//////////////////////////////////////////////

Judy, nice, doing the dirty work for that little piss ant, ke
according to bonhoeffer "to not speak in the face of evil i
itself". Of course the jew hater hitler like your jew hating
killed bonehoeffer for supporting all those jews

Just wait until I free up some time to make sure your frie
change.org or church group in yorba linda know you sup
believes it erotic for me a scumbag jew to have been gang
jew hating niggers while the prison guards jerked off in r

And had the temerity to threaten with worse or more ero
fukin pervert boss) treatment while I was in federal custo
scumbag liars like your little piss ant sword swallowing b

//////////////////////////////////////////////

Am laghin my ass off u fukin piece of shit. I died 7 years ago
sukin liars like u. Bring it on baby I am a walking corpse an
be a jew hating lying nigger loving piece of shit

//////////////////////////////////////////////

5

I declare under penalty of perjury under the laws of the Uni

aws of the State of California that the foregoing is true and correct.

lay of June, 2012 at Newport Beach, California.


_____ /s/ Michael J. Ave
Michael J. Avenatti

6

1   EAGAN AVENATTI, LLP
    Michael Q. Eagan, Bar No. 63479
2   mqe@eoalaw.com
    Michael J. Avenatti, Bar No. 206929
3   mavenatti@eoalaw.com
    450 Newport Center Drive, Second Floor
4   Newport Beach, CA 92660
    Tel:   (949) 706-7000
5   Fax:   (949) 706-7050

6   Attorneys for Plaintiff

7

8                  UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

10

11  SCOTT A. BLUM,                    Case No.    SACV11-01885 CJC (ANx)

12          Plaintiff,

13      vs.                           COMPLAINT AND DEMAND FOR
                                      JURY TRIAL
14
    KPMG, LLP, a Delaware Limited Liability   Breach of Fiduciary Duty (Count I)
15  Partnership, JEFFREY STEIN, an            Fraud (Count II)
    individual, JEFFREY EISCHEID, an          Fraudulent Non-Disclosure (Count III)
16  individual, CARL HASTING, an              Negligent Misrepresentation (Count IV)
    individual, ROBIN PAULE, an individual,   Negligent Non-Disclosure (Count V)
17  and DAVID GREENBERG, an individual,       Professional Negligence (Count VI)

18
            Defendants.
19

20

21

22

23

24

25

26

27

28

Plaintiff Scott A. Blum ("Plaintiff" or "Blum"), hereby alleges:

## I.    INTRODUCTION

1.    This action involves the fraudulent scheme of Defendant KPMG LLP ("KPMG"), one of the world's largest accounting firms, and others to line their own pockets with millions of dollars in fees at the expense of their clients and/or to place their clients, including Plaintiff at significant risk by selling tax strategies about which Defendants to this action made numerous affirmative misrepresentations and concealed or failed to disclose material facts.  In the 1990s and continuing through at least 2002, KPMG created investment schemes, which were tax deferral/avoidance products that KPMG mass marketed to its clients in order to generate millions of dollars in fees. KPMG, and others, including the other Defendants named herein, induced Plaintiff to invest millions of dollars in the investments, and KPMG gave Plaintiff a false opinion letter stating that it was "more likely than not" that a deduction taken for losses generated by such investments would be upheld if challenged by the IRS.  In reality, Defendants knew but misrepresented, actively concealed, and/or did not disclose to Plaintiff numerous facts, including that several KPMG tax partners had repeatedly warned KPMG management that the IRS would likely succeed in challenging any deductions taken for losses generated by the investments, thus placing KPMG's clients at considerable risk. Yet, KPMG nevertheless induced Plaintiff to rely on KPMG's good faith, expertise, integrity, professional standing, and/or goodwill in providing them investment strategies. On information and belief, the inducements by KPMG to Plaintiff were false.  To make matters worse, KPMG had provided various business and accounting services to, or for the benefit of Plaintiff Scott Blum and therefore occupied a fiduciary status as to Plaintiff

1

Blum. In reliance on Defendants' misrepresentations, inducements, and/or conduct, Plaintiff paid large sums of money for investments he never would have made had he known the true facts, and has, *inter alia*, been embroiled in litigation with government authorities over millions of dollars in tax liabilities, interest, and penalties that Plaintiff would not have incurred absent Defendants' misconduct. Additionally, Plaintiff, in reliance on Defendants' representations and advice, structured other investments and made other decisions relating to his finances and business differently than he would have absent Defendants' acts and omissions. Indeed, Plaintiff was actively induced by KPMG to sell only a select portion of Buy.com, a business that was founded and operated by Plaintiff Blum, rather than his entire interest, in order to "benefit" from a strategy KPMG and the other Defendants knew – but concealed from and/or failed to disclose to Plaintiff – was a sham. Were it not for the acts and omissions of the Defendants, Plaintiff would have sold the entirety of Buy.com for approximately $400 million to a Japanese investor who had previously purchased stock in Buy.com. Had Plaintiff sold the business, he would have received hundreds of millions of dollars in additional money. As a result of KPMG's unlawful acts in developing, designing, marketing, and/or selling its tax strategies, Plaintiff has suffered significant injuries and damage, which have been, and/or will likely be, incurred by Plaintiff.

## II. THE PARTIES

2. Plaintiff Scott A. Blum is a resident of the State of Wyoming and domiciled therein. Plaintiff Blum is the founder of Buy.com, an online retailer. During the years 1998 through early 2001, Plaintiff was a resident of California and resided specifically in

Orange County, CA and within the Central District of California. In the years 1998 and 1999, Plaintiff Blum, through the Scott A. Blum Separate Property Trust and Bogan Ventures, LLC, participated in the strategies known as the Offshore Portfolio Investment Strategy ("OPIS") and Bond Linked Issue Premium Structure ("BLIPS"), developed, marketed and sold to Plaintiff Blum by the Defendants to this action.

3.     Plaintiff is informed and believes and thereon alleges that Defendant KPMG, LLP ("KPMG") is a Delaware limited liability partnership with a number of partners who reside and work in Orange County and the Central District of California. Plaintiff is informed and believes and thereon alleges that KPMG maintains a significant business presence within the Central District at 20 Pacifica, Suite 700, Irvine, CA 92618-3391. KPMG is the third largest accounting firm in the United States, and generates more than $4 billion in annual revenues. At the time of the conduct in question, Plaintiff Scott Blum resided in Orange County within the Central District.

4.     On or about August 29, 2005, KPMG entered into a Deferred Prosecution Agreement ("DPA") with the U.S. Justice Department in which KPMG admitted to fraud in the design and marketing of similar tax shelters. In connection with the agreement, a federal grand jury issued an indictment against numerous KPMG executives and partners, accusing the defendants of using various means to fraudulently conceal the shelters from the government, including failing to register them with the IRS, preparing tax returns that disguised the shelters' effects, and using sham attorney-client privilege claims to hide their actions from the government and their clients. The indictment also accuses many of the KPMG defendants of lying to the IRS and to a Senate investigative panel during

public hearings in November 2003, all in an effort to keep the government and KPMG's clients in the dark about their misconduct.  The Justice Department has called the KPMG case "the largest criminal tax case ever filed."  On information and belief, KPMG is prohibited from denying in civil litigation, including this lawsuit, that it engaged in a fraudulent scheme and a fraudulent course of conduct relating to the development, marketing, and/or selling of tax shelter products, including variants at issue in this case. Moreover, on information and belief, as a result of the conduct at issue in this lawsuit, KPMG is prohibited from denying that it engaged in a conspiracy with one or more individuals or entities relating to its tax products sold on a mass basis.  Plaintiff is informed and believes that the acts of KPMG and/or others that were part of the scheme and/or conspiracy and executed in conformity therewith continued into 2006, and included affirmative acts designed to hide or conceal the unlawful nature of the scheme or conspiracy.  On information and belief, all of the unlawful acts of KPMG formed a course of conduct, which included but was not limited to both of the tax strategies at issue here.  Moreover, part of KPMG's unlawful conduct as to Plaintiff included its concealment and/or failure to disclose KPMG's wide-ranging participation in tax strategies which it was misrepresenting to others and/or the knowledge of KPMG as to the potential consequences of its actions.  Plaintiff thus was repeatedly misled regarding, among other things, the alleged good faith of KPMG in issuing its opinions, the circumstances under which the validity of KPMG's opinions would be reviewed and analyzed, and the attendant risks of undertaking the tax strategies in question.  Plaintiff was also misled as to the widespread course of conduct at KPMG regarding the mass marketing of fraudulent/highly risky tax strategies across the country.

- 4 -

COMPLAINT AND DEMAND FOR JURY TRIAL

5.     Defendant Jeffrey Stein ("Stein") is the former Deputy Chairman of KPMG, former Vice Chairman of Tax Services at KPMG, and a former KPMG tax partner from at least in or about 1987 through in or about 2004.  Defendant Stein is a lawyer with a Master's degree in tax law.  In or about 1996, Defendant Stein became the partner-in-charge of KPMG's international tax group; in or about March 1998, Defendant Stein became Vice Chairman – Tax Operations; in or about 2000, Defendant Stein became Vice Chairman of Tax Services; and in or about April 2002, Defendant Stein became Deputy Chairman of KPMG.  Upon information and belief and by virtue of his positions of leadership at KPMG throughout the time period in question, Defendant Stein exercised considerable control over Defendant KPMG's conduct including the approval and marketing of the unlawful products discussed herein and continued concealment of KPMG's activities up to KPMG's eventual admission of wrong-doing in 2005. Defendant Stein exercised control over the development and marketing of both the OPIS and BLIPS products and, through his position and participation, caused to be issued the opinion letters (discussed herein) which contained numerous statements and representations that Defendant Stein knew or should have known were false and in breach of various duties he owed to Plaintiff Blum by virtue of KPMG's role as Blum's accountant.  Defendant Stein was criminally indicted in federal court in the Southern District of New York for, among other things, his role in the conduct alleged herein

6.     Defendant Jeffrey Eischeid ("Eischeid"), a CPA, is a former tax partner at Defendant KPMG from at least 1997 through in or about 2004.  Upon information and belief, Defendant Eischeid is the former head of KPMG's Innovative Strategies Group, former Partner-In-Charge of KPMG's Personal Financial Planning Group and worked out

of Defendant KPMG's Atlanta, GA offices.  Plaintiff is informed and believes that Defendant Eischeid played a significant role in the development of the OPIS and BLIPS products marketed and sold by KPMG.  In particular, Defendant Eischeid played a significant role in drafting the opinion letters KPMG provided for the OPIS and BLIPS products and the particular letters that were provided to Plaintiff Blum.  As alleged in more detailed herein, these letters contained numerous statements and representations that Defendant Eischeid knew or should have known were false and in breach of various duties he owed to Plaintiff Blum by virtue of KPMG's role as Blum's accountant. Defendant Eischeid was criminally indicted in federal court in the Southern District of New York for, among other things, his role in the conduct alleged herein.  Upon information and belief, Defendant Eischeid continues to be domiciled in or about Atlanta, Georgia.

7.     Defendant Carl Hasting ("Hasting"), a lawyer and CPA, is a former tax partner at Defendant KPMG's Woodland Hills, California offices.  As alleged herein, Defendant Hasting was Plaintiff Blum's primary contact person with KPMG.  Defendant Hasting made numerous false representations to Blum and personally signed the opinion letters issued to Plaintiff Blum by KPMG which contained numerous statements and representations that Defendant Hasting knew or should have known were false and in breach of various duties he owed to Plaintiff Blum by virtue of KPMG's role as Blum's accountant.  Defendant Hasting was criminally indicted in federal court in the Southern District of New York for, among other things, his role in the conduct alleged herein. Upon information and belief, Defendant Hasting continues to be domiciled in the state of California.

8.    Defendant Robin Paule ("Paule"), a CPA, is a former tax partner at Defendant KPMG's Woodland Hills, CA offices.    Upon information and belief, Defendant Paule, along with Defendant Hasting, was primarily responsible for the actual implementation of Plaintiff Blum's OPIS and BLIPS transactions.  As alleged herein, Defendant Paule signed the September 21, 1999 engagement letter which contained numerous statements and representations that Defendant Paule knew or should have known were false and in breach of various duties she owed to Plaintiff Blum by virtue of KPMG's role as Blum's accountant.   Upon information and belief, Defendant Paule continues to be domiciled in the state of California.

9.    Defendant David Greenberg ("Greenberg"), a CPA, is a former tax partner at KPMG starting in or about May 1999.  Defendant Greenberg was a member of the Stratecon Group and worked in KPMG's Los Angeles, California offices.  Defendant Greenberg was involved in the development and marketing of the BLIPS product and, upon information and belief, met with Plaintiff Blum in October of 2000 in order to discuss Plaintiff's BLIPS transaction.  Defendant Greenberg was criminally indicted in federal court in the Southern District of New York for, among other things, his role in the conduct alleged herein

10.    The true names and capacities of defendants named herein as Does 1 through 50 are unknown to Plaintiff, who, therefore, sues these defendants by such fictitious names.  Plaintiff will amend the complaint to show the true names and capacities of such Does when they have been ascertained. Plaintiff is informed and believes and thereon alleges that Does 1 through 50 were responsible in some manner for the acts and

- 7 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1   transactions hereinafter alleged and are liable to Plaintiff therefore.

2

3       11.   Plaintiff is informed and believes and thereon alleges that at all times

4   mentioned herein each of the Doe defendants was the agent, joint venturer, partner,

5   and/or employee of KPMG and/or other affiliated parties, and at all times mentioned

6

7   herein was acting within the scope of such agency, joint venture, partnership and/or

8   employment.

9

10              **III.   JURISDICTION AND VENUE**

11

12

13       12.   This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  There is

14   complete diversity in this action as Plaintiff is informed and believes that no Defendant is

15   a resident of or domiciled in the same state as Plaintiff Scott Blum.  Plaintiff Scott Blum

16   is domiciled in and a resident of the State of Wyoming with his permanent residence

17   located at 2925 Red House Road, Jackson, WY 83001.  Defendant KPMG, LLP is a

18   limited liability partnership and, upon information and belief, does not maintain offices in

19   the State of Wyoming and no current partners of KPMG are domiciled within Wyoming.

20   As alleged herein, and upon information and belief, Defendants Stein, Eischeid, Hasting,

21

22   and Paule are not domiciled within the State of Wyoming.  As alleged herein, the amount

23   in controversy is greater than $75,000.

24

25       13.   Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because, on information

26   and belief, Defendant KPMG LLP maintains an office and conducts business at 20

27   Pacifica, Suite 700, Irvine, CA  92618-3391.  Accordingly, Defendant KPMG resides

28

- 8 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

within this district for the purposes of venue.  Further, upon information and belief, Defendant KPMG as a limited liability partnership has partners who reside within this district and therefore Defendant KPMG resides within the Central District for purposes of venue.

14.   Venue is also proper pursuant to 28 U.S.C. § 1391(a)(2) because, as alleged herein, a substantial part of the events or omissions giving rise to the claim occurred within Orange County, CA, including at Plaintiff Blum's former offices located in Aliso Viejo, California and within the Central District of California.

## IV.   KPMG DEVELOPS GENERIC TAX PRODUCTS

15.   Plaintiff Blum is a successful entrepreneur who retained KPMG to provide income, gift and estate tax advice and tax return preparation services to Plaintiff dating back to approximately 1993.  In connection with this retention, Plaintiff developed a close relationship of trust with various employees and partners of KPMG, disclosed personal financial information to KPMG, and came to place significant trust and confidence in KPMG and in the advice it rendered to Plaintiff.  Further, in connection with providing business, financial, and/or accounting services to Blum, KPMG assumed a fiduciary relationship with Blum.

16.   Although Plaintiff was unaware of it at the time, beginning in the mid-1990s, KPMG began to alter its approach to providing tax advice.  Traditionally, KPMG focused on offering individualized tax advice to persons such as Blum concerning that

1  individual's unique financial situation.  However, in an attempt to increase its revenue

2  through the receipt of flat rate fees as opposed to fees based on an hourly basis, KPMG

3  began to focus on developing a series of generic "tax products" and engaging in a course

4  of conduct such that KPMG could aggressively market on a mass scale and throughout

5  the country alleged tax strategies to clients potentially having significant taxable income.

6  For example, in various cases, KPMG charged flat fees from $100,000 to in excess of $1

7  million or more per transaction. In 1997, KPMG established a Tax Innovation Center,

8  which employed numerous tax specialists whose sole mission was to push for the

9  development of new generic KPMG tax products.  In connection with the creation of the

10  Tax Innovation Center, KPMG management began to pressure its tax professionals to

11  market and sell generic tax products – which KPMG itself apparently did not legitimately

12  believe in – to persons such as Plaintiff.  KPMG also began to pressure its tax review

13  professionals to approve tax products which KPMG knew, and/or believed, would not be

14  upheld by the IRS. In pressuring clients like Plaintiff to purchase its generic tax products,

15  on information and belief, KPMG developed and engaged in a scheme and/or course of

16  conduct in selling multiple tax products to the same clients and/or marketing them as part

17  of a single, continuing sales enterprise. Indeed, on information and belief, KPMG on its

18  own and, via a conspiracy with others, developed a network wherein a standard sales

19  pitch was developed, clients were convinced to establish new companies or entities they

20  would never otherwise have established, clients were pressured to engage in transactions

21  they otherwise would never have considered, and/or a continuing scheme was put in

22  place whereby KPMG and other co-conspirators, would reap the benefits while

23  concealing from, and/or failing to disclose, the true facts and risks to the clients.

24  KPMG's clients, like Plaintiff, were never told that the tax strategies were fraudulent or

that KPMG itself did not believe in the tax strategies it was selling. Furthermore, KPMG concealed and/or failed to disclose to clients, like Plaintiff, that KPMG as part of generating increased profitability for KPMG had a nationwide scheme or course of conduct of selling tax strategies for flat fees on a mass basis with the design of translating the flat or percentage fees from those efforts into rates far in excess of any individual hourly rates KPMG may otherwise have charged for tax work. Thus, KPMG misrepresented to Plaintiff the true risks attendant to entering into these strategies involving use of, and reliance on, KPMG and concealed from Plaintiff many material facts that would have demonstrated the extreme risk at which Plaintiff was placed.

17.   For example, unknown to Plaintiff, beginning in the late 1990s, KPMG, together with a network of tax-shelter promoters and law firms, developed a form of generic tax-shelter products with names such as FLIPS ("Foreign-Leveraged Investment Programs"); BLIPS ("Bond Linked Issue Premium Structures"); OPIS ("Offshore Portfolio Investment Strategy"); and others.   KPMG, with the assistance of others, ultimately sold these "products" to a number of individuals between approximately 1996 and 2002, and generated close to $500 million in fees.   In many instances, KPMG aggressively marketed the tax shelter products to individuals who potentially had significant ordinary or capital gains income, representing that in exchange for a fee, the investor would obtain a significant tax loss, thus assisting in off-setting their income. Unbeknownst to Plaintiff, the defendants created, marketed and administered these tax shelter products to generate significant fees for themselves, notwithstanding the fact that KPMG and the other defendants knew and/or recklessly disregarded that the tax strategies were fraudulent. Further unbeknownst to Plaintiff, various monies provided by

the clients via these tax strategies were sent to companies/accounts established or run jointly by KPMG personnel and/or other personnel, thereby constituting additional acts in furtherance of the fraudulent conspiracy and/or scheme. All of this was concealed from, and/or not disclosed to, Plaintiff.

18. As years passed, KPMG would develop new and different variants on its tax strategies and/or "products." Two of those variants – OPIS and BLIPS – were sold to Plaintiff in 1998 and 1999. Specifically, as to the OPIS transaction, it commenced in 1998 and continued into 1999 for which KPMG issued an opinion dated December 31, 1998. As indicated below, Plaintiff Blum and the Scott A. Blum Separate Property Trust were involved with that transaction. Later, in 1999, as part of the BLIPS transaction, Plaintiff Blum and Bogan Ventures, LLC were involved with that transaction. Plaintiff would not have pursued the transactions in question but for KPMG's misrepresentations as to their likely validity and/or KPMG's misrepresentations and concealment as to its alleged good faith, expertise, and/or professionalism in analyzing, evaluating, and/or promoting these purported investment strategies. Had KPMG disclosed that engaging in these tax strategies in reliance on KPMG was placing Plaintiff in position to be subject to a nationwide review of apparently fraudulent tax strategies implemented by KPMG, Plaintiff would not have participated. At all times, Plaintiff viewed KPMG as the endorser, marketer, and/or expert standing behind the validity and good faith of the tax strategies through which Plaintiff were damaged. KPMG repeatedly sold itself as the experts as to the tax strategies recommended to Plaintiff, and KPMG convinced Plaintiff to rely on KPMG's expertise. KPMG repeatedly concealed, and failed to disclose, its systemic and mass approach to tax strategies, including KPMG's own lack of a legitimate

belief in its "more likely than not" opinions.

19.    As part of its strategy to generate fees by mass-marketing its investment schemes, KPMG began to exploit the confidential financial information provided by its own clients to determine which clients might be targets for a sale.  In particular, KPMG determined which of its current clients potentially had significant ordinary or capital gains income, and thus might have a need for a large tax loss to offset such income. Plaintiff is informed and believes and thereon alleges that in connection with KPMG's marketing efforts, KPMG determined that Plaintiff was a target for a sale of a tax shelter product and subsequently aggressively approached and marketed the tax shelters at issue to him while using the prior trust and confidence KPMG had gained from its prior relationship with Plaintiff to convince Plaintiff to adopt the shelters.

**A.    Development of the OPIS Product**

20.    Upon information and belief, and unbeknownst to Blum, in 1996, KPMG enlisted QA Investments, LLC ("QA") to assist in constructing an offshore transaction that could serve as the vehicle for Foreign Leveraged Investment Program ("FLIP"). KPMG and QA jointly crafted, refined and marketed two similar offshore products, first the FLIP and later, the Offshore Portfolio Investment Strategy ("OPIS"), which was sometimes referred to by KPMG as "son of FLIP."

21.    Upon information and belief, and unbeknownst to Blum, both FLIP and OPIS were designed, implemented and caused to be implemented by Defendant KPMG

and Defendants Stein and Eischeid in return for fees totaling a percentage of the tax loss Defendants knew would be created by the products, including a fee to KPMG based also on the percentage of the tax loss.

22.     Unbeknownst to Blum, on August 12, 1996, a QA internal memo regarding FLIP indicated that "KPMG approached us as to whether we could affect the security trades necessary to achieve the desired tax results. . . . The tax opportunity created is extremely complex, and is really based more on the structuring of the entities involved in the securities transactions rather than the security transactions themselves."

23.     Upon information and belief, and unbeknownst to Blum, in late 1996, QA enlisted UBS to assist KPMG and QA in implementing the FLIP product in return for substantial fees, by providing financing and serving as the execution counter-party.

24.     Unbeknownst to Blum, on September 21, 1996, QA sent a memo to UBS attaching a review of a proposed transaction, stating that it was "excited about the potential of this transaction especially given KPMG's active involvement."  The memo of the proposed transaction included the following regarding the FLIP product:

A.     "Each transaction will involve two sets of trades involving UBS common stock and OTC options.  The majority of the trades will occur in an offshore corporation/investment fund managed by Quadra.  A smaller amount of trades will occur in a standard securities account for the client in which Quadra will have investment discretion.  In both accounts we will most likely want to hedge any foreign currency exposure."

B.    "Quadra will control both accounts and as you suggested, we will deposit ample funds in the UBS account so that your credit committee will not have to be involved in the process."

C.    "I would like to have all of the fees with the exception of any basic transaction fees paid from the Investment Account. As we have briefly discussed, Quadra and KPMG will have their fees tied to the performance of the transaction in the Investment Account. To hedge our interests we will set up a Quadra account and simply enter into an option position to hedge this possibility. In this account we should be able to aggregate Quadra's exposure for all similar transactions."

D.    "KPMG's memo will describe how the tax objectives are achieved based on how these two accounts are integrated for tax purposes."

E.    "I think this will be pretty straightforward to execute and I was glad to hear that you will be able to basically accommodate any size that we can do. Once we establish the process for setting up accounts, option agreements and various transactions it should be relatively easy to replicate."

F.    "Please keep this fax EXTREMELY CONFIDENTIAL and not distribute it. If you need something that can be distributed I will prepare a similar memo."

25.    Unbeknownst to Blum, on July 21, 1997, a UBS internal email regarding the FLIP product outlined the "overall structure and purpose of the trade" including the following:

- 15 -

A. "The 'UBS Trade' uses provisions in the US Tax Code to create a synthetic tax loss via a trading strategy in UBS shares."

B. "A US person ('Investor') buys a call warrant in an offshore company ('SPV') which entitles the holder to 80% of the company's assets. This creates a shared tax base between the SPV and Investor."

C. "The SPV invests in UBS stock (via a stock purchase with delayed settlement). The Investor is therefore deemed to have beneficial ownership of the UBS stock."

D. "The SPV also invests in a call/put arrangement with UBS on the UBS stock. The reason for this is to hedge the SPV's economic exposure to the shares whilst creating a good chance for the SPV to make money."

E. "Exercise of the put [sic] option between UBS and the SPV is treated for US tax purposes as a redemption of stock. The redemption proceeds are deemed to be a dividend from UBS. This dividend is taxable as income. (Actually there are no net proceeds as the SPV borrowed cash to buy the shares, so the only real financial transaction here is financing)."

F. "Simultaneous with the redemption; the US person buys a call option on UBS stock. The call option is for a number of shares equal to the number of shares redeemed. This has the effect of creating the impression that the number of shares owned (or attributed to) the Investor remains constant throughout the trade."

G. "At maturity the Investor sells their call option and realizes a loss this net loss is offsetable against capital gains."

26.    Upon information and belief, and unbeknownst to Blum, OPIS was developed by KPMG in 1998 as the successor to FLIP.  In all material respects, OPIS is identical to FLIP.

27.    Upon information and belief, and unbeknownst to Blum, OPIS was developed to "tweak" or redesign FLIP and KPMG determined that whatever the new product was, it needed a greater economic risk attached to it to meet the requirements of federal tax law.

28.    However, unbeknownst to Blum, in February of 1998, a senior KPMG tax professional wrote a seven page memorandum criticizing the proposed tax product.  The memorandum states, among other things:

A.    "In OPIS, the use of debt has apparently been jettisoned.  If we can not [sic] structure a deal without at least some debt, it strikes me that all the investment banker's economic justification for the deal is smoke and mirrors."

B.    "The only thing that really distinguishes OPIS (from FLIPS) from a tax perspective is the use of an instrument that is purported to be a swap. ... However, the instrument described in the opinion is <u>not</u> a swap under I.R.C. § 446. ... [A] fairly strong argument could be made that the U.S. investor has nothing more than a disguised partnership interest."

C.    "If the risk of loss concepts of Notice 98-5 were applied to OPIS, I doubt

- 17 -

<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

the investor's ownership interest would pass muster."

D.     "As it stands now, the company remains extremely vulnerable to the argument that it is a sham."

29.     In order to carry out the OPIS transaction, clients were advised to participate in the transactions through "grantor trusts" – in Blum's case, the Scott A. Blum Separate Property Trust.

30.     KPMG tax professionals and the other architects of the OPIS product advised their clients to file tax returns in which all of the losses from the OPIS transactions were "netted" with the capital gains realized by the taxpayer at the grantor trust level, instead of reporting each individual gain or loss. Unbeknownst to Blum, the purpose of this "netting" was so only a single, small net capital gain or loss would appear on the client's personal income tax return.

31.     This netting approach, advocated in an internally distributed KPMG memorandum, unbeknownst to Blum, elicited intense debate within KPMG. Unbeknownst to Blum, Mark Watson, one of KPMG's top technical tax experts on this issue, wrote via email to Jeffrey Eischeid (and others) at the time that OPIS was being marketed and implemented during 1998 and 1999:

A.     "I don't think netting at the grantor trust level is a proper reporting position.  Further, we have never prepared grantor trust returns in this manner.  What will our explanation be when the Service and/or courts ask

- 18 -

COMPLAINT AND DEMAND FOR JURY TRIAL

why we suddenly changed the way we prepared grantor trust returns/statements only for certain clients?"

B.    "When you put the OPIS transaction together with this 'stealth' reporting approach, the whole thing stinks."

C.    "You should all know that I do not agree with the conclusion … that capital gains can be netted at the trust level.  I believe we are filing misleading, and perhaps false, returns by taking this reporting position."

32.    Thereafter, unbeknownst to Blum, and during his interview before the Senate Subcommittee investigating Defendants' actions, Mark Watson told the Subcommittee that it was his understanding that, as the top technical expert, his technical judgment on the matter should have stopped KPMG tax professionals from using or advocating the use of this technique.  In fact, he stated that he thought he had done so before leaving for a KPMG post outside the United States.  However, he stated that he later learned that the OPIS National Deployment Champion had convened a conference call without informing him and told the participating tax professionals that they could use the netting technique if they wished.

33.    Upon information and belief, and unbeknownst to Blum, because OPIS was a pre-packaged tax product, the structure of transactions that made up OPIS was the same for each client.  What differed from client to client was the amount of capital loss that the tax product sought to create.

34.    Upon information and belief, and unbeknownst to Blum, KPMG sold OPIS

to 111 individuals, including Plaintiff, and conducted 79 OPIS transactions on their behalf in 1998 and 1999.

**B.     Development of the BLIPS Product**

35.     Unbeknownst to Blum, on September 10, 1997, KPMG and Presidio Growth, LLC and Presidio Advisory Services (collectively, "Presidio") (through former KPMG partner John Larson entered into an Operating Agreement regarding a foreign leveraged investment strategy and certain other tax advantaged strategies.

36.     Unbeknownst to Blum, KPMG partner Randall Bickham, by memo dated August 30, 1998 to KPMG partner Doug Ammerman and others, reviewed his "thoughts on how to best structure the PFP ["Personal Financial Planning"] Tax Products Practice" and indicated that:

> [t]he goal is to create a $100 million business over a three year period built around creating and marketing the 'capital market-based' tax products to high wealth individuals. In reaching the $100 million, the plan is revenues of $30 million in FY'99, $60 million in FY'00, and $100 million in FY'01. . . . The structure of the existing tax products market for high-wealth individuals is extremely fragmented with no dominant market leader. In light of this fragmentation, we can dominant [sic] the market in three years by investing in the organizational structure to support a $100 million business. . . ."

> Bickham went on to say that "[t]he strategy is to co-develop products with Deutsche Bank and Brown & Wood and sell into the $1 to $5 million market segment on a joint basis. . . . Organizationally, the next level of concentric

- 20 -
COMPLAINT AND DEMAND FOR JURY TRIAL

relationships is with boutique tax products groups such as Presidio Advisors.  Our lead relationship at this organization level is currently with Presidio and we expect that Presidio will continue to be our 'vendor of choice.'"  Bickham went on to discuss his "personal considerations" and compensation, and expectation that he "would be offered an equity partnership position in FY '99" and noted that "I was responsible for KPMG's position that we should not register OPIS as a tax shelter and insisted that we make the business case with DPP ["Department of Practice and Professionalism"].  This was of significant benefit in marketing the OPIS product and will establish the direction with respect to KPMG's position on future tax products."

37.    Upon information and belief and unbeknownst to Blum, beginning in late 1998, KPMG and law firm Brown & Wood, with the assistance of Presidio, developed a product known as Bond Linked Premium Structure, or BLIPS.  BLIPS was developed to replace OPIS, the successor to FLIP.  Upon information and belief, BLIPS was ultimately sold to approximately 186 individuals, including Plaintiff, generating at least $53 million in fees to KPMG.

38.    Upon information and belief, and unbeknownst to Blum, BLIPS was designed by Defendants KPMG and Eischeid under the supervision of Defendant Stein.

39.    Unbeknownst to Blum, on December 1, 1998, Presidio sent an email to KPMG partners and to Brown & Wood partner R. J. Ruble ("Ruble"), stating "I understand that a BLIPS planning meeting has been proposed for next week.  The

purpose of the meeting as I understand it is twofold.  First, Bob (Pfaff, of Presidio) and I will bring the tax people up to date on the financing/investment work we have done over the past week or so.  Second, the tax analyses and opinion-writing needs to go into high gear."

40.    Unbeknownst to Blum, on December 3, 1998, KPMG partner Bickham indicated by email to KPMG partners, Presidio, and Brown & Wood partner Ruble stating "I spoke with R. J. (Ruble) this morning about a 'tax-focused' meeting next week. As a first step before scheduling a meeting, we thought that we should first draft the base of an opinion letter in outline format which will be circulated for comment before getting everyone together for a 'hands-on' meeting.  We are currently working on the document and expect to circulate it next week."

41.    Unbeknownst to Blum, in a December 3, 1998 Memo by Brown & Wood partner Ruble that included circulation to KPMG partner Bickham, Ruble stated that "[i]n looking at the bond premium rules in another context (i.e. a legitimate deal), I found an issue that we need to address for BLIPS" and goes on to discuss the tax effect of various treasury regulations.

42.    Upon information and belief, and unbeknownst to Blum, on December 15, 1998, Brown & Wood partner Ruble sent an email to Brown & Wood management stating that he had worked closely with KPMG in developing tax products and had agreed to issue "concurring" "more likely than not" opinion letters for those products in return for a fee of $50,000.00 per deal from KPMG for 1997, and a fee for 1998 based on deal

1    size.

3    43.   Upon information and belief and unbeknownst to Blum, from BLIPS'

inception, KPMG senior tax leadership pressured KPMG tax professionals to quickly

approve it for sale to clients.

44.   Upon information and belief, and unbeknownst to Blum, pursuant to

KPMG's Tax Services Manual and/or Tax Innovation Center Manual, a three stage

approval process was required for approval of BLIPS as a tax product as follows:

A.      During the first stage, the product was required to pass initial screening for "technical and revenue potential."

B.      During the second stage, the product required approval from Washington National Tax ["WNT"], the group charged with deciding if the product met technical requirements of existing tax law and "to address tax shelter regulations issues."

C.      During the third and final stage, the product required approval from the Department of Practice and Professionalism, the group charged with deciding if the product complied with the law, and also met KPMG standards for "risk management and professional practice," including the substantive content of client engagement and tax opinion letters; disclosures to potential clients regarding risks associated with a tax product; the need for confidentiality and/or marketing restrictions; KPMG fee structure; auditor independence issues; and potential impact on the

- 23 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1     firm's reputation.

2

3     45.   Upon information and belief, and unbeknownst to Blum, the final approval or

4     disapproval of a new tax product, including BLIPS, was vested in the head of the

5     Department of Professional Practice, Lawrence [Larry] DeLap ("DeLap")

6

7

8     46.   Upon information and belief and unbeknownst to Blum, the formal internal

9     review process for BLIPS began in February of 1999.  On February 19, 1999, KPMG's

10    Washington National Tax held a meeting to determine if BLIPS was viable.   At the

11    conclusion of the meeting, a final decision was postponed.

12

13    47.   Unbeknownst to Blum, on April 6, 1999, KPMG's Steven Rosenthal sent an

14    email stating that "I would not characterize my assessment of the economic substance of

15    the 'premium borrowing' in the BLIPS transaction as positive.  I had one conversation

16    with representatives of the Presidio investment firm, and did not find their economic

17    arguments compelling."

18

19

20    48.   Unbeknownst to Blum, in a memo dated April 20, 1999, Presidio's Amir

21    Makov ("Makov") indicated to Deutsche Bank, that "further to our Friday phone

22    conversation, I would like to describe the necessary financing steps the BLIPS program

23    will require" and included the following:

24

25    Day 1:  Investor's LLC borrows a $100MM principal amount for 7 years at a

26    16% annual (or semi – let's discuss) coupon.  The price of the loan (the cash

27    amount) is to be determined after a 7 day grace period.

28

- 24 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Day 7:  Grace period is over and cash value is determined based on the 7-year swap rate for day 7.  In today's rate environment, the price is approximately $162MM.  Once cash value is determined, Investor's LLC [in this case, Bogan Ventures, LLC] contributes cash subject to loan liability to Partnership.  Investor is assumed to have borrowed that amount starting on day 1, and having invested the proceeds ($162MM) at an account with Deutsche Bank. . . . On day 60, Investor exits partnership and unwinds all trades in partnership. . . . In our example above, Deutsche Bank will earn a fee or [sic] $620,000."

49.    Unbeknownst to Blum, between April 20 and May 20, 1999, Deutsche Bank provided a "New Product Overview Memo:  BLIPS Transaction" to its employees, and included the following:  BLIPS will be marketed to High Net Worth ["HNW"] Individual Clients of KPMG.  It is envisioned that BLIPS will be a large program, covering over a 6 month period of time over 40 separate accounts/counterparties. . . . If DB [Deutsche Bank] proceeds with the BLIPS program, it will involve the following:

1 – HNW Individuals will be introduced to the DB Private Bank by Presidio/KPMG for Know Your Client Review

2 - The "LLC" (HNW Individual is the single member of a Delaware LLC) will receive a nominal 7 year loan from the DB Private Bank.  The Loan will be a high coupon loan (16%) and the loan amount will be delivered to the HNW Individual in the form of a par amount (100) and a premium amount (estimated at 60). The loan/premium amounts will be priced by Global Markets off the US Interest Rate Swap Curve.

For <u>tax</u> and <u>accounting</u> purposes the Loan Liability for the LLC/HNW Individual will be the paramount only (100), not the premium.  The LLC will also be obligated for the above market interest rate for the term of the loan. . . . Loan will include a prepayment clause with provisions to require repayment of unamortized premium in addition to principal.  Loan conditions will be such as to enable DB to, in effect, force (p)repayment after 60 days at its options.

3 – After a 7 to 10 day holding period, the LLC will transfer all Loan Proceeds to a Company/Partnership ("Company").  The Company will also have 3% of paramount Equity Capital contributed by the HNW Individual and an additional .3% Equity Capital contributed by the Manager of the Company, Presidio. . . . The entire amount of funds in the Company will be held in custody at a DB Global Markets Margin Account. . . .

* * *

5 – The Company will enter into an Interest Rate Swap to convert its Loan Liability from Fixed to Floating.

6 – The Company will enter into a series of FX transactions, all approved by DB and all executed by DB. . . .

* * *

- 26 -

COMPLAINT AND DEMAND FOR JURY TRIAL

9 – The holding period/life of the Company will be 45 to 60 days.  At the end of this time period, the Company will likely unwind all transactions, repay the loan paramount and premium amount.  For tax and accounting purposes, repaying the premium amount will 'count' like a loss for tax and accounting purposes. . . .

\* \* \*

12 – It is imperative that the transaction be wound up after 45-60 days and the loan repaid due to the fact that the HNW individual will not receive his/her capital loss (or tax benefit) until the transaction is wound up and the loan repaid. . . ."

50.    Unbeknownst to Blum, on April 22, 1999, KPMG partner DeLap indicated by email regarding BLIPS that "[t]he underlying tax planning is such that the investor is likely to bail out after Stage 1, i.e. after about 60 days."

51.    Unbeknownst to Blum, on April 30 and May 1, 1999, KPMG tax professionals met with Presidio to discuss BLIPS.

52.    Unbeknownst to Blum, on May 4, 1999, KPMG partner and chief WNT PFP technical expert Mark Watson ("Watson"), who was responsible for the BLIPS review process at WNT, stated by email, "based on the BLIPS meeting I attended on April 30

1  and May 1, I am not comfortable issuing a more-likely-than-not opinion letter wrt [with
2  respect to] this product . . ."

3

4      53.   Unbeknownst to Blum, on May 4, 1999, KPMG partner DeLap responded to
5
   KPMG partner Watson that "as this is a PFP product and you are the chief PFP technical
6
7  resource, I believe this product should not be approved if you are uncomfortable with it."

8

9      54.   Unbeknownst to Blum, on May 5, 1999, KPMG partner Defendant Eischeid
10 indicated by email to others at KPMG, including partner Branan, that KPMG partner
11 Carol Warley ("Warley") had sent an "excellent message to others at KPMG" regarding
12
   BLIPS including the following:  "Although this tax product is not yet approved for
13
14 marketing to client, BLIPS was far enough along to conduct a meeting of the individuals
15 who will be responsible for marketing.  Some of the key points discussed in the meeting
16 were:

17         •  BLIPS will have a $20 million minimum just like OPIS
18
19         •  DPP has indicated that we will only be able to do 50 BLIPS transactions

20         •  Providing a copy of a draft opinion letter will no longer be done to assist
21            clients in their due diligence process
22
23         •  Signed nondisclosure agreements will have to be obtained before any
              meetings can be scheduled
24

25 Given the current limitation on the number of transactions, it is imperative that we
26
   identify, start to talk about and screen candidates now.  Therefore, it is imperative that
27
28 you talk to Deke or me about BLIPS prospects so we can fine tune our prospect list and

1  immediately attempt to close these prospects once we get the go ahead to market BLIPS."

2  KPMG partner Eischeid then commented regarding Warley's email that "I believe it is

3  entirely appropriate to prospect for opportunities.  Unfortunately, it [sic] some instances

4  the prospecting is being carried too far in light of the fact that we do not have approval

5  for the product. . . . There is a fine line that we all have to tread between being ready to

6  go to market when approval comes and jumping the gun."

7

8

9      55.    Unbeknownst to Blum, on May 5, 1999, KPMG partner Watson stated by

10  internal email at KPMG, that "[b]ased on our meeting on April 30 and May 1, I am not

11  comfortable with the BLIPS product for the following reasons:

12

13      • According to Presidio, the probability of making a profit from this strategy is

14      remote (possible, but remote).  Thus, I don't think a client's representation that

15      they thought there was a reasonable opportunity to make a profit is a reasonable

16      representation.    If it isn't a reasonable representation, our opinion letter is

17      worthless.

18

19      • The bank will control, via a veto power over Presidio, how the 'loan' proceeds

20      are invested.  Also, it appears that the bank will require this 'loan' to be repaid in

21      a relatively short period of time (e.g. 60 days) even though it is structured as a

22      seven-year loan.  These factors make it difficult for me to conclude that a bona

23      fide loan was ever made.  If a bona fide loan was not made, the whole transaction

24      falls apart.

25

26  Until these issues are resolved satisfactorily, I don't think we should release this

27  product."

28

COMPLAINT AND DEMAND FOR JURY TRIAL

56.   Unbeknownst to Blum, on May 5, 1999, KPMG partner Watson, by internal email at KPMG, stated that, "my change in heart about BLIPS was based on information Presidio disclosed to me at a meeting on May 1. This information raised serious concerns in my mind about the viability of the transaction, and indicated that WNT had not been given complete information about how the transaction would be structured when we were asked to review the model opinion letter."

57.   Unbeknownst to Blum, on May 7, 1999, KPMG partner DeLap stated by email that "I don't believe a PFP product should be approved when the top PFP technical partner in WNT believes it should not be approved."

58.   Unbeknownst to Blum, on May 7, 1999, KPMG's Steven Rosenthal indicated by email to others at KPMG in an email entitled "Who is the Borrower in the BLIPS transaction," that:

> [m]y largest concern is that the BLIPS facts suggest that, in economic substance, the partnership, rather than the individual Investor is the true borrower (assuming there is a debt). I believe the following facts are problematic:  the investor is nominally the borrower for only a transitory period (7-10 days); the loan is non-recourse (the investor never assumes any personal liability); the investor does not control the proceeds (the proceeds are left in the bank) and the Investor apparently has little investment discretion while it holds the funds; the investor presumably will earn a negative spread while it holds the proceeds; the bank – and all of the other parties to the transaction – will look to the partnership, and not the investor, to repay the loan; the non-tax business reason for the investor to borrow the

- 30 -
COMPLAINT AND DEMAND FOR JURY TRIAL

proceeds and convey the loan is not substantial (the purported reason, leverage, can be accomplished in or out of the partnership). . . . in Rev. Rul. 80-240, in a structure very similar to BLIPS (but, with a corporation and not a partnership, assuming a loan borrowed by an individual), the IRS determined that the individual would be ignored for federal income tax purposes because the individual was merely an intermediate agent (and there was no plan or intention for the individual either to own the property acquired with the loan proceeds or repay the loan proceeds).

59.     Unbeknownst to Blum on May 9, 1999, KPMG WNT partner Richard Smith ("Smith") asked of KPMG's Steven Rosenthal by email whether, "Based on your analysis below, do you conclude that the tax results sought by the Investor are NOT 'more likely than not' to be realized?" to which Rosenthal responded "Yes."

60.     Unbeknownst to Blum, on May 10, 1999, KPMG partner and Department of Practice and Professionalism head DeLap stated by internal email to other KPMG partners that "I spoke again with Steve (Rosenthal) this morning and he is uncomfortable with a more-likely-than-not opinion that the investor is the true borrower at any point in the transaction."

61.     Unbeknownst to Blum, also on May 10, 1999, KPMG partner Philip Wiesner ("Wiesner"), by internal KPMG email, stated that "[m]y own recommendation here is that we should be paid a lot of money for our opinion since the transaction is clearly one that the IRS would review as falling squarely within the tax shelter orbit."

62.   Unbeknownst to Blum, on May 14, 1999, KPMG partner Michael Lippman inquired of KPMG partner DeLap by email, asking "Larry – Have you approved this product?" to which DeLap answered "No."  Lippman further inquired "If not, when do you expect to make a decision?" to which Larry answered "Upon receipt from Presidio of explicit confirmation that the additional representations requested by Mark will be given."

63.   Unbeknownst to Blum, in June of 1999, KPMG partner Warley presented a slide show within KPMG, in which she stated that the BLIPS transaction More-Likely-Than-Not Opinion Letter involved "about a 10 risk on scale of 1-10"

64.   Unbeknownst to Blum, on July 22, 1999, KPMG partner Watson indicated by email to KPMG partners Smith and Wiesner:

Gentlemen, we have completed our review of the BLIPS loan documents.  In general, these documents indicate that the loan proceeds will be invested in very safe investments (e.g. money market instruments).  Thus, it seems very unlikely that the rate of return on the investments purchased with the loan proceeds will equal or exceed that interest charged on the loan and the fees incurred by the borrower to secure the loan. . . . Before any fees are considered, the client would have to generate a 240% annual rate of return on the $2.5 million foreign currencies investment in order to break even.  If fees are considered, the necessary rate of return to break even will be even greater. . . . Although the loan is structured as a seven-year loan, the client has a tremendous economic incentive to get out of loan as soon as possible due to the large negative spread.  Before I submit our non-

economic substance comments on the loan documents to Presidio, I want to confirm that you are still comfortable with the economic substance of this transaction.

65.   Unbeknownst to Blum, on August 4, 1999, KPMG partner Wiesner sent an email regarding BLIPS and noted that "the WNT team reviewing BLIPS has completed our review of the loan documents and LLC agreement related to BLIPS" and that "we believe that, while it is a close call, a 'more-likely-than-not' federal tax opinion with respect to the transaction is, on balance, appropriate."

66.   Unbeknownst to Blum, on August 4, 1999, KPMG partner Watson sent an email internally at KPMG noting that "before engagement letters are signed and revenue is collected, I feel it is important to again note that I and several other WNT partners remain skeptical that the tax results purportedly generated by a BLIPS transaction would actually be sustained by a court if challenged by the IRS."

67.   Unbeknownst to Blum, on August 5, 1999, KPMG's Paul Kearns indicated by internal email at KPMG that "'a close call' to get to 'more likely than not' is not good enough for us to sell to a client" and later that day indicated "[j]ust so we are clear, I personally view it as no greater than 15%."

68.   Upon information and belief, and unbeknownst to Blum, on August 5, 1999, a KPMG partner sent an email to Brown & Wood partner Ruble, stating that he and Ruble had received a "get out of jail free card" as a result of obtaining permission from

Washington National Tax to proceed with BLIPS.

69.    Unbeknownst to Blum, on August 5, 1999, KPMG's Brent Lipschultz sent an email internally at KPMG stating that "[i]n an effort to obtain additional client leads for BLIPS given the short-time horizon, we would like to deploy the BDMs in the Northeast in an effort to assist us in contacting the NE area audit, tax, and consulting partners. Could you forward these documents to Larry DeLap for his review as soon as possible so that we can start deployment immediately."  Attached to this was a "BLIPS Script" which noted that it "will be changed depending upon who is making the introduction" and stated as follows:

Hi, this is ___ from KPMG's Personal Financial Planning Practice.  We have an innovative strategy that can offset the federal and state capital gains tax from your key client's target's asset sales.  It's a substantial fee generator for the firm (minimum is $250,000 and it is a turnkey type of product).  However, the strategy is extremely time sensitive.  It must be initiated by September 15th.  We're looking for clients or targets who have or will have realized a minimum of a $20 million capital gain.  Persons who recently sold or will have sold a closely held business or individuals with highly appreciated stock positions looking to diversify are ideal candidates.

70.    Unbeknownst to Blum, on August 18, 1999, KPMG's Steven Rosenthal stated by email to KPMG partner Watson in an email regarding the BLIPS documents, "I feel strongly that we should disclose all tax risks, but I think Larry DeLap needs to make the call.  I know there will be 'heat' but the documents are not consistent with our

1   original understanding on this point (and, as I understand from Richard, will not be

2   modified)."

3

4

5       71.    Ultimately, and in spite of numerous and repeated warnings regarding its

6   legality/viability, BLIPS was approved for marketing and sale and, as alleged below, to

7   Plaintiff Blum.

8

9       72.    Upon information and belief, and unbeknownst to Blum, because BLIPS was

10  a pre-packaged tax product, the structure of transactions that made up BLIPS was the

11  same for each client.  What differed from client to client was the amount of capital gains

12  loss that the tax product sought to create.

13

14

15      73.    Upon information and belief, unbeknownst to Blum, the cost to the client to

16  purchase the BLIPS product was at least 7% of the capital gains loss that the tax product

17  sought to create, and an additional $1,250,000 in fees directly to KPMG.

18

19  C.    KPMG Markets Its Generic Tax Products In A Way Designed To Conceal

20        Their True Nature From Both Its Clients And Government Authorities

21

22      74.    Unbeknownst to Blum, KPMG took precautions against detection of its

23  activities during the marketing of the generic tax products that it developed, including

24  OPIS and BLIPS.  These efforts included keeping the purchasers of the tax products in

25  the dark regarding the true details of the products and Defendants' understanding of these

26  products solely as tax avoidance strategies.

27

28

- 35 -

COMPLAINT AND DEMAND FOR JURY TRIAL

75.   KPMG generally refused to discuss any of the details of FLIP or OPIS with potential clients until after the potential client signed a confidentiality agreement promising not to disclose the information to anyone else.

76.   As to OPIS, unbeknownst to Blum, KPMG tax professionals were instructed in June of 1998 not to leave any marketing material with clients or targets under any circumstances.  Indeed, they were falsely told by KPMG management that not only will this harm Defendants' ability to keep the product confidential, it will "destroy" any chance the client may have to avoid the step transaction doctrine.

77.   As to BLIPS, unbeknownst to Blum, in May of 1999 KPMG tax professionals were instructed by Defendant Eischeid to obtain signed nondisclosure agreements before scheduling any meetings.

78.   KPMG also limited the paperwork used to explain what little information was provided to potential clients.  As a matter of policy, and in order to maintain the secrecy of the products, client presentations were done on chalkboards or erasable whiteboards and written materials were retrieved from clients before leaving a meeting.

79.   Further, upon information and belief, Defendants did not market these products, including BLIPS and OPIS, as what Defendants developed them to be, namely tax shelters, but instead told potential clients that they were "investment strategies" with possible tax consequences.

80.   In fact, during the years 1998 and 1999 and continuing through approximately 2005, Defendants' publicly stated position, as well as in any relevant representations to Plaintiff, was that it does not develop, sell, or promote tax shelters. Defendants took this position despite the fact that they knew that this was precisely what Defendants were developing, selling, and/or promoting to Plaintiff and others.

81.   Unbeknownst to Blum, in May of 1998, Gregg Ritchie, the second most senior tax official at KPMG, sent a memorandum to Jeffrey Stein, the then head of operations in the Tax Services Practice, advising that OPIS not be registered as a tax shelter, even assuming that Defendants otherwise concluded that "the OPIS product meets the definition of a tax shelter under IRC section 6111(c)."

82.   Unbeknownst to Blum, this memorandum advised that "KPMG should make the business/strategic decision not to register the OPIS product as a tax shelter" because to do so would put KPMG in "a severe competitive disadvantage." Importantly, the memorandum supports this conclusion with the rationale that "the rewards of a successful marketing of the OPIS product ... far exceed the financial exposure to penalties that may arise."

83.   Similarly as to BLIPS, unbeknownst to Blum and upon information and belief, high ranking KPMG personnel, such as Lawrence DeLap, recommended that BLIPS be registered as a tax shelter, but were overruled by other KPMG personnel.

84.   In fact, unbeknownst to Blum, KPMG devoted significant resources to devising rationales for not registering its products as tax strategies and even considered

- 37 -

creating a separate entity to act as the registrant for the KPMG tax products in order to enable KPMG to avoid submitting its name as the organizer of a tax shelter.  In reality, KPMG was well aware its products should be registered as tax shelters.  Nevertheless, Defendants did not disclose this fact to either Plaintiff or the public at large, nor were the products ever registered as tax shelters.

## V.    DEFENDANTS INDUCE PLAINTIFF TO INVEST IN THE OPIS AND BLIPS SHELTERS

### A.    Defendants Induce Plaintiff's Investment In OPIS

85.    In mid-1998, Plaintiff was contacted telephonically by Brent Law of KPMG.  At the time, Plaintiff was the Founder and Chairman of the internet startup company known as Buy.com.  Brent Law was Plaintiff's accountant and had previously worked with Plaintiff regarding his personal finances and tax filings, including a large unrelated four year IRS audit that had recently concluded in which KPMG had provided Plaintiff with accounting and tax advice and services.  Mr. Law told Plaintiff that KPMG was marketing an "investment strategy" that was reserved for its "best clients" and inquired as to whether Plaintiff would be interested in learning more about this KPMG strategy.  Plaintiff indicated that he was.  Accordingly, Mr. Law told Plaintiff that he would set up a meeting with one of his KPMG colleagues regarding the strategy.

86.    Within two weeks after the call from Mr. Law, Plaintiff met with Defendant Hasting of KPMG regarding the proposed "investment strategy."  The meeting took place in a conference room at the Buy.com offices on Brookline in Aliso Viejo, California.  While Plaintiff does not recall exactly who else was present at the

1  meeting, he recalls that another individual from KPMG may have accompanied
2  Defendant Hasting and that this individual was likely female.

3

4      87.    This meeting lasted approximately one hour.  Plaintiff was not provided
5  with or allowed to retain any documents regarding the "investment strategy" discussed,
6  but Hasting did draw and write on a whiteboard hanging on the wall in the conference
7  room where the meeting took place.

8

9      88.    Defendant Hasting represented that the strategy was a "new opportunity"
10  and that it was based on inside information KPMG had gained by virtue of its role in
11  auditing companies worldwide.     Accordingly, Defendant Hasting specifically
12  represented that KPMG, by virtue of its position as an auditor of companies worldwide,
13  had the inside track on how to make substantial money through hedging and currency
14  strategies.  Defendant Hasting stated that that the strategy would be very profitable and
15  reiterated that it was only being offered to KPMG's "best clients."  Defendant Hasting
16  erased the whiteboard at the conclusion of the meeting.

17

18      89.    Plaintiff was initially uncertain as to whether he should invest in the
19  KPMG strategy.  Because of Plaintiff's uncertainty, a second meeting was scheduled
20  between Plaintiff and Defendant Hasting approximately one month later in
21  approximately mid-1998.  This second meeting with Defendant Hasting lasted about an
22  hour and a half.  Plaintiff does not recall the exact date of the meeting.  The meeting
23  took place at the Buy.com offices, but in a different building from the first meeting.

24

25      90.    The discussion regarding the strategy during this second meeting was more
26  detailed and Defendant Hasting used concrete numbers and examples to illustrate the
27  alleged profitability of the KPMG strategy.  For example, Defendant Hasting made
28  representations regarding how much money Plaintiff stood to make based on specific

- 39 -
COMPLAINT AND DEMAND FOR JURY TRIAL

investment amounts.  Plaintiff questioned Defendant Hasting regarding his confidence in the strategy's ability to make money and Defendant Hasting represented that he was very confident that KPMG's strategy would be profitable.  Again, however, Defendant Hasting did not provide any documents to Plaintiff.  Defendant Hasting did use a whiteboard to draw and write, but Defendant Hasting erased the whiteboard at the conclusion of the meeting.

91.    Defendant Hasting did not represent that the primary purpose of the strategy was to result in losses that would serve to offset otherwise taxable gains.  Had Defendant Hasting made this representation, and not concealed this fact from Plaintiff, Plaintiff would not have participated in the strategy.  Plaintiff had recently completed a lengthy and costly, but unrelated, four year audit with the IRS, which culminated in the IRS determining that Plaintiff had *overpaid* his taxes.  Nevertheless, and particularly in light of this prior audit, Plaintiff had no desire to get involved in any transactions or deals which might result in another lengthy and costly audit.  In addition, Plaintiff wanted his investment to be a "sure thing" because if it was not he would invest the money in Buy.com instead.

92.    Approximately one month later – and based on Defendant Hasting's express representations during these two meetings – Plaintiff made the decision to invest in the strategy.  The engagement letter memorializing Plaintiff's decision to invest in the strategy is dated September 24, 1998.  In that engagement letter, KPMG and Hasting promised that it would furnish "a tax opinion letter" providing that "the tax treatment described in the opinion is 'more likely than not' to occur."  The engagement letter was signed by Carl Hasting.

93.    In approximately September of 1998, Plaintiff received a verbal offer from a Japanese businessman, Masayoshi Son, to purchase Buy.com.  Plaintiff was aware

- 40 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1  that Masayoshi Son was a principal at Softbank and was engaged in aggressive efforts
2  to obtain various "dotcom" companies at the time having purchased substantial interests
3  or participated in joint ventures with companies such as Yahoo, Yahoo Japan, E Trade,
4  and others. Softbank had previously acquired shares in Buy.com. The verbal offer was
5  to purchase all of Buy.com for $400 million.

7      94.    In the months prior to this offer, Plaintiff had been attempting to sell
8  Buy.com stock to a competitor of Softbank, Kleiner Perkins. At the time, Plaintiff was
9  the primary owner of Buy.com.

11     95.    Upon receiving the offer, Plaintiff called Brent Law at KPMG to ask for
12 advice regarding the transaction.  Mr. Law referred him to Defendant Hasting who
13 advised Plaintiff not to sell the entire company, but instead to sell approximately 10%
14 of the company.   Pursuant to this advice from KPMG, the Softbank deal was
15 consummated whereby approximately 10% of Buy.com was sold to Softbank for
16 roughly $40 million.

18     96.    Plaintiff paid in excess of $1.5 million in costs associated with OPIS,
19 including over $500,000.00 paid to KPMG in professional fees.

21     97.    In an opinion letter dated December 31, 1998 by KPMG, KPMG stated
22 that "there is a greater than 50 percent likelihood (i.e. it is 'more likely than not') that"
23 the OPIS product would "be upheld if challenged by the Internal Revenue Service..."
24 The opinion letter was signed by Carl Hasting.

26     98.    Importantly, the opinion letter purports to rely on certain factual
27 representations made by the Plaintiff. This purported reliance is, in fact, false as the
28 representations were boilerplate and in actuality drafted by Defendants and essentially

- 41 -

1   identical representations were employed by Defendants in connection with each OPIS
2   product sold.  Plaintiff in fact relied upon KPMG's advice and expertise as well as its
3   prior role as his accountant in believing that the representations were appropriate and
4   correct.

6        99.    Unbeknownst to Blum, KPMG tax professionals expended extensive effort
7   drafting a prototype tax opinion letter to serve as a template for the opinion letters
8   actually sent by KPMG to Plaintiff.  As such, virtually all the FLIP, OPIS, and BLIPS
9   opinion letters contained boilerplate repetitions of the factual representations attributed
10  to the participating parties.  A law firm also relied on these identical representations,
11  without further independent analysis, in drafting its own opinion letter.

13       100.   In drafting these representations, Defendants did not consult with its clients
14  beforehand, even for representations purporting to describe, in a factual way, the
15  client's intentions, motivations, or understanding of the tax product.  KPMG alone,
16  through Defendants Stein, Eischeid, Hasting, and Paule, without any client input, wrote
17  the client's representations and then demanded that each client attest to them by
18  returning a signed letter to the accounting firm.  In doing so, Plaintiff relied on
19  Defendants' expertise, reputation, and past role as accountants in believing the
20  representations to be accurate and appropriate.

22       101.   In particular, to the extent that the representations purport to rely on
23  Plaintiff' independent review of the transactions and independent assessment of the
24  likelihood of making a profit and the economics of OPIS, Defendants knew this not to
25  be true and that Plaintiff was relying on Defendants in believing it to be the case.  In
26  truth, as alleged above, Defendants provided only a verbal description of the product
27  accompanied by a presentation written out on a whiteboard.  Plaintiff was not permitted
28  to retain documentation of the purported investment strategy much-less examine its

1   economics in detail.   Defendants knew this to be the case, but drafted the factual

2   representations anyway and instructed Plaintiff Blum to sign the representation letter.

3

4       102.   In truth, despite being a gifted entrepreneur, Plaintiff did not have a full

5   understanding of the nature of OPIS, including the fact that it had been designed as a

6   tax shelter, rather than, as represented by KPMG and Defendant Hasting, an investment

7   strategy.  Plaintiff Blum lacks significant formal education, having attended only briefly

8   a community college, and does not understand the intricacies of tax law and accounting

9   methods.

10

11       103.   In connection with OPIS, KPMG, through its partners and employees, and

12   by virtue of its role as the architect of the strategies at issue made numerous affirmative

13   false and misleading statements and representations to Plaintiff that KPMG either knew

14   were untrue or misleading at the time they were made or should have known they were

15   untrue and misleading:

16

17       A. Defendants misrepresented the transaction known as OPIS as an

18           investment strategy designed primarily to make a profit rather than solely

19           to generate losses for tax purposes.  KPMG made these misrepresentations

20           both orally and in writing on numerous occasions through, principally,

21           Carl Hasting.   These misrepresentations were made during the various

22           meetings that Plaintiff had with Defendant Hastings (described in more

23           detail elsewhere herein) and in the engagement and opinion letters that

24           KPMG issued to Plaintiff dated September 24, 1998 and December 31,

25           1998.  KPMG made these representations despite the fact that "in truth and

26           in fact" the transactions "were tax shelters designed [by KPMG] to

27           generate bogus tax losses."

28

- 43 -

COMPLAINT AND DEMAND FOR JURY TRIAL

B. Defendants misrepresented the legal opinion available from a law firm in connection with OPIS, as independent legal advice when in truth and in fact, it was nothing more than an orchestrated extension of KPMG's marketing machine, relying on the same factual representations that were drafted by KPMG.

C. Defendants made numerous misrepresentations regarding the likelihood of the success of the strategy, both with respect to the likelihood of making a profit and the likelihood of being upheld as legitimate investments if the IRS challenged the strategy.  KPMG made these misrepresentations both orally and in writing on numerous occasions through, principally, Carl Hasting.  The misrepresentations were made during the various meetings that Plaintiff had with Defendant Hastings (described in more detail elsewhere herein) and in the engagement and opinion letters that KPMG issued to Plaintiff that are dated September 24, 1998 and December 31, 1998.

 i. More specifically, Carl Hasting represented to Plaintiff orally that Plaintiff would make a significant amount of money by investing in the strategy presently known as OPIS and that the strategy was a legitimate investment only offered to KPMG's "best clients."

 ii. Further, as to the strategy presently known as OPIS, KPMG represented in writing in its opinion letter dated December 31, 1998 that it was "more likely than not" that the strategy would withstand IRS scrutiny if challenged.

iii. KPMG misrepresented in its opinion letters that it was relying on certain factual representations made by Plaintiff when in truth KPMG had previously devised these representations without regard to the actual facts or facts unique to Plaintiff, required that Plaintiff make those representations as a condition of the transaction, and relied on the overall complexity of the transactions and Plaintiff's trust and faith in KPMG as his trusted accountant and adviser in obtaining Plaintiff's "consent" to these representations.

iv. Additionally, KPMG made misrepresentations regarding the likelihood of penalties being imposed.  KPMG also misrepresented the likely impact of obtaining an opinion from an "independent" law firm and the impact that opinion would have on the likelihood of penalties being imposed.

104.   In addition to the enumerated affirmative misrepresentations, KPMG failed to disclose numerous facts that KPMG was or should have been aware of, which were material to the transactions and, had Plaintiff known them, would have caused Plaintiff not to invest in the strategies:

A. Defendants failed to disclose that the investment strategies it marketed to Plaintiff were generic tax products that KPMG developed and marketed on a mass basis along with other such strategies that were similarly designed solely to generate losses for tax purposes.

B. As to the OPIS product, Defendants failed to disclose that the tax opinions signed by the KPMG tax partners purported to rely on certain factual

COMPLAINT AND DEMAND FOR JURY TRIAL

representations that were devised by KPMG tax partners and others involved in designing the OPIS strategy and were false and misleading.

C.  Further, Defendants failed to disclose that its own tax opinions were boilerplate and that virtually identical opinions were provided to other clients.  As such, Defendants failed to disclose that the opinions did not deal with facts unique to Plaintiff, make any effort to get those facts right, or analyze the governing law with respect to those facts.

D.  As to the OPIS product, Defendants failed to disclose to Plaintiff that KPMG did not in fact believe there was a reasonable opportunity to earn a pre-tax profit from the strategy known as OPIS.

E.  Defendants failed to disclose that the strategy known as OPIS was intended to generate substantial capital losses through the use of a pre-arranged series of purchases of and options on stock of one of two prominent international banks, in Plaintiff's case UBS, followed by redemptions of those investments by the bank.

F.  Defendants failed to disclose that it knew the representations it made in its tax opinions were false and yet issued them anyway.  As such, Defendants knew the strategies were not likely to withstand IRS scrutiny.

G.  As to the strategy known as OPIS, Defendants failed to disclose that senior KPMG tax professionals criticized the viability of these transactions and specifically questioned whether the transaction had economic substance or risk.

H. In fact, Defendants did not disclose that throughout the development of the transaction known as OPIS, KPMG tax partners and other professionals had raised serious and valid concerns about the honesty of the proposed opinion letter.

I. Furthermore, Defendants failed to disclose that it was actively taking steps to conceal these transactions from the IRS. In doing so, Defendants made the decision not to register the transactions as tax shelters. Defendants made this decision in the face of advice from its professionals and legal compliance personnel that the shelters should have been registered and that the failure to do so could amount to criminal conduct.

J. Defendants failed to disclose to Plaintiff that in 1998, KPMG decided not to register the OPIS strategy with the IRS after a KPMG partner determined that the potential penalties KPMG might face were vastly lower than the potential fees KPMG would bring in through the transactions.

105. Had Plaintiff known the true facts or Defendants properly disclosed the facts as Defendants knew them to be, Plaintiff would never have invested in the OPIS strategy. As such, Plaintiff has been or likely will be, damaged in an amount to be proven at trial.

B. **Defendants Induce Plaintiff's Investment In BLIPS**

106. Approximately eight months after completing the transaction presently known as OPIS, Plaintiff received a phone call from Masayoshi Son. During that phone call, Masayoshi Son indicated a desire to purchase an unspecified amount of Plaintiff's

1  personal stock in Buy.com and corporate stock in Buy.com. Ultimately, the purchase

2  would result in Masayoshi Son and Softbank owning approximately 30% of Buy.com.

3

4       107.  Shortly after hearing from Masayoshi Son, Plaintiff contacted Brent Law

5  from KPMG. Plaintiff told Mr. Law of the likely transaction and asked Mr. Law how

6  he should handle it. Mr. Law again referred Plaintiff to Carl Hasting. Plaintiff does not

7  recall the specific date that he contacted Mr. Law. Defendant Hasting contacted

8  Plaintiff the next day. Defendant Hasting told Plaintiff that he had a "better deal" for

9  Plaintiff.

10

11      108.  Shortly thereafter, Plaintiff met with Defendant Hasting. Plaintiff recalls

12  that no one else was present at that meeting. The meeting took place at Buy.com and

13  lasted approximately one hour.

14

15      109.  During that meeting with Defendant Hasting, Plaintiff was primarily

16  interested in the differences between the investment Defendant Hasting was discussing

17  and the prior investment strategy. Plaintiff recalls that it was very different. Further,

18  Defendant Hasting stressed the certainty behind the investment. He informed Plaintiff

19  that it had a "120%" chance of success and sought to explain why it was better than the

20  previous transaction. Further, Defendant Hasting stressed the reputation of KPMG and

21  asserted that they had the best and smartest people working on these investments. This

22  time, Defendant Hasting did mention that if the strategy did not work as planned, it

23  would result in a tax write off. However, this was mentioned only as an aside and not

24  emphasized. Further, Plaintiff stressed that having recently concluded a lengthy

25  unrelated IRS audit, even though that audit resulted in a refund to Plaintiff, he did not

26  want to risk another audit.

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

1    110.  Plaintiff next spoke with Defendant Hasting once the sale of Buy.com

2  stock had been finalized with Masayoshi Son.  Defendant Hasting informed Plaintiff

3  that the new investment strategy would be significantly more expensive than the last

4  one.  Based on Defendant Hasting's express representations, Plaintiff decided to invest

5  in the strategy in late 1999.

6

7    111.  The engagement letter memorializing Plaintiff's decision is dated

8  September 21, 1999.  The engagement letter is signed by Defendant Paule and states

9  that KPMG will furnish a "tax opinion" regarding the "tax consequences" of the BLIPS

10  product and providing that "there is a greater than 50 percent likelihood (i.e., it is 'more

11  likely than not') that those consequences will be upheld if challenged by the Internal

12  Revenue Service."

13

14    112.  In an opinion letter dated December 31, 1999 by KPMG, KPMG stated

15  that "there is a greater than 50 percent likelihood (i.e. it is 'more likely than not') that"

16  the OPIS product would "be upheld if challenged by the Internal Revenue Service..."

17  The opinion letter was signed by Carl Hasting.

18

19    113.  Importantly, the opinion letter purports to rely on certain factual

20  representations made by one or more of the Plaintiff.  This purported reliance is in fact,

21  false as the representations were boilerplate and in actuality drafted by Defendants and

22  essentially identical representations were employed by Defendants in connection with

23  each BLIPS product sold.  Plaintiff in fact relied upon KPMG's advice and expertise as

24  well as its prior role as his accountant in believing that the representations were

25  appropriate and correct.

26

27    114.  Unbeknownst to Blum, KPMG tax professionals expended extensive effort

28  drafting a prototype tax opinion letter to serve as a template for the opinion letters

actually sent by KPMG to Plaintiff. As such, virtually all the FLIP, OPIS, and BLIPS opinion letters contained boilerplate repetitions of the factual representations attributed to the participating parties. A law firm also relied on these identical representations, without further independent analysis, in drafting its own opinion letter.

115. In drafting these representations, Defendants did not consult with its clients beforehand, even for representations purporting to describe, in a factual way, the client's intentions, motivations, or understanding of the tax product. KPMG alone, without any client input, wrote the client's representations and then demanded that each client attest to them by returning a signed letter to the accounting firm. In doing so, Plaintiff relied on Defendants' expertise, reputation, and past role as accountants in believing the representations to be accurate and appropriate.

116. In particular, to the extent that the representations purport to rely on Plaintiff' independent review of the transactions and independent assessment of the likelihood of making a profit and the economics of BLIPS, Defendants knew this not to be true and that Plaintiff was relying on Defendants in believing it to be the case. In truth, as alleged above, Defendants provided only a verbal description of the product accompanied by a presentation written out on a whiteboard. Plaintiff was not permitted to retain documentation of the purported investment strategy much less examine its economics in detail. Defendants knew this to be the case, but drafted the factual representations anyway and instructed Plaintiff Blum to sign the representation letter.

117. In truth, despite being a gifted entrepreneur, Plaintiff did not have a full understanding of the nature of BLIPS including the fact that it had been designed as a tax shelter, rather than, as represented, an investment strategy. Plaintiff Blum lacks significant formal education, having attended only briefly a community college, and does not understand the intricacies of tax law and accounting methods.

118. As a consequence and in connection with BLIPS, KPMG, through its partners and employees, and by virtue of its role as the architect of the strategies at issue made numerous affirmative false and misleading statements and representations to Plaintiff that KPMG either knew were untrue or misleading at the time they were made or should have known they were untrue and misleading.

A. Defendants misrepresented the transaction known as BLIPS as an investment strategy designed primarily to make a profit rather than solely to generate losses for tax purposes. Defendants made these misrepresentations both orally and in writing on numerous occasions through, principally, Carl Hasting. These misrepresentations were made during the various meetings that Plaintiff had with Defendant Hasting (described in more detail elsewhere herein) and in the engagement and opinion letters that KPMG issued to Plaintiff dated September 21, 1999 and December 31, 1999. KPMG made these representations despite the fact that "in truth and in fact" the transactions "were tax shelters designed [by KPMG] to generate bogus tax losses."

B. Defendants misrepresented the available legal opinion available in connection with BLIPS, as independent legal advice when in truth and in fact, it was nothing more than an orchestrated extension of KPMG's marketing machine, relying on the same factual representations that were drafted by KPMG.

C. Defendants made numerous misrepresentations regarding the likelihood of the success of the strategy, both with respect to the likelihood of making a profit and the likelihood of being upheld as legitimate investments if the

IRS challenged the strategy.  KPMG made these misrepresentations both orally and in writing on numerous occasions through, principally, Carl Hasting.  The misrepresentations were made during the various meetings that Plaintiff had with Defendant Hastings (described in more detail elsewhere herein) and in the engagement and opinion letters that KPMG issued to Plaintiff that are dated September 21, 1999 and December 31, 1999.

i.  More specifically, Carl Hasting represented to Plaintiff orally that Plaintiff would make a significant amount of money by investing in the strategy presently known as BLIPS and that the strategy was a legitimate investment stressing KPMG's reputation and reliability. As to the strategy presently known as BLIPS, Defendant Hastings represented orally to Plaintiff that it had a 120% or more likelihood of success and was more certain to be successful than the strategy OPIS strategy.

ii.  Further, as to the BLIPS product, KPMG represented in writing in its opinion letter dated December 31, 1999 that it was "more likely than not" that the strategy would withstand IRS scrutiny if challenged.

iii.  KPMG misrepresented in its opinion letters that it was relying on certain factual representations made by Plaintiff when in truth KPMG had previously devised these representations without regard to the actual facts or facts unique to Plaintiff, required that Plaintiff make those representations as a condition of the transaction, and relied on the overall complexity of the transactions and Plaintiff's

trust and faith in KPMG as his accountant and adviser in obtaining Plaintiff's "consent" to these representations.

iv. Additionally, KPMG made misrepresentations regarding the likelihood of penalties being imposed. KPMG also misrepresented the likely impact of obtaining an opinion from an "independent" law firm and the impact that opinion would have on the likelihood of penalties being imposed.

119. In addition to the enumerated affirmative misrepresentations, Defendants failed to disclose numerous facts that KPMG was or should have been aware of, which were material to the transactions and, had Plaintiff known them, he would not have invested in the strategies in the first place:

A. Defendants failed to disclose that the investment strategies it marketed to Plaintiff were generic tax products that KPMG developed and marketed on a mass basis along with other such strategies that were similarly designed solely to generate losses for tax purposes.

B. As to the BLIPS product, Defendants failed to disclose that the tax opinions signed by the KPMG tax partners purported to rely on certain factual representations that were devised by KPMG tax partners and others involved in designing the BLIPS strategy and were false and misleading.

C. Further, Defendants failed to disclose that its own tax opinions were boilerplate and that virtually identical opinions were provided to other clients. As such, KPMG failed to disclose that the opinions did not deal

- 53 -
COMPLAINT AND DEMAND FOR JURY TRIAL

1  with facts unique to Plaintiff, make any effort to get those facts right, or

2  analyze the governing law with respect to those facts.

3

4  D. As to the BLIPS product, Defendants failed to disclose to Plaintiff that

5     KPMG did not believe there was a reasonable opportunity, or at best a

6     remote opportunity, to earn a reasonable pre-tax profit from the strategy

7     known as BLIPS.

8

9  E. Defendants failed to disclose that the strategy known as BLIPS was

10    intended to generate substantial capital losses.

11

12 F. Defendants failed to disclose that it knew the representations it made in its

13    tax opinions were false and yet issued them anyway.   As such, KPMG

14    knew the strategies were not likely to withstand IRS scrutiny.

15

16 G. As to the BLIPS product, Defendants did not disclose that in March 2000,

17    KPMG's tax leadership was advised by two of KPMG's top technical tax

18    experts that the strategy presently known as BLIPS was 'frivolous' and

19    would 'lose' in court, and was advised by professional and legal

20    compliance personnel of the risks associated with tax shelter transactions

21    like BLIPS, including the risk of criminal investigation, civil liability, and

22    penalties, action by the IRS's Director of Practice, and action by State

23    Boards of Accountancy.   Nevertheless, despite the obvious facts about

24    BLIPS and the warnings conveyed during that time frame, KPMG's tax

25    leadership decided to authorize the issuance of favorable opinions on all of

26    the 1999 transactions of which Plaintiff was a part.

27

28

- 54 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

H. In fact, Defendants did not disclose that throughout the development of the transaction known as BLIPS, KPMG tax partners and other professionals had raised serious and valid concerns about the honesty of the proposed opinion letter.

I. Furthermore, Defendants failed to disclose that it was actively taking steps to conceal these transactions from the IRS.  In doing so, KPMG made the decision not to register the transactions as tax shelters.  KPMG made this decision in the face of advice from its professionals and legal compliance personnel that the shelters should have been registered and that the failure to do so could amount to criminal conduct.

120.   Had Plaintiff known the true facts or Defendants properly disclosed the facts as Defendants knew them to be, Plaintiff would never have invested in the BLIPS strategy.  As such, Plaintiff has been damaged in an amount to be proven at trial.

## VI.   PLAINTIFF'S 1999 AND 2000 TAX RETURNS ARE AUDITED AND BACK TAXES AND PENALTIES ARE IMPOSED

121.  Despite Plaintiff having repeatedly made it clear to Defendants that Blum had no desire to risk another lengthy or costly audit and having relied on Defendants' representations that the strategies Plaintiff participating in were legitimate and lawful "investment strategies." Plaintiff's 1998 and 1999 tax returns were selected for further examination and audited.

122. With respect to the OPIS product, as of September 24, 2010, the IRS

contended that for the 1998 tax year, Plaintiff owed taxes in the amount of $9,414,861.00, penalties in the amount of $1,882,972.00, and interest in the amount of $12,189,993.00. Additionally, with regard to the 1999 tax year and the OPIS transaction, the IRS contended that Plaintiff owed an additional $14,772.00 in taxes, $4,432.00 in penalties, and $17,630.00 in interest. Finally, for 2002 and OPIS, the IRS contended Plaintiff owed $18,737.00 in taxes, $3,747.00 in penalties, and $12,274.00 in interest.

123. With respect to the BLIPS product, for the 1999 tax year, the IRS contends that Plaintiff owes in excess of $16,000,000.00 in taxes and at least $7,000,000.00 in penalties. Plaintiff is aware that the IRS also contends that Plaintiff owes significant interest payments.

124. Initially, Plaintiff retained KPMG to represent him in connection with the government investigation. Although KPMG had a clear conflict of interest in representing Plaintiff with respect to an audit of its own work, KPMG induced Plaintiff to sign a waiver of that conflict of interest thereby compounding the likelihood of harm to Plaintiff.

125. At the time, Plaintiff still believed in the legitimacy of the advice he had received from KPMG and, equally importantly, thought that KPMG believed in the propriety of its advice. In inducing Plaintiff to waive KPMG's conflict of interest, KPMG inadequately and falsely described the conflict, and Plaintiff signed the waiver without knowing the details of KPMG's unlawful conduct or the full extent of the facts that KPMG would later admit. Had Plaintiff known these facts, Plaintiff never would

1    have signed the waiver.

2

3    126. Although at the time, Plaintiff was unaware of Defendants' outright fraud and

4    wrongful conduct alleged herein and continued to rely on KPMG's then continuing

5    representations regarding the propriety of its advice and representation, in 2003 Plaintiff

6    entered into a tolling agreement with Defendants.  The tolling agreement tolled any and

7    all statute of limitations regarding any cause of action Plaintiff may have had against

8

9    Defendants.  The tolling agreement, together with its amendments, remained effective

10   through the end of December of 2009.

11

12   127. As of the filing of this complaint, the exact amount of any back taxes,

13   penalties, and interest that Plaintiff may be assessed in connection with the OPIS and

14   BLIPS products is currently being litigated and has not been determined with finality.

15

16

17   **VII.   KPMG ADMITS THE TAX PRODUCTS IT MARKETED AND SOLD TO**

18   **PLAINTIFF WERE UNLAWFUL AND FRAUDULENT**

19

20   128. After a government investigation and in response to the likelihood that

21   KPMG would be formally indicted, KPMG entered into a Deferred Prosecution

22   Agreement ("DPA") on or about August 29, 2005.

23

24

25   129. Pursuant to the DPA, and to avoid further criminal prosecution for its

26   wrongdoing, KPMG admitted to its criminal conduct and agreed to pay a fine to the

27   United States in the amount of Four Hundred and Fifty-Six Million dollars

28   ($456,000,000).

130. Importantly, by virtue of the DPA, KPMG is prohibited from contesting various facts in civil litigation. There are several clear findings in the DPA regarding an intricate pattern and practice/course of conduct at KPMG whereby unregistered and unlawful tax shelters were developed, marketed, and sold by KPMG on a mass basis to an unsuspecting public.

131. For example, the DPA states that a "number of KPMG tax partners engaged in conduct that was unlawful and fraudulent, including: (i) preparing false and fraudulent tax returns for shelter clients; (ii) drafting false and fraudulent proposed factual recitations and representations as part of the documentation underlying the shelters; (iii) issuing opinions that contained those false and fraudulent statements and that purported to rely upon those representations, although the KPMG tax partners . . . knew they were not true; (iv) actively taking steps to conceal from the IRS these shelters and the true facts regarding them; and (v) impeding the IRS by knowingly failing to locate and produce all documents called for by IRS summonses and misrepresenting to the IRS the nature and extent of KPMG's role with respect to certain tax shelters."

132. Through the DPA, KPMG admitted that it took various steps to conceal its unlawful conduct from Plaintiff and others up to and through August 28, 2005, including through the activities of "the Stratecon Partner," who, on information and belief Plaintiff alleges was Defendant Greenberg. As admitted by KPMG, the Stratecon Partner took steps to conceal KPMG's activities from both the government and public through the assertion of bogus claims of the attorney-client privilege regarding law firms KPMG retained on its own, but improperly claimed were retained by KPMG's clients.

133. Through the DPA, KPMG admitted that this course of conduct was "deliberately approved and perpetrated at the highest levels of KPMG's tax management, and involved dozens of KPMG partners and other personnel. Certain individuals involved were later promoted to firm-wide leadership positions. Moreover, during the period 1996 through 2002, KPMG changed its policies and practices in a manner that encouraged the sale of tax "products" to multiple clients.   In this regard, KPMG changed its compensation structure in a manner that encouraged the sale of tax products, set policies and goals that demanded the creation and sale of tax products, and created within its tax department groups of partners and other personnel who were specifically charged with developing and selling tax shelters."

134. Pursuant to the DPA, KPMG agreed "that it shall not, through its attorneys, agents, partners, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement." KPMG may raise defenses in civil litigation only "as long as doing so does not contradict the Statement of Facts or such representations."

135. Should KPMG make any such contradictory statement, it "shall constitute a breach of [the DPA] and KPMG thereafter shall be subject to prosecution…"

136. In keeping with these obligations, in the immediate aftermath of the DPA, KPMG issued a press release wherein it stated that it not only "accepts and acknowledges responsibility for its conduct" but that it "regret[s]" its past tax practices and pledges that as to the civil litigation arising out of its wrongful conduct, "KPMG looks forward to

resolving the civil litigation expeditiously and with full and fair accountability."

137. The DPA and Statement of Facts explicitly name the very tax shelter transactions marketed and sold to Plaintiff, namely "OPIS" and "BLIPS". Moreover, the conduct admitted to by KPMG includes conduct carried out by KPMG in connection with marketing, selling, and implementing of Plaintiff's transactions.

138. As to OPIS, KPMG admitted that the opinion letters "signed by KPMG tax partners" contained numerous false representations regarding the nature of the transaction "when in truth and in fact" the transactions "were tax shelters designed to generate bogus tax losses."

139. KPMG admitted that the OPIS strategy was marketed to at least 170 individuals and that the opinion letters issued by KPMG "were substantially identical, save for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions."

140. KPMG admitted as to OPIS that "[s]enior KPMG tax professionals criticized the viability of these transactions and specifically questioned whether the transaction had economic substance or risk..."

141. Similarly as to BLIPS, KPMG admitted that the "tax opinions signed by the KPMG tax partners purported to rely on certain factual representations" that were "devised by KPMG tax partners and others involved in designing BLIPS" and "were false and misleading."

142. Also regarding BLIPS, KPMG admitted that "In March 2000, KPMG's tax leadership was advised by two of KPMG's top technical tax experts that BLIPS was 'frivolous' and would 'lose' in court, and was advised by professional and legal compliance personnel of the risks associated with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil liability, and penalties, action by the IRS's Director of Practice, and action by State Boards of Accountancy."

143. "Nevertheless," KPMG admitted and "despite the obvious facts about BLIPS and the warnings conveyed during that time frame, KPMG's tax leadership decided to authorize the issuance of favorable opinions on all of the 1999 transactions, and proceeded with the implementation of another series of BLIPS transactions in 2000."

144. Importantly, the DPA contains statements regarding the purported knowledge of KPMG's clients or "high net worth" individuals.  KPMG directly participated in the negotiation and drafting of the terms of the DPA.  Plaintiff was in no way involved in the negotiation and/or drafting of the terms of the DPA.  Thus, while KPMG is, by its terms, bound by the admissions in the DPA, the DPA is not an accurate account of Plaintiff's knowledge or awareness of KPMG's misconduct.  Upon information and belief, and unbeknownst to Plaintiff at the time he were drafted, the statements in the DPA regarding the purported knowledge of KPMG's clients (a) were drafted by KPMG in order to protect itself in civil litigation KPMG knew would result from its admission of widespread misconduct and unlawful actions and (b) were negotiated and inserted by KPMG's counsel in an effort to reduce KPMG's liability to later plaintiffs, including Blum.  To the contrary, Plaintiff relied on Defendants advice and representations that

OPIS and BLIPS were legitimate investment strategies.   Defendants never informed Plaintiff that OPIS and BLIPS were designed solely as tax shelters and implemented as such.  As such, Plaintiff believed and conducted his financial affairs, including filing tax returns and taking other positions before the government, based on and in reliance upon Defendants' advice and representations in this regard.

## FIRST CAUSE OF ACTION

(Breach of Fiduciary Duty Against All Named Defendants

and Does 1 through 10, inclusive)

145. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 144 above and in each and every other cause of action in this Complaint, as if fully set forth herein.

146.  Pursuant to Plaintiff' relationship with KPMG, Plaintiff reposed trust and confidence in KPMG to provide faithful and accurate financial advice, and to place the interests of Plaintiff above those of KPMG.  Accordingly, KPMG and each of its partners owed a fiduciary duty to Plaintiff.

147.  Defendants breached their fiduciary duties to Plaintiff by numerous acts and omissions, including, but not limited to, the following:

A. Defendants misrepresented OPIS and BLIPS strategies as investment strategies designed primarily to make a profit rather than solely to generate losses for tax purposes.  Defendants made these misrepresentations both orally and in writing on numerous occasions through, principally, Carl Hasting.  These misrepresentations were made during the various meetings

that Plaintiff Blum had with Defendant Hastings (described in more detail elsewhere herein) and in the engagement and opinion letters that KPMG issued to Plaintiff that are dated in 1998 and 1999.  KPMG made these representations despite the fact that "in truth and in fact" the transactions "were tax shelters designed [by KPMG] to generate bogus tax losses."

B. Defendants misrepresented the available legal opinion available from a law firm in connection with OPIS and BLIPS, as independent legal advice when in truth and in fact, it was nothing more than an orchestrated extension of KPMG's marketing machine, relying on the same factual representations that were drafted by KPMG.

C. Defendants made numerous misrepresentations regarding the likelihood of the success of the strategy, both with respect to the likelihood of making a profit and the likelihood of being upheld as legitimate investments if the IRS challenged the strategy.  KPMG made these misrepresentations both orally and in writing on numerous occasions through, principally, Carl Hasting.  The misrepresentations were made during the various meetings that Plaintiff had with Defendant Hastings (described in more detail elsewhere herein) and in the engagement and opinion letters that KPMG issued to Plaintiff.

   i. More specifically, Carl Hasting represented to Plaintiff orally that Plaintiff would make a significant amount of money by investing in the OPIS and BLIPS strategies and that the strategies were a legitimate investment only offered to KPMG's "best clients."

ii. Defendants represented in writing in the engagement and opinion letters provided to Plaintiff that it was "more likely than not" that the strategy would withstand IRS scrutiny if challenged.

iii. Defendants misrepresented in its opinion letters that it was relying on certain factual representations made by Plaintiff when in truth KPMG had previously devised these representations without regard to the actual facts or facts unique to Plaintiff, required that Plaintiff make those representations as a condition of the transaction, and relied on the overall complexity of the transactions and Plaintiff's trust and faith in KPMG as his trusted accountant and adviser in obtaining Plaintiff's "consent" to these representations.

iv. Additionally, Defendants made misrepresentations regarding the likelihood of penalties being imposed. KPMG also misrepresented the likely impact of obtaining an opinion from an "independent" law firm and the impact that opinion would have on the likelihood of penalties being imposed.

148. In addition to the enumerated affirmative misrepresentations, Defendants failed to disclose numerous facts that KPMG was or should have been aware of, which were material to the transactions and, had Plaintiff known them, he would not have invested in the strategies in the first place:

A. Defendants failed to disclose that the OPIS and BLIPS strategies marketed to Plaintiff were generic tax products that Defendants developed and marketed on a mass basis along with other such strategies that were similarly designed solely to generate losses for tax purposes.

- 64 -
COMPLAINT AND DEMAND FOR JURY TRIAL

B. As to the OPIS and BLIPS products, Defendants failed to disclose that the tax opinions signed by the KPMG tax partners purported to rely on certain factual representations that were devised by KPMG tax partners and others involved in designing the OPIS and BLIPS strategy and were false and misleading.

C. Further, KPMG failed to disclose that its own tax opinions were boilerplate and that virtually identical opinions were provided to other clients. As such, KPMG failed to disclose that the opinions did not deal with facts unique to Plaintiff, make any effort to get those facts right, or analyze the governing law with respect to those facts.

D. As to the OPIS and BLIPS products, Defendants failed to disclose to Plaintiff that KPMG did not believe there was a reasonable opportunity, or at best a remote opportunity, to earn a reasonable pre-tax profit from the strategies.

E. Defendants failed to disclose that the OPIS and BLIPS strategies were intended solely to generate substantial capital losses.

F. KPMG failed to disclose that it knew the representations it made in its tax opinions were false and yet issued them anyway. As such, KPMG knew the strategies were not likely to withstand IRS scrutiny.

G. Defendants did not disclose that throughout the development of the transactions known as OPIS and BLIPS, KPMG tax partners and other professionals had raised serious and valid concerns about the honesty of

- 65 -

the proposed opinion letter and the likelihood of the products withstanding IRS scrutiny.

H. Furthermore, Defendants failed to disclose that they were actively taking steps to conceal these transactions from the IRS. In doing so, Defendants made the decision not to register the transactions as tax shelters. Defendants made this decision in the face of advice from its professionals and legal compliance personnel that the shelters should have been registered and that the failure to do so could amount to criminal conduct.

149. Had Plaintiff known the true facts or Defendants properly disclosed the facts as Defendants knew them to be, Plaintiff would never have invested in the OPIS and BLIPS strategies. As such, Plaintiff has been damaged in an amount to be proven at trial.

150. Plaintiff justifiably relied on KPMG and the other Defendants' misrepresentations and nondisclosures, especially because KPMG and the other Defendants held themselves out as experts in the field of tax, were Plaintiff' fiduciaries, and had superior knowledge of the existence of the true facts.

151. Plaintiff did not begin to suspect Defendants' breaches of their fiduciary duties until the Spring of 2005, at the earliest, when Plaintiff was informed of the then pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in 2003, Plaintiff entered into a tolling agreement with Defendants that, together with subsequent amendments, effectively tolled any statute of limitations through December of 2009. As to the OPIS and BLIPS products, Plaintiff continues to litigate the

imposition of back taxes, interest, and penalties for the tax years 1998 and 1999. Accordingly, any applicable statute of limitations has not yet begun to run or is equitably tolled pending the resolution of that litigation. Defendants had timely notice of that litigation having initially represented Plaintiff Blum in connection with the IRS examination of tax years 1998 and 1999. Defendants have suffered no prejudice by virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax, penalty, and interest liability in good faith and pursuant to the opinion letters in this action which are premised on the likelihood of the strategies surviving a challenge by the government in litigation. Further, any applicable statute of limitations was tolled, equitably or otherwise, from December 2009 through March 2011 during the pendency of the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later dismissed without prejudice. Accordingly, any applicable statute of limitations is tolled, did not arise, and/or Defendants are equitably estopped from asserting it as a defense.

152. As a direct and proximate result of the breaches of fiduciary duty by Defendants, Plaintiff has, or likely will, suffer damages in an amount that Plaintiff is informed and believes and thereon alleges will exceed $75,000,000, the exact amount to be proven at trial.

153. The aforementioned conduct of Defendants is despicable and was done with the intention on the part of these Defendants of depriving Plaintiff of his property and rights and otherwise causing him injury, and this despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an

- 67 -
COMPLAINT AND DEMAND FOR JURY TRIAL

award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.

## SECOND CAUSE OF ACTION

(Fraud Against All Named Defendants
and Does 5 through 15, inclusive)

154. Plaintiff repeat and reallege each and every allegation contained in paragraphs 1 through 153 above and in each and every other cause of action in this Complaint, as if fully set forth herein.

155. Defendants defrauded Plaintiff by virtue of the conduct set forth above, including the misrepresentations, acts of concealment, non-disclosure, inducements, and/or other conduct alleged in detail.  Among other things, at meetings at Plaintiff Blum's office and during conversations and written correspondence thereafter, including engagement and opinion letters, Defendants made the representations to Plaintiff orally and/or in writing as set forth in Paragraphs 103-104, 118-119 above.

156. Plaintiff is informed and believes and thereon alleges that when Defendants made these representations, they knew them to be false and/or recklessly disregarded their falsity, and that they made them with the intent to defraud and deceive Plaintiff and with the intent to induce Plaintiff to invest in the OPIS and BLIPS transactions and take the other actions herein alleged.

157. Defendants made such misrepresentations without any reasonable justification in order to induce Plaintiff to invest in the OPIS and BLIPS transactions and take the other actions herein alleged, and thereby benefit Defendants to the detriment of Plaintiff.

158. At the time Defendants made such misrepresentations, and undertook acts of concealment and other fraudulent conduct as alleged above, and at the time Plaintiff took the actions alleged herein, Plaintiff were unaware of the falsity and/or misleading nature of the representations and conduct. Even in the exercise of reasonable diligence, Plaintiff could not have discovered such falsity.

159. In reliance on the misrepresentations and conduct of Defendants, as alleged herein, Plaintiff was induced to and did invest in the OPIS and BLIPS transactions as detailed above, claimed a tax deduction for the losses generated by the transactions on his 1998 and 1999 federal and state tax returns, agreed to sell, and sold stock in Buy.com on terms that Plaintiff would not have agreed to had he known of the false representations of the Defendants, conducted his business in such a way as to realize taxable income which would be offset by the losses generated by the transactions, did not adopt other available strategies which would have deferred or minimized tax liability during that time, and made other decisions relating to his finances differently. If Plaintiff had known the true facts, he would not have invested in the transactions, claimed the deductions, or agreed to sell the stock in Buy.com at the price and on the terms at which the sales closed. Instead, Plaintiff would have taken other actions up to and including selling Blum's entire interest in Buy.com for $400 million in 1998. Plaintiff justifiably relied on Defendants'

COMPLAINT AND DEMAND FOR JURY TRIAL

misrepresentations, concealment, fraudulent conduct and nondisclosures, especially because Defendants held themselves out as experts in the field of tax, were Plaintiff's fiduciaries, and had superior knowledge of the existence of the true facts.

160. Plaintiff did not begin to suspect Defendants' misconduct until the Spring of 2005 at the earliest, when Plaintiff was informed of the then pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in 2003, Plaintiff entered into a tolling agreement with Defendants that, together with subsequent amendments, effectively tolled any statute of limitations through December of 2009. As to the OPIS and BLIPS products, Plaintiff continues to litigate the imposition of back taxes, interest, and penalties for the tax years 1998 and 1999. Accordingly, any applicable statute of limitations has not yet begun to run or is equitably tolled pending the resolution of that litigation. Defendants had timely notice of that litigation having initially represented Plaintiff Blum in connection with the IRS examination of tax years 1998 and 1999. Defendants have suffered no prejudice by virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax, penalty, and interest liability in good faith and pursuant to the opinion letters in this action which are premised on the likelihood of the strategies surviving a challenge by the government in litigation. Further, any applicable statute of limitations was tolled, equitably or otherwise, from December 2009 through March 2011 during the pendency of the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later dismissed without prejudice. Accordingly, any applicable statute of limitation is tolled, did not arise, and/or

- 70 -

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1    Defendants are equitably estopped from asserting it as a defense.

2

3       161. As a direct and proximate result of the fraud by Defendants, Plaintiff has, or

4    likely will, suffer damages in an amount that Plaintiff is informed and believes and

5    thereon alleges will exceed $75,000,000, the exact amount to be proven at trial.

6

7

8       162. The aforementioned conduct of Defendants is despicable and was done with

9    the intention on the part of these Defendants of depriving Plaintiff of his property and

10   rights and otherwise causing him injury, and this despicable conduct subjected Plaintiff to

11   cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an

12   award of punitive damages in an amount sufficient to deter such wrongful conduct in the

13   future.

14

15

16                          **THIRD CAUSE OF ACTION**

17               (Fraudulent Nondisclosure Against All Named Defendants

18                          and Does 5 through 15, inclusive)

19

20

21      163. Plaintiff repeats and realleges each and every allegation contained in

22   paragraphs 1 through 162 above and in each and every other cause of action in this

23   Complaint, as if fully set forth herein.

24

25

26      164. Prior to Plaintiff investing in the OPIS or BLIPS transactions, Defendants had

27   a duty to Plaintiff to disclose all facts materially affecting (i) the value or desirability of

28   the OPIS and BLIPS transactions and/or (ii) the likelihood that a tax loss generated by the

- 71 -

COMPLAINT AND DEMAND FOR JURY TRIAL

OPIS or BLIPS transactions would be allowed by the IRS.

165.   In order to induce Plaintiff to invest in the OPIS or BLIPS transactions, Defendants knew and/or recklessly disregarded, but failed to disclose to Plaintiff, numerous critical, material facts relating to the advisability of the transactions, including, all of the conduct outlined above, plus, without limitation:

A. Defendants failed to disclose that the OPIS and BLIPS strategies marketed to Plaintiff were generic tax products that Defendants developed and marketed on a mass basis along with other such strategies that were similarly designed solely to generate losses for tax purposes.

B. As to the OPIS and BLIPS products, Defendants failed to disclose that the tax opinions signed by the KPMG tax partners purported to rely on certain factual representations that were devised by KPMG tax partners and others involved in designing the OPIS and BLIPS strategy and were false and misleading.

C. KPMG failed to disclose that its own tax opinions were boilerplate and that virtually identical opinions were provided to other clients.  As such, KPMG failed to disclose that the opinions did not deal with facts unique to Plaintiff, make any effort to get those facts right, or analyze the governing law with respect to those facts.

D. As to the OPIS and BLIPS products, Defendants failed to disclose to Plaintiff that KPMG did not believe there was a reasonable opportunity, or at best a remote opportunity, to earn a reasonable pre-tax profit from the strategies.

E. Defendants failed to disclose that the OPIS and BLIPS strategies were intended solely to generate substantial capital losses.

F. KPMG failed to disclose that it knew the representations it made in its tax opinions were false and yet issued them anyway. As such, KPMG knew the strategies were not likely to withstand IRS scrutiny.

G. Defendants did not disclose that throughout the development of the transactions known as OPIS and BLIPS, KPMG tax partners and other professionals had raised serious and valid concerns about the honesty of the proposed opinion letters and the likelihood of the products withstanding IRS scrutiny.

H. Defendants failed to disclose that they were actively taking steps to conceal these transactions from the IRS and defraud the IRS. In doing so, Defendants made the decision not to register the transactions as tax shelters. Defendants made this decision in the face of advice from its professionals and legal compliance personnel that the shelters should have been registered and that the failure to do so could amount to criminal conduct.

166. Plaintiff is informed and believes and thereon alleges that Defendants knew or reasonably should have known that Plaintiff did not possess this information and that this information was material to Plaintiff's decision whether to invest in the OPIS and BLIPS transactions.

167. Defendants withheld such information without any reasonable justification in order to induce Plaintiff to invest in the OPIS and BLIPS transactions, sell specific amounts of his interest in Buy.com and take the other actions herein alleged, and thereby benefit Defendants to the detriment of Plaintiff.

168. At the time Defendants made such nondisclosures, and at the time Plaintiff took the actions alleged herein, Plaintiff was ignorant of the nondisclosure of the true facts by Defendants. Even in the exercise of reasonable diligence, Plaintiff could not have discovered such nondisclosures.

169. In reliance on the misrepresentations and conduct of Defendants, as alleged herein, Plaintiff was induced to and did invest in the OPIS and BLIPS transactions as detailed above, claimed a tax deduction for the losses generated by the transactions on his 1998 and 1999 federal and state tax returns, agreed to sell, and sold stock in Buy.com on terms that Plaintiff would not have agreed to had he known of the false representations of the Defendants, conducted his business in such a way as to realize taxable income which would be offset by the losses generated by the transactions, did not adopt other available strategies which would have deferred or minimized tax liability during that time, and made other decisions relating to his finances differently. If Plaintiff had known the true facts, he would not have invested in the transactions, claimed the deductions, or agreed to sell the stock in Buy.com at the price and on the terms at which the sales closed. Instead, Plaintiff would have taken other actions up to and including selling Blum's entire interest in Buy.com for $400 million in 1998. Plaintiff justifiably relied on Defendants' misrepresentations, concealment, fraudulent conduct and nondisclosures, especially

- 74 -

COMPLAINT AND DEMAND FOR JURY TRIAL

because Defendants held themselves out as experts in the field of tax, were Plaintiff's fiduciaries, and had superior knowledge of the existence of the true facts.

170. Plaintiff did not begin to suspect Defendants' misconduct until the Spring of 2005, at the earliest, when Plaintiff was informed of the then pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in 2003, Plaintiff entered into a tolling agreement with Defendants that, together with subsequent amendments, effectively tolled any statute of limitations through December of 2009. As to the OPIS and BLIPS products, Plaintiff continues to litigate the imposition of back taxes, interest, and penalties for the tax years 1998 and 1999. Accordingly, any applicable statute of limitations has not yet begun to run or is equitably tolled pending the resolution of that litigation. Defendants had timely notice of that litigation having initially represented Plaintiff Blum in connection with the IRS examination of tax years 1998 and 1999. Defendants have suffered no prejudice by virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax, penalty, and interest liability in good faith and pursuant to the opinion letters in this action which are premised on the likelihood of the strategies surviving a challenge by the government in litigation. Further, any applicable statute of limitations was tolled, equitably or otherwise, from December 2009 through March 2011 during the pendency of the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later dismissed without prejudice. Accordingly, any applicable statute of limitations is tolled, did not arise, and/or Defendants are equitably estopped from asserting it as a defense.

COMPLAINT AND DEMAND FOR JURY TRIAL

171. As a direct and proximate result of the fraud by KPMG and Does 5 through 15, inclusive, Plaintiff has, or likely will, suffer damages in an amount that Plaintiff is informed and believes and thereon alleges will exceed $75,000,000, the exact amount to be proven at trial.

172. The aforementioned conduct of Defendants is despicable and was done with the intention on the part of these Defendants of depriving Plaintiff of his property and rights and otherwise causing him injury, and this despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights, so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future.

## FOURTH CAUSE OF ACTION

(Negligent Misrepresentation Against All Named Defendants and Does 5 through 15, inclusive)

173. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 172 above and in each and every other cause of action in this Complaint, as if fully set forth herein.

174. At meetings at Blum's offices and during telephone conversations thereafter, Defendants made the representations to Plaintiff orally and/or in writing as set forth in Paragraphs 103-104, 118-119 above. Further, KPMG provided the "more likely than

- 76 -

not" opinion letters as detailed in Paragraphs 97-102, 112-117 above.

175. Plaintiff is informed and believes and thereon alleges that when Defendants made these representations, they should have known, through the exercise of reasonable care, that the representations were false.

176. Defendants made such misrepresentations without any reasonable justification in order to induce Plaintiff to invest in the OPIS and BLIPS transactions, sell specific amounts of his interest in Buy.com and take the other actions herein alleged, and thereby benefit Defendants to the detriment of Plaintiff.

177. At the time Defendants made such misrepresentations, and at the time Plaintiff took the actions alleged herein, Plaintiff was unaware of the falsity and/or misleading nature of the representations.  Even in the exercise of reasonable diligence, Plaintiff could not have discovered such falsity.

178. In reliance on the misrepresentations and conduct of Defendants, as alleged herein, Plaintiff was induced to and did invest in the OPIS and BLIPS transactions as detailed above, claimed a tax deduction for the losses generated by the transactions on his 1998 and 1999 federal and state tax returns, agreed to sell, and sold stock in Buy.com on terms that Plaintiff would not have agreed to had they known of the false representations of the Defendants, conducted his business in such a way as to realize taxable income which would be offset by the losses generated by the transactions, did not adopt other available strategies which would have deferred or minimized tax liability during that

- 77 -
COMPLAINT AND DEMAND FOR JURY TRIAL

time, and made other decisions relating to his finances differently. If Plaintiff had known the true facts, he would not have invested in the transactions, claimed the deductions, or agreed to sell the stock in Buy.com at the price and on the terms at which the sales closed. Instead, Plaintiff would have taken other actions up to and including selling Blum's entire interest in Buy.com for $400 million in 1998. Plaintiff justifiably relied on Defendants' misrepresentations, concealment, fraudulent conduct and nondisclosures, especially because Defendants held themselves out as experts in the field of tax, were Plaintiff' fiduciaries, and had superior knowledge of the existence of the true facts.

179. Plaintiff did not begin to suspect Defendants' misconduct until the Spring of 2005, at the earliest, when Plaintiff was informed of the then pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in 2003, Plaintiff entered into a tolling agreement with Defendants that, together with subsequent amendments, effectively tolled any statute of limitations through December of 2009. As to the OPIS and BLIPS products, Plaintiff continues to litigate the imposition of back taxes, interest, and penalties for the tax years 1998 and 1999. Accordingly, any applicable statute of limitations has not yet begun to run or is equitably tolled pending the resolution of that litigation. Defendants had timely notice of that litigation having initially represented Plaintiff Blum in connection with the IRS examination of tax years 1998 and 1999. Defendants have suffered no prejudice by virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax, penalty, and interest liability in good faith and pursuant to the opinion letters in this action which are premised on the

likelihood of the strategies surviving a challenge by the government in litigation. Further, any applicable statute of limitations was tolled, equitably or otherwise, from December 2009 through March 2011 during the pendency of the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later dismissed without prejudice. Accordingly, any applicable statute of limitations is tolled, did not arise, and/or Defendants are equitably estopped from asserting it as a defense.

180. As a direct and proximate result of the misrepresentations by Defendants, Plaintiff has, or likely will, suffer damages in an amount that Plaintiff is informed and believes and thereon alleges will exceed $75,000,000, the exact amount to be proven at trial.

## **FIFTH CAUSE OF ACTION**

(Negligent Nondisclosure Against All Named Defendants
and Does 5 through 15, inclusive)

181. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 180 above and in each and every other cause of action in this Complaint, as if fully set forth herein.

182. Prior to Plaintiff investing in the OPIS and BLIPS transactions, selling the specific amounts of Plaintiff's interest in Buy.com and taking the other actions as alleged herein, Defendants had a duty to Plaintiff to disclose all facts materially affecting (i) the value or desirability of the OPIS and BLIPS transactions and/or (ii) the likelihood that a

tax loss generated by the OPIS or BLIPS transactions would be allowed by the IRS.

183. In order to induce Plaintiff to invest in the OPIS and BLIPS transactions, Defendants knew or, in the exercise of reasonable care should have known, but failed to disclose to Plaintiff numerous critical facts relating to the advisability of the transactions, including, without limitation, that:

    A. The OPIS and BLIPS strategies marketed to Plaintiff were generic tax products that Defendants developed and marketed on a mass basis along with other such strategies that were similarly designed solely to generate losses for tax purposes.

    B. As to the OPIS and BLIPS products, that the tax opinions signed by the KPMG tax partners purported to rely on certain factual representations that were devised by KPMG tax partners and others involved in designing the OPIS and BLIPS strategy and were false and misleading.

    C. Further, KPMG failed to disclose that its own tax opinions were boilerplate and that virtually identical opinions were provided to other clients. As such, KPMG failed to disclose that the opinions did not deal with facts unique to Plaintiff, make any effort to get those facts right, or analyze the governing law with respect to those facts.

    D. As to the OPIS and BLIPS products, Defendants failed to disclose to Plaintiff KPMG did not believe there was a reasonable opportunity, or at best a remote opportunity, to earn a reasonable pre-tax profit from the strategies.

E. Defendants failed to disclose that the OPIS and BLIPS strategies were intended solely to generate substantial capital losses.

F. KPMG failed to disclose that it knew the representations it made in its tax opinions were false and yet issued them anyway. As such, KPMG knew the strategies were not likely to withstand IRS scrutiny.

G. Defendants did not disclose that throughout the development of the transactions known as OPIS and BLIPS, KPMG tax partners and other professionals had raised serious and valid concerns about the honesty of the proposed opinion letter and the likelihood of the products withstanding IRS scrutiny.

H. Furthermore, Defendants failed to disclose that they were actively taking steps to conceal these transactions from the IRS. In doing so, Defendants made the decision not to register the transactions as tax shelters. Defendants made this decision in the face of advice from its professionals and legal compliance personnel that the shelters should have been registered and that the failure to do so could amount to criminal conduct.

184. Plaintiff is informed and believe and thereon allege that Defendants knew or reasonably should have known that Plaintiff did not possess this information and that this information was material to Plaintiff' decision whether to invest in the OPIS and BLIPS transactions.

185. KPMG and Defendants withheld such information without any reasonable

- 81 -
COMPLAINT AND DEMAND FOR JURY TRIAL

justification in order to induce Plaintiff to invest in the OPIS and BLIPS transactions, sell specific amounts of his interest in Buy.com and take the other actions herein alleged, and thereby benefit Defendants to the detriment of Plaintiff.

186. At the time Defendants failed to make such disclosures, and at the time Plaintiff took the actions alleged herein, Plaintiff was ignorant of the nondisclosure of the true facts by KPMG and Defendants.  Even in the exercise of reasonable diligence, Plaintiff could not have discovered such nondisclosures.

187. In reliance on the misrepresentations and conduct of Defendants, as alleged herein, Plaintiff was induced to and did invest in the OPIS and BLIPS transactions as detailed above, claimed a tax deduction for the losses generated by the transactions on his 1998 and 1999 federal and state tax returns, agreed to sell, and sold stock in Buy.com on terms that Plaintiff would not have agreed to had he known of the false representations of the Defendants, conducted his business in such a way as to realize taxable income which would be offset by the losses generated by the transactions, did not adopt other available strategies which would have deferred or minimized tax liability during that time, and made other decisions relating to his finances differently.  If Plaintiff had known the true facts, he would not have invested in the transactions, claimed the deductions, or agreed to sell the stock in Buy.com at the price and on the terms at which the sales closed.  Instead, Plaintiff would have taken other actions up to and including selling Blum's entire interest in Buy.com for $400 million in 1998.  Plaintiff justifiably relied on Defendants' misrepresentations, concealment, fraudulent conduct and nondisclosures, especially because Defendants held themselves out as experts in the field of tax, were Plaintiff'

1    fiduciaries, and had superior knowledge of the existence of the true facts.

2

3        188. Plaintiff did not begin to suspect Defendants' breaches of their fiduciary

4    duties until the Spring of 2005, at the earliest, when Plaintiff was informed of the then

5    pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's

6    admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in

7

8    2003, Plaintiff entered into a tolling agreement with Defendants that, together with

9    subsequent amendments, effectively tolled any statute of limitations through December

10   of 2009. As to the OPIS and BLIPS products, Plaintiff continues to litigate the

11   imposition of back taxes, interest, and penalties for the tax years 1998 and 1999.

12

13   Accordingly, any applicable statute of limitations has not yet begun to run or is equitably

14   tolled pending the resolution of that litigation. Defendants had timely notice of that

15   litigation having initially represented Plaintiff Blum in connection with the IRS

16   examination of tax years 1998 and 1999. Defendants have suffered no prejudice by

17   virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's

18   damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax,

19

20   penalty, and interest liability in good faith and pursuant to the opinion letters in this

21   action which are premised on the likelihood of the strategies surviving a challenge by the

22   government in litigation. Further, any applicable statute of limitations was tolled,

23   equitably or otherwise, from December 2009 through March 2011 during the pendency of

24   the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later

25   dismissed without prejudice. Accordingly, any applicable statute of limitations is tolled,

26   did not arise, and/or Defendants are equitably estopped from asserting it as a defense.

27

28

189. As a direct and proximate result of KPMG's conduct and the conduct of Does 5 through 15, inclusive, Plaintiff has, or likely will, suffer damages in an amount that Plaintiff is informed and believes and thereon alleges will exceed $75,000,000, the exact amount to be proven at trial.

## SIXTH CAUSE OF ACTION

(Professional Negligence Against All Named Defendants
and Does 1 through 15, inclusive)

190. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 189 above and in each and every other cause of action in this Complaint, as if fully set forth herein.

191. By virtue of the accountant-client relationship between Defendants and Plaintiff, Defendants owed a duty to Plaintiff to use such skill, prudence and diligence as other reputable members of the accounting profession in a similar locality commonly possess and exercise under similar circumstances.  Defendants also owed a duty to Plaintiff to fully comply with their professional responsibilities and obligations. Defendants also owed a duty to Plaintiff to fully comply with KPMG's own internal policies and procedures and KPMG's own interpretations of, and guidance concerning, the applicable professional standards.

192. Plaintiff is informed and believes and thereon alleges that Defendants failed to fulfill their duties, responsibilities, and obligations by engaging in the conduct alleged

- 84 -

COMPLAINT AND DEMAND FOR JURY TRIAL

herein including: (1) wrongfully advising Plaintiff that it was "more likely than not" that a tax deduction for a losses generated by the OPIS and BLIPS transactions would be upheld if challenged by the IRS; (2) failing to disclose to Plaintiff numerous material facts that were necessary for Plaintiff to make an informed decision whether to (i) invest in the OPIS and BLIPS transactions, (ii) sell specific amounts of his interest in Buy.com; (iii) claim as a tax deduction on his federal and state tax returns the losses purportedly generated by the transactions, (iv) structure his tax strategy to maximize the realization of income in order to offset the losses they expected to realize from the transactions, and/or (v) structure his other investments and make other decisions relating to his finances differently in light of Plaintiff's investments in the OPIS and BLIPS transactions; and (3) failing to provide to Plaintiff proper tax planning and accounting advice.

193.   Plaintiff is informed and believes and thereon alleges that Defendants further failed to fulfill their duties, professional responsibilities and obligations to Plaintiff by, without limitation, (1) failing to properly train KPMG's tax professionals, auditors and accountants; (2) failing to properly follow and distribute KPMG's training materials and reference materials to KPMG's tax professionals, auditors and accountants; (3) failing to properly follow and distribute KPMG's *Assurance Source* CDs and the material and documents contained on the *Assurance Source* CDs;  (4) failing to properly follow and distribute KPMG's *Informant* CDs and the material and documents contained on the *Informant* CDs; (5) failing to properly follow and distribute KPMG's Professional Practice Letters, including but not limited to Professional Practice Letters relating to auditing, accounting and tax; (6) failing to attend training courses sponsored and/or held by KPMG relating to auditing, accounting and/or tax; (7) failing to provide adequate

training courses relating to auditing, accounting and/or tax; (8) failing to properly follow and distribute *WorldDisc* CDs and the material and documents contained on the *WorldDisc* CDs, including but not limited to tax and accounting related guidance and policies; (9) failing to properly follow and distribute KPMG's Professional Practice Manual, Tax Manual, Reports Manual, and/or other engagement manuals, guidance and policies; (10) failing to properly follow and distribute KPMG's internal manuals related to tax, audit and accounting engagements; (11) failing to properly follow KPMG's own training videos, materials and documents related to the detection and prevention of fraud and criminal acts, including but not limited to tax fraud; (12) failing to properly follow the policies, guidance, instructions and/or directions KPMG provided to its employees, including its tax, audit and accounting professionals, relating to tax, audit, and accounting engagements; (13) failing to properly follow KPMG's document retention policies relating to the retention of KPMG's own training videos, materials and documents, including those related to the detection and prevention of fraud and criminal acts, including tax fraud; (14) failing to retain KPMG's own training videos, materials and documents, including those related to the detection and prevention of fraud and criminal acts, including tax fraud; (15) failing to properly advise KPMG's partners, tax professionals, auditors and accountants of KPMG's liability for negligent and fraudulent acts relating to its tax, audit and accounting engagements; and (16) failing to properly train KPMG's partners, tax professionals, auditors and accountants about KPMG's liability for negligent and fraudulent acts relating to its tax, audit and accounting engagements.

194. Plaintiff did not begin to suspect Defendants' breaches of their fiduciary

1   duties until the Spring of 2005, at the earliest, when Plaintiff was informed of the then

2   pending criminal probe into Defendants' conduct that ultimately resulted in KPMG's

3   admission of wrong doing in August of 2005 via the DPA. Further, prior to that time, in

4   2003, Plaintiff entered into a tolling agreement with Defendants that, together with

5   subsequent amendments, effectively tolled any statute of limitations through December

6   of 2009.   As to the OPIS and BLIPS products, Plaintiff continues to litigate the

7   imposition of back taxes, interest, and penalties for the tax years 1998 and 1999.

8   Accordingly, any applicable statute of limitations has not yet begun to run or is equitably

9   tolled pending the resolution of that litigation. Defendants had timely notice of that

10   litigation having initially represented Plaintiff Blum in connection with the IRS

11   examination of tax years 1998 and 1999. Defendants have suffered no prejudice by

12   virtue of the pendency of that litigation. If anything, it may serve to reduce Plaintiff's

13   damages and therefore, potentially, Defendants' liability. Plaintiff has litigated his tax,

14   penalty, and interest liability in good faith and pursuant to the opinion letters in this

15   action which are premised on the likelihood of the strategies surviving a challenge by the

16   government in litigation.   Further, any applicable statute of limitations was tolled,

17   equitably or otherwise, from December 2009 through March 2011 during the pendency of

18   the *Blum v. KPMG* action previously filed in Los Angeles Superior Court and later

19   dismissed without prejudice. Accordingly, any applicable statute of limitations is tolled,

20   did not arise, and/or Defendants are equitably estopped from asserting it as a defense.

21   

22   

23   195. As a direct and proximate result of the above-described negligence of

24   Defendants in failing to fulfill their professional duties, responsibilities, and obligations

25   to Plaintiff, Plaintiff has, or likely will, suffer damages in an amount that Plaintiff is

1    informed and believes and thereon alleges will exceed $75,000,000, the exact amount to

2    be proven at trial.

3

4          **WHEREFORE, Plaintiff prays for judgment as follows:**

5

6

7    1.     On the First Cause of Action for Breach of Fiduciary Duty against all named

8    Defendants, jointly and severally:

9          a.     For damages against all named Defendants in an amount not less than

10                $75 million, according to proof at trial; and

11         b.     For punitive damages in an amount sufficient to punish the

12                Defendants and to deter them from engaging in wrongful conduct in

13                the future.

14

15

16   2.     On the Second Cause of Action for Fraud against all named Defendants,

17   jointly and severally:

18         a.     For damages against all named Defendants in an amount not less than

19                $75 million, according to proof at trial; and

20         b.     For punitive damages in an amount sufficient to punish Defendants

21                and deter them from engaging in wrongful conduct in the future.

22

23

24   3.     On the Third Cause of Action for Fraudulent Nondisclosure against all named

25   Defendants, jointly and severally:

26         a.     For damages against all named Defendants in an amount not less than

27                $75 million, according to proof at trial; and

28

b.  For punitive damages in an amount sufficient to punish Defendants and deter them from engaging in wrongful conduct in the future.

4.  On the Fourth Cause of Action for Negligent Misrepresentation against all named Defendants, jointly and severally:

a.  For damages against all named Defendants in an amount not less than $75 million, according to proof at trial.

5.  On the Fifth Cause of Action for Negligent Nondisclosure against all named Defendants, jointly and severally:

a.  For damages against all named Defendants in an amount not less than $75 million, according to proof at trial.

6.  On the Sixth Cause of Action for Professional Negligence against all named Defendants, jointly and severally:

a.  For damages against all named Defendants in an amount not less than $75 million, according to proof at trial.

COMPLAINT AND DEMAND FOR JURY TRIAL

7.    On All Causes of Action:

    a.    An award of all costs and attorneys' fees incurred by Plaintiff herein;

    b.    An award of prejudgment and post judgment interest as authorized by law; and

    c.    Such other and further relief as the Court deems just and proper.

DATED:  December 7, 2011                    EAGAN AVENATTI, LLP


By: _____

MICHAEL J. AVENATTI
Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL

1

## DEMAND FOR TRIAL BY JURY

2

3    Plaintiff Scott A. Blum hereby demands trial of all causes by jury.

4

5

6   DATED:  December 7, 2011                    EAGAN AVENATTI, LLP

7

8                                       By: *Michael Avenatti*

9                                           MICHAEL J. AVENATTI
10                                          Attorneys for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Michael J. Avenatti, Esq. (SBN 206929)<br>EAGAN AVENATTI, LLP<br>450 Newport Center Drive, 2nd Floor<br>Newport Beach, CA  92660<br>   TELEPHONE NO.: (949) 706-7000    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: Plaintiff | FOR COURT USE ONLY |
|---|---|

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>   STREET ADDRESS:<br>   MAILING ADDRESS:<br>   CITY AND ZIP CODE:<br>   BRANCH NAME:    USDC - CENTRAL DISTRICT OF CALIFORNIA |
|---|

| PLAINTIFF/PETITIONER: Scott A. Blum | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: KPMG, LLP | SACV11-01885 CJC (ANx) |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.:<br>BLUM |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [✓] summons
   b. [✓] complaint
   c. [ ] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [✓] other *(specify documents)*: see attached list of served documents

3. a. Party served *(specify name of party as shown on documents served)*:
   DAVID GREENBERG, an individual

   b. [ ] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:

4. Address where the party was served:
   4621 GORHAM DRIVE, CORONA DEL MAR, CA 92625
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date)*:                      (2) at *(time)*:
   b. [✓] **by substituted service.** On *(date)*: 12/14/11     at *(time)*: 8:10PM  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
   KELLY FENNELL, OCCUPANT

   (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

   (2) [✓] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

   (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

   (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:              from *(city)*:                    or [✓] a declaration of mailing is attached.

   (5) [✓] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

| PLAINTIFF/PETITIONER: Scott A. Blum | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: KPMG, LLP | SACV11-01885 CJC (ANx) |

5. c. [ ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the
   address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*               (2) from *(city):*

    (3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed
   to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4) [ ] to an address outside California with return receipt requested.  (Code Civ. Proc., § 415.40.)

  d. [ ] **by other means** *(specify means of service and authorizing code section):*

    [ ] Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. [✓] as an individual defendant.
   b. [ ] as the person sued under the fictitious name of *(specify):*
   c. [ ] as occupant.
   d. [ ] On behalf of *(specify):*
      under the following Code of Civil Procedure section:

| | |
|---|---|
| [ ] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| | [ ] other: |

7. **Person who served papers**
   a. Name: FRANK HARRIGAN
   b. Address: Nationwide Legal, LLC, 820 N. Parton Street, 2nd Floor, Santa Ana, CA 92702 (LA 6771)
   c. Telephone number: (714) 558-2400
   d. **The fee** for service was: $ 464.97
   e. I am:

    (1) [ ] not a registered California process server.
    (2) [ ] exempt from registration under Business and Professions Code section 22350(b).
    (3) [✓] a registered California process server:
      (i) [ ] owner [ ] employee [✓] independent contractor.
      (ii) Registration No.: 1530
      (iii) County: Orange

8. [✓] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. [ ] **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: DECEMBER 16, 2011

FRANK HARRIGAN        2339293      ▶

_____      _____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)        (SIGNATURE )

2339293

ATTACHMENT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


Scott A. Blum vs. KPMG, LLC
CASE No.: SACV11-01885 CJC (ANx)


'LIST OF DOCUMENTS SERVED'


1. SUMMONS

2. COMPLAINT AND DEMAND FOR JURY TRIAL

3. CIVIL COVER SHEET

4. CERTIFICATION OF INTERESTED PARTIES

5. NOTICE OF CASE ASSIGNMENT TO UNITED STATES MAGISTRATE
   JUDGE FOR DISCOVERY

USDC CENTRAL DISTRICT OF CALIFORNIA
Scott A. Blum vs. KPMG, LLP
Case No.: SACV11-01885 CJC (ANx)


# **PROOF OF MAILING**


       I am Employed in the City of Santa Ana County of Orange, State of California. I am over the age of 18 and not a party to within action. My business address is 820 N. Parton Street, Suite 203, Santa Ana, CA 92701.


       On December 15, 2011 I completed service by mailing the document(s) described as "see attached list of served documents" placing a copy thereof in a sealed envelope, with fully prepaid postage thereon for first class mail, in the U.S. Mail from Santa Ana. The envelope(s) were addressed as follows:


**DAVID GREENBERG, an individual**
**4621 GORHAM DRIVE, CORONA DEL MAR, CA 92625**


Reference #2339293


    I declare under Penalty of Perjury under the laws of the State of California that the above is true and correct and was executed on December 15, 2011 at Santa Ana, California.


FAVIOLA SALCEDO

| DILIGENCE OF ATTEMPTS | FOR COURT USE ONLY |
|---|---|
| Michael J. Avenatti, ESQ. (State Bar No. 206929)<br>EAGAN AVENATTI, LLP<br>450 Newport Center Drive, 2nd Floor<br>Newport Beach, California 92660<br>Tel. No: (949) 706-7000<br>Attorney For: Plaintiff | |
| UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA | CASE No.<br>SACV11-01885 CJC (ANx) |
| SCOTT A. BLUM VS. KPMG, LLP | REF No.<br>BLUM |

I am over the age of eighteen and have personal knowledge of the foregoing facts listed below. After due and diligent effort, we have been unable to effect service on the within named party.

**PARTY SERVED**
DAVID GREENBERG, an individual

**DOCUMENTS TO BE SERVED**
SUMMONS; COMPLAINT AND DEMAND FOR JURY TRIAL; CIVIL COVER SHEET; CERTIFICATION OF INTERESTED PARTIES; NOTICE OF CASE ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**ADDRESS DATES AND TIMES ATTEMPTED**
4621 GORHAM DRIVE, CORONA DEL MAR, CA 92625

| | |
|---|---|
| 12-09-11 @ 7:40 A.M. | PER GIRLFRIEND "KELLY" THE SUBJECT IS NOT IN. HE IS OUT OF TOWN BUT SHE SAID SHE COULD TAKE THE DOCUMENTS FOR HIM. |
| 12-10-11 @ 7:00 A.M. | NO ACCESS TO THE DOOR, THE GATE TO THE FRONT DOOR WAS CLOSED AND LOCKED. |
| 12-10-11 @ 11:30 A.M. | NO ACCESS TO THE FRONT DOOR, GATE IS LOCKED AND CLOSED. |
| 12-10-11 @ 5:30 P.M. | NO ANSWER, NO ACTIVITY WITHIN PREMISES, NO ANSWER AT THE NEIGHBOR. |
| 12-11-11 @ 7:30 A.M. | NO ACCESS TO THE FRONT DOOR, GATE LOCKED, NO ANSWER WITH NEIGHBORS. |
| 12-11-11 @ 6:35 P.M. | THE SAME STATUS, NO ANSWER, NO ACTIVITY. |
| 12-12-11 @ 7:15 A.M. | NO ANSWER, GATE LOCKED, NO ACTIVITY AROUND. |
| 12-13-11 @ 6:00 P.M. | NO CHANGE, GATE LOCKED, NO ONE AROUND, NO ACTIVITY. |
| 12-14-11 @ 5:15 P.M | NO ANSWER, NO ACTIVITY. |
| 12-14-11 @ 8:10 P.M. | sub-served on "KELLY FENNELL", OCCUPANT. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: December 16, 2011

Signature: _____
Frank Harrigan, Process Server
Reg. #1530, Orange
Service Provided for:
Nationwide Legal LLC
820 North Parton Street, Suite 203 (LA 6771)
Santa Ana, CA  92701
Ctrl. No.: 2339293

**L G I** LLP

LAWYERS GROUP INTERNATIONAL
A LIMITED LIABILITY PARTNERSHIP
18101 VON KARMAN AVENUE, SUITE 330
IRVINE, CALIFORNIA 92612-0146 U.S.A.
TELEPHONE +1.949.253.0500; FAX +1.949.253.0505
PRIVATE FAX/VOICE MAIL +1.949.203.8654

BRADLEY A. PATTERSON
PARTNER
BAPATTERSON@LGILAW.NET

IRVINE
BANGKOK
LISBON
LONDON
NEW YORK
PARIS

June 14, 2012

**VIA FACSIMILE (+1.305.358.4707), E-MAIL (bill@williamhearon.com) AND U.S. MAIL**

William C. Hearon, Esq.
1 SE 3RD AVE STE 3000
MIAMI FL 33131-1711

Re:   *Eagan Avenatti, LLP and Michael J. Avenatti v. David B. Greenberg*
      <u>U.S.D.C., S.D. Florida Case No. 12-cv-80438-Middlebrooks/Brannon</u>

Dear Mr. Hearon:

This law firm represents David B. Greenberg, defendant in the action cited above, in various matters.  We just learned that you have taken Mr. Greenberg's default in that action.

The proof of service filed with the court states that Mr. Greenberg was purportedly served by substitute service on his "wife" on Sunday, April 29, 2012, at 4621 Gorham Drive, Corona Del Mar, California.

The purported service of process is ineffective.

Service outside of Florida is governed by Florida Rules of Civil Procedure § 48.194:

Except as otherwise provided herein, service of process on persons outside of this state shall be made in the same manner as service within this state by any officer authorized to serve process in the state where the person is served.

Service on individuals within Florida is generally governed by Florida Rules of Civil Procedure § 48.031, which provides in relevant part:

Service of original process is made by delivering a copy of it to the person to be served with a copy of the complaint, petition, or other initial pleading or paper or by leaving the copies at his or her usual place of abode with any person residing therein who is 15 years of age or older and informing the person of their contents.

Mr. Greenberg was not personally served under the first provision of Rule 48.031.

LGI LLP
LAWYERS GROUP INTERNATIONAL

William C. Hearon, Esq.
June 14, 2012
Page 2 of 2

As to the second provision of Rule 48.031, Mr. Greenberg is not domiciled at 4621 Gorham Drive, i.e., it is not his "usual place of abode." You already conceded this fact in paragraph 3 of your complaint, in which you pleaded, "Greenberg is a resident of Palm Beach County, Florida." In fact, you relied upon this allegation to support diversity jurisdiction in the federal court. As such, the purported substituted service on Mr. Greenberg at the Gorham Drive address is not permitted under Rule 48.031.

Furthermore, going to the veracity of the process server's statements, process could not have been left with Mr. Greenberg's "wife" as Mr. Greenberg is not married.

In any event, the process server claims to have effected service on a Sunday. As you are no doubt aware, Florida Rules of Civil Procedure § 48.20 prohibits service on Sundays:

> Service or execution on Sunday of any writ, process, warrant, order, or judgment is void and the person serving or executing, or causing it to be served or executed, is liable to the party aggrieved for damages for so doing as if he or she had done it without any process, writ, warrant, order, or judgment.

A summons is "process" within the meaning of section 48.20 providing that civil process cannot be served on Sunday. (*Miller v. Johnson*, 466 So.2d 340 (1985).)

Since Mr. Greenberg was not validly served, the default was obtained fraudulently.

Demand is hereby made that you immediately take all steps necessary to withdraw the purported proof of service and set aside the default entered by the Court. If you fail to do so, we will move the court for that relief and will also seek the imposition of sanctions under F.R.C.P. Rule 11.

We trust that will not be necessary.

Very truly yours,

Bradley A. Patterson

BAP:gs

WILLIAM C. HEARON, P.A.
ATTORNEY AT LAW
SUNTRUST INTERNATIONAL CENTER
ONE SOUTHEAST THIRD AVENUE
SUITE 3000
MIAMI, FLORIDA 33131

PHONE: (305) 579-9813
FAX: (305) 358-4707

June 18, 2012

*Via email and U.S. Mail*

Bradley A. Patterson
Lawyers Group International
18101 Von Karman Ave., Suite 330
Irvine, CA 92612
Email: bapatterson@lgilaw.net

> Re:  Eagan Avenatti, LLP v. Greenberg
>      Case No. 12-cv-80438 (S.D. Fla.)
>      Our File No.: 6489

Dear Mr. Patterson:

I am in receipt of your letter dated June 14, 2012 regarding the service of process on Defendant David Greenberg in this action. Before addressing the substance of your letter I would note that in your letter you fail to state whether you are, in fact, acting as counsel for Defendant Greenberg in this action, stating only that you represent Greenberg in "various matters." By failing to state clearly that you represent Defendant Greenberg in this matter leads me to question your authority to contact me on his behalf *in this case*. In the absence of clarification on this point, I do not consider this a proper meet and confer attempt to resolve this dispute as required under our Local Rules – if that is what your letter is attempting to achieve. Putting aside this procedural defect in your letter and your questionable approach at raising the issues contained therein, your analysis of the purported defects in service is not accurate.

First, this action is pending in United States District Court for the Southern District of Florida, and not in Florida state court. As a result, service is governed by Rule 4 Fed. R. Civ. P., not the Florida rules. Rule 4 states that service may be effected by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located *or where service is made*." Fed. R. Civ. P. 4(e)(1) (emphasis added). As you know, service in this instance was made in California, not Florida. Thus, service is governed by Rule 4 and/or California law. Rule 4 further provides that service is proper when a copy of the summons and of the complaint is delivered to the individual personally or when "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there" or "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e)(2)(A)-(C). In any event, neither California law nor the Federal Rules provide for the Sunday exception you have cited under Florida law. As a result, that provision is simply not applicable. In fact, in light of

Bradley A. Patterson
June 18, 2012
Page 2

your misplaced reliance on Florida law, you have not provided any authority for the proposition that service was improper under the Federal Rules or California law.

Second, you take issue with the service at the Corona Del Mar address. In doing so you ignore the affidavit of the process server, who is personally familiar with Defendant Greenberg, that Mr. Greenberg was present when service was effectuated, and that the woman who accepted service (and refused to identify herself) admitted that Mr. Greenberg would not come out. Further, you ignore the fact that Defendant Greenberg has confirmed his knowledge of this action in other defamatory communications with Plaintiffs, acknowledged that he was there at the Corona Del Mar abode along with his daughter at the time of service, and made various statements that he looked forward to conducting discovery in this action. Based upon the foregoing, it is not clear what relevance your claim that the recipient of service is not Defendant Greenberg's wife has to establishing that service was improper. In fact, it is clear that Defendant Greenberg was attempting, unsuccessfully and in bad faith, to evade service. If it was not Mr. Greenberg's intention to improperly evade service, then the proper course of action would have been to file a motion to dismiss pursuant to Rule 12. See Fed. R. Civ. P. 12(b)(5). No such motion was filed and now a default has been properly entered.

Third, Plaintiffs have alleged, that Defendant Greenberg resides in Florida. The allegations about the residency of the parties does create diversity jurisdiction. Where service is effectuated has no bearing on those allegations. Not only has Mr. Greenberg listed a Palm Beach County address in his *pro se* filings in the Blum case, but you also sent a letter (interestingly also about service) in that case to Mr. Avenatti (and then you did not make an appearance) in which you also represented that Mr. Greenberg resides in Florida. I trust that I do not have to supply you with a copy of your January 10, 2012 letter, nor do I need to provide you with copies of other correspondence from you acknowledging the same thing. Notwithstanding that Mr. Greenberg resides in Florida, he appears to have a place of abode at the Corona Del Mar address, and may have others. You have cited no authority for the proposition that service is only proper in the state of a person's residency, and with good reason – there is no such restriction. Courts recognize that a person may have multiple abodes for the purposes of service under the Rule. *See*, National Devel. Co. v. Triad Holding Corp., 930 F. 2d 253 (2nd Cir. 1991), *cert denied* 112 S. Ct. 440 (1991). Thus, the fact that Defendant Greenberg resides in Florida does not establish that service in California is improper.

In sum, you have offered no compelling reason to conclude that service was anything but proper. In fact, by entering the default, the Court implicitly, if not explicitly, concluded that service was in fact proper. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time."). Accordingly, it would seem that Rule 11 would apply more to your contemplated motion than to any action taken by Plaintiffs. This is particularly true in light of your failure to conclusively state whether you do represent Mr. Greenberg in this matter, and that

Bradley A. Patterson
June 18, 2012
Page 3

you have authority to act on his behalf, not to mention Defendant Greenberg's continuing efforts to harass and defame Plaintiffs.

       Simply put, the position you have taken and the authorities you have cited are incorrect. Please do not hesitate to contact me if you have any questions.

                     Sincerely,

                     William C. Hearon